

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Case No. 1:14-CR-278-GBL |
| ) | |
| v. ) | Counts 1-53: Health Care Fraud |
| ) | (18 U.S.C. §§ 1347 & 2) |
| AMIR A. BAJOGHLI, ) | |
| ) | Counts 54-59: Aggravated Identity |
| Defendant. ) | Theft (18 U.S.C. §§ 1028A & 2) |
| ) | |
| ) | Count 60: Obstruction of Justice |
| ) | (18 U.S.C. §§ 1512(c)(2) & 2) |
| ) | |
| ) | Forfeiture Notice |

## INDICTMENT

August 2014 Term - at Alexandria, Virginia

### INTRODUCTORY ALLEGATIONS

THE GRAND JURY CHARGES THAT:

Unless otherwise noted, at all times material to this indictment:

I.  DEFENDANT'S MEDICAL PRACTICE

1. The defendant AMIR A. BAJOGHLI was a medical doctor practicing medicine as a dermatologist, that is, a physician specializing in diseases of the skin. The defendant was licensed to practice medicine in the Commonwealth of Virginia and the District of Columbia, and owned and operated a medical practice known as the Skin and Laser Surgery Center, which had offices in Stafford, Woodbridge, and Vienna, Virginia, all within the Eastern District of Virginia, and in Washington, D.C.

2. The defendant employed various types of individuals at his medical practice, including billing and administrative personnel, physician's assistants, nurse practitioners, and

numerous medical assistants. For periods of time, the defendant also employed additional medical doctors.

3. Physician's assistants and nurse practitioners were licensed professions in the Commonwealth of Virginia with specific educational and training requirements. There were no such requirements for medical assistants. Medical assistants were not a licensed profession in the Commonwealth of Virginia, and they were not permitted by the Virginia Board of Medicine to perform medical procedures.

4. The defendant's employees at the Skin and Laser Surgery Center were paid hourly wages or salaries that did not vary with the number of patients treated or the types of services rendered.

II. MOHS PROCEDURES

5. The defendant provided general dermatological services through his medical practice, including both medically necessary procedures and elective cosmetic procedures, and specialized in a surgical procedure known as Mohs micrographic surgery. The defendant was not a fellowship-trained Mohs surgeon.

6. Mohs surgery is a specialized surgical technique for the removal of skin cancer from healthy skin. Mohs surgery is generally performed on sensitive areas of the body, such as the head and neck, where preservation of healthy tissue and cosmetic appearance are particularly important.

7. Prior to the initiation of Mohs surgery, the presence of cancerous cells is confirmed by biopsy. There are two methods of preparing biopsy slides for microscopic examination: permanent sections and frozen sections. Permanent section biopsy slides are generally prepared by an off-site laboratory and take several days to prepare. Frozen section

biopsy slides may be prepared in a short period of time in the Mohs surgeon's in-house laboratory.

8.  After the presence of cancerous cells is confirmed by biopsy, Mohs surgery is done on an out-patient basis, with local anesthesia, and the removal of tissue is done in stages, one layer at a time, to minimize the amount of healthy tissue removed.

9.  Following the removal of each layer of tissue and while the patient waits, a frozen section Mohs slide of the removed tissue is prepared, and the Mohs surgeon microscopically examines the excised skin to determine whether cancerous cells appear at the margins of the removed tissue. Additional layers of skin are removed and examined until all cancerous cells have been eliminated and the margins of the excised tissue are clear.

10. Repair of the Mohs surgical site may involve complex suturing; the use of a flap closure, where skin adjacent to the wound is moved to cover it; and skin grafts, where healthy skin is completely removed from another site on the patient's body and sewn to patch the wound. The wound repairs are customarily performed immediately following the Mohs surgery, but may also occur days after the procedure at a follow-up office visit.

III. HEALTH CARE BENEFIT PROGRAMS

11. Medicare, Tricare, Blue Cross and Blue Shield Federal Employee Program ("BCBS FEP"), and Anthem Blue Cross and Blue Shield ("Anthem") were health care benefit programs as defined in Title 18; United States Code, Section 24(b), that is, they were public and private plans and contracts, affecting commerce, under which medical benefits, items, and services were provided to eligible individuals.

12. Medicare generally covered individuals who were at least sixty-five years old or disabled.

13. Tricare generally covered active and retired members of the military and their families.

14. The Centers for Medicare and Medicaid Services (CMS) was an agency of the United States Department of Health and Human Services and was responsible for the administration of Medicare.

## IV. HEALTH CARE BILLING

15. Medical providers and health care benefit programs utilized well-known and standard insurance processing codes to identify the service provider, the medical diagnoses, and the medical treatments or procedures rendered to a patient.

16. Each licensed medical provider, such as a physician, physician's assistant, or nurse practitioner, had a unique code called a National Provider Identifier, or NPI.

17. The numerical codes for medical diagnoses were published in the International Classification of Diseases, Ninth Revision, Clinical Modification. The codes were commonly referred to as ICD-9 Codes.

18. The numerical codes for medical procedures were called CPT codes and were published in the American Medical Association's Physicians' Current Procedural Terminology.

19. Medical providers commonly recorded diagnosis and procedure codes on a form referred to as a "superbill" during the course of the examination of a patient or the performance of a medical procedure.

20. The provider's NPI and the diagnosis and procedure codes were later recorded on a standard claim form known as the Centers for Medicare and Medicaid Services 1500 (CMS-1500) form, which the medical provider would send to the patient's health care benefit program, or the data from which the medical provider would submit electronically to the patient's health

care benefit program, for payment. Whether submitted in paper form or electronically, the health care benefit program would rely on such information in evaluating the claims for payment.

21. Means of identification of the patient, including the patient's name, date of birth, and insurance identification number, were included with the claims and communicated to the health care benefit programs in either paper form or electronically, and health care benefit programs relied on those means of identification to process and pay the claims.

22. When each claim was submitted for payment, either in paper form or electronically, the treating physician certified to the health care benefit program that (1) the services shown on the form were medically indicated and necessary for the health of the patient, and (2) were personally furnished by the physician or were furnished incident to the physician's professional service by the physician's employee under his immediate personal supervision.

23. Services were considered as incident to a physician's professional service if (1) they were rendered under the physician's immediate personal supervision by his employee, (2) they were an integral, although incidental part of a covered physician's service, (3) they were of kinds commonly furnished in physician's offices, and (4) the services of nonphysicians were included on the physician's bill.

24. The health care benefit programs relied on this certification, the NPI, the diagnosis codes, and the CPT codes, and only provided medical providers payment on claims if the services were medically reasonable and necessary and either personally furnished by the physician or under his immediate personal supervision.

25. Mohs surgery was deemed medically reasonable and necessary only if performed based on certain current, accepted diagnoses and indications. Health care benefit programs reimbursed separately for each stage of Mohs surgery.

## COUNTS 1 – 53

(Health Care Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

26. The Introductory Allegations are hereby realleged and incorporated by reference as though set forth in full herein.

27. From at least in or about January 2009 through at least in or about August 2012, within the Eastern District of Virginia and elsewhere, the defendant

## AMIR A. BAJOGHLI

did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by and under the custody and control of health care benefit programs, in connection with the delivery of health care benefits, items, and services.

It was part of the scheme and artifice to defraud that:

### *Fraudulent Billing for Mohs Surgery*

28. Mohs surgery was highly lucrative for the defendant, and he established a quota as to the number of Mohs surgeries he desired to perform on a particular day in the office.

29. The defendant routinely diagnosed benign tissue as skin cancer, informed patients they had skin cancer when they in fact did not, and performed unnecessary and invasive surgery on the patients' benign tissue — including, at times, multiple stages of Mohs surgery.

30. The defendant caused fraudulent claims to be submitted to health care benefit programs falsely stating the diagnosis codes associated with skin cancer and falsely certifying to the health care benefit programs that the surgical procedures were medically indicated and necessary for the health of the patients.

31. The defendant at times falsely diagnosed patients with skin cancer and performed the unnecessary and invasive Mohs surgery on benign tissue prior to analyzing a biopsy of the patient's lesion for the presence of cancerous cells.

32. The defendant also caused fraudulent claims to be submitted to health care benefit programs falsely billing for Mohs procedures and falsely stating the diagnosis codes associated with skin cancer, when in fact no Mohs surgery had actually been performed.

33. The defendant commonly prepared and caused to be prepared frozen section biopsy pathology reports for Mohs patients that were standard template reports and did not in fact contain actual details of his microscopic analysis of the patients' tissue.

34. The performance of Mohs surgery required the defendant to have in-house laboratories for the preparation of frozen section slides. The defendant employed unqualified and untrained technicians in these laboratories, which in one location doubled as the practice's lunch room, and the defendant directed his staff to improperly dispose of medical waste to save money.

### *Fraudulent Billing for Wound Repairs*

35. The defendant routinely directed his unlicensed and unqualified medical assistants to perform wound closures, including complex suturing, flaps, and skin grafts, on Mohs surgery patients at follow-up office visits, including when the defendant was seeing patients at a different office location from where the wound closure was being performed.

36. The defendant caused fraudulent claims to be submitted to health care benefit programs falsely certifying that the wound closures were personally furnished by the defendant or were furnished incident to the defendant's professional service by the defendant's employees under his immediate personal supervision.

37. The defendant also caused fraudulent claims to be submitted to health care benefit programs falsely stating CPT codes reflecting heightened levels of complexity for the wound closures, and resulting in higher payments to the defendant, when the wound closures were not in fact of heightened complexity — also known as "up-coding."

38. The defendant routinely left critical decisions, such as the type of wound closure, the number and type of sutures, and the location on the patient's body from which a skin graft would be taken, to the judgment of the unlicensed, unqualified, and unsupervised medical assistants performing the wound closures.

39. When confronted regarding his billing of medical procedures performed by medical assistants, the defendant falsely told his billing staff that he was not allowing medical assistants to perform medical procedures and that reports from patients regarding medical services rendered by medical assistants were not true.

40. When a medical assistant expressed concern about her competency to perform wound closures, the defendant provided sutures to the medical assistant to take home and practice on raw chicken.

***Fraudulent Billing for Medical Services Performed by Other Providers***

41. The physician's assistant and nurse practitioner employed by the defendant each had their own NPI, or billing number.

42. The physician's assistant and nurse practitioner were required to bill under their own NPIs unless the services they were providing were furnished incident to professional services rendered by the defendant and those services were rendered under the defendant's immediate personal supervision. A service could not be billed incident to professional services

rendered by the defendant if, among other things, the patient had never previously been treated by the defendant.

43. Health care benefit programs generally paid more for services billed under a physician's NPI than for the same services billed under the NPI of a physician's assistant or nurse practitioner.

44. The defendant caused fraudulent claims under his NPI to be submitted to health care benefit programs falsely certifying that medical services were personally furnished by the defendant or were furnished incident to the defendant's professional service by the defendant's employees under his immediate personal supervision, when the services were in fact rendered by the defendant's physician's assistant or nurse practitioner and were not incident to his professional services, and the defendant was at the time seeing patients at a different office location or was away from the practice.

45. When confronted about improperly billing under his NPI for services rendered by others, the defendant instructed his billing staff not to do anything about it.

### *Fraudulent Billing for Permanent Section Pathology Slides and Reports*

46. For the preparation of permanent section biopsy slides, the defendant caused biopsied tissue of his patients to be sent to a company in Ohio, which prepared the permanent section slides and sent them, at the defendant's direction, to a dermatopathologist in Connecticut.

47. The defendant had an arrangement with the Ohio company whereby the company billed Medicare directly for preparing the slides of Medicare beneficiaries. For non-Medicare patients, the defendant billed the patients' health care benefit programs and paid the Ohio company approximately $5 per slide.

48.     For a fee of approximately $10 per slide paid by the defendant, the dermatopathologist in Connecticut analyzed the slides, provided a diagnosis, and prepared a pathology report in the defendant's name, which the individual sent to the defendant at his medical practice in Virginia. The defendant and the dermatopathologist had an arrangement to use the defendant's name on the pathology reports so that the dermatopathologist could avoid the costs associated with purchasing malpractice insurance to cover the work.

49.     The defendant falsely represented to others that the pathology reports sent to him by the dermatopathologist in Connecticut were his work product and falsely claimed that he had analyzed the underlying permanent section slides in his office.

50.     The defendant fraudulently submitted claims to patients' health care benefit programs for preparing the permanent section slides and analyzing those slides, when he actually performed neither service. The defendant regularly billed the health care benefit programs $300 to $450 per slide, when he had paid the Ohio company and the dermatopathologist a total of approximately $15 per slide for actually rendering the services.

51.     For the biopsies of Medicare beneficiaries, Medicare was double-billed for the preparation of the permanent section biopsy slides.

*Executions of the Health Care Fraud Scheme*

52.     On or about the dates listed for each count below, within the Eastern District of Virginia and elsewhere, for the purpose of executing the aforementioned scheme and artifice, the defendant did knowingly and willfully submit and cause to be submitted the identified materially false and fraudulent claim to the specified health care benefit program:

| Count | Patient | Approx. Date of Service | Approx. Date Claim Submitted | Health Care Benefit Program | Fraud |
|---|---|---|---|---|---|
| 1 | F.F. | 6/1/2009 | 6/11/2009 | Medicare | Mohs |

| Count | Patient | Approx. Date of Service | Approx. Date Claim Submitted | Health Care Benefit Program | Fraud |
|---|---|---|---|---|---|
| 2 | L.B | 7/6/2009 | 7/14/2009 | Anthem | Mohs |
| 3 | D.B | 10/30/2009 | 11/2/2009 | Medicare | Mohs |
| 4 | D.B | 10/30/2009 | 11/2/2009 | Medicare | Mohs |
| 5 | D.B | 11/2/2009 | 11/30/2009 | Medicare | Mohs |
| 6 | S.W. | 12/4/2009 | 12/8/2009 | Medicare | Mohs |
| 7 | E.P. | 12/18/2009 | 12/21/2009 | Medicare | Mohs |
| 8 | M.B. | 2/15/2010 | 2/18/2010 | Medicare | Mohs |
| 9 | V.K | 4/15/2010 | 5/4/2010 | Medicare | Mohs |
| 10 | H.F. | 11/3/2009 | 9/1/2010 | Medicare | Mohs |
| 11 | P.B. | 4/9/2010 | 11/23/2010 | Medicare | Mohs |
| 12 | J.B. | 11/29/2010 | 12/9/2010 | Medicare | Mohs |
| 13 | R.A. | 2/28/2011 | 3/2/2011 | Medicare | Mohs |
| 14 | C.C. | 3/30/2011 | 6/10/2011 | Medicare | Mohs |
| 15 | J.C. | 6/22/2011 | 7/27/2011 | Medicare | Mohs |
| 16 | W.T. | 12/13/2011 | 12/21/2011 | Medicare | Mohs |
| 17 | W.T. | 12/21/2011 | 12/30/2011 | Medicare | Mohs |
| 18 | C.L. | 5/31/2012 | 6/7/2012 | Medicare | Wound Repair |
| 19 | A.C | 6/7/2012 | 6/13/2012 | Medicare | Wound Repair |
| 20 | G.P. | 6/7/2012 | 6/13/2012 | Medicare | Wound Repair |
| 21 | N.P. | 6/7/2012 | 6/13/2012 | Medicare | Wound Repair |
| 22 | J.C. | 6/21/2012 | 6/25/2012 | Medicare | Wound Repair |
| 23 | D.P. | 6/21/2012 | 6/25/2012 | Medicare | Wound Repair |
| 24 | K.S. | 6/21/2012 | 6/25/2012 | Tricare | Wound Repair |
| 25 | D.Z. | 6/21/2012 | 6/25/2012 | Medicare | Wound Repair |
| 26 | R.A. | 6/28/2012 | 7/6/2012 | Medicare | Wound Repair |
| 27 | W.B. | 6/28/2012 | 7/6/2012 | Medicare | Wound Repair |
| 28 | D.L. | 6/28/2012 | 7/6/2012 | Medicare | Wound Repair |
| 29 | R.S. | 6/28/2012 | 7/6/2012 | BCBS FEP | Wound Repair |

| Count | Patient | Approx. Date of Service | Approx. Date Claim Submitted | Health Care Benefit Program | Fraud |
|---|---|---|---|---|---|
| 30 | R.H. | 7/26/2012 | 7/31/2012 | Medicare | Wound Repair |
| 31 | M.B. | 8/7/2012 | 8/8/2012 | Medicare | Wound Repair |
| 32 | J.M. | 8/7/2012 | 8/8/2012 | Medicare | Wound Repair |
| 33 | S.P. | 1/9/2012 | 1/19/2012 | Tricare | NPI |
| 34 | R.M | 3/15/2012 | 3/21/2012 | Tricare | NPI |
| 35 | D.A. | 3/20/2012 | 3/27/2012 | Tricare | NPI |
| 36 | H.M. | 3/19/2012 | 3/27/2012 | BCBS FEP | NPI |
| 37 | P.R. | 3/20/2012 | 3/27/2012 | Tricare | NPI |
| 38 | V.C. | 4/17/2012 | 4/24/2012 | Tricare | NPI |
| 39 | P.B. | 4/18/2012 | 4/27/2012 | Tricare | NPI |
| 40 | W.M. | 4/11/2012 | 5/22/2012 | BCBS FEP | NPI |
| 41 | F.B. | 6/26/2012 | 7/6/2012 | BCBS FEP | NPI |
| 42 | S.J. | 7/5/2012 | 7/6/2012 | BCBS FEP | NPI |
| 43 | L.A. | 2/9/2012 | 2/21/2012 | Tricare | Pathology |
| 44 | R.J. | 2/7/2012 | 2/21/2012 | BCBS FEP | Pathology |
| 45 | V.M. | 3/8/2012 | 3/27/2012 | BCBS FEP | Pathology |
| 46 | G.S. | 3/19/2012 | 3/29/2012 | BCBS FEP | Pathology |
| 47 | P.J. | 3/30/2012 | 4/10/2012 | Tricare | Pathology |
| 48 | N.U. | 4/26/2012 | 5/8/2012 | Medicare | Pathology |
| 49 | D.H. | 5/1/2012 | 5/10/2012 | Medicare | Pathology |
| 50 | M.D. | 5/9/2012 | 5/22/2012 | Tricare | Pathology |
| 51 | B.L. | 5/8/2012 | 5/22/2012 | Medicare | Pathology |
| 52 | M.T | 5/14/2012 | 5/24/2012 | Tricare | Pathology |
| 53 | G.D. | 5/31/2012 | 6/13/2012 | Medicare | Pathology |

(In violation of Title 18, United States Code, Sections 1347 and 2.)

## COUNTS 54 – 59

(Aggravated Identity Theft)

THE GRAND JURY FURTHER CHARGES THAT:

53. The Introductory Allegations are hereby realleged and incorporated by reference as though set forth in full herein.

54. On or about the dates listed for each count below, within the Eastern District of Virginia and elsewhere, the defendant

### AMIR A. BAJOGHLI

did knowingly transfer, possess, and use without lawful authority a means of identification of another person, to wit: the name, date of birth, and insurance identification number of the individuals identified below, during and in relation to a violation of Title 18, United States Code, Section 1347, Health Care Fraud, as described in Counts 1 – 53 of the Indictment, in that the defendant caused the means of identification to be submitted to health care benefit programs as part of fraudulent claims for payment for services rendered with respect to those individuals:

| Count | Patient | Approx. Date Claim Submitted | Health Care Benefit Program |
|---|---|---|---|
| 54 | F.F. | 6/11/2009 | Medicare |
| 55 | H.F. | 9/1/2010 | Medicare |
| 56 | J.B. | 12/9/2010 | Medicare |
| 57 | K.S. | 6/25/2012 | Tricare |
| 58 | D.L. | 7/6/2012 | Medicare |
| 59 | R.H. | 7/31/2012 | Medicare |

(In violation of Title 18, United States Code, Sections 1028A and 2.)

## COUNT 60

(Obstruction of Justice)

THE GRAND JURY FURTHER CHARGES THAT:

55. The Introductory Allegations are hereby realleged and incorporated by reference as though set forth in full herein.

56. As part of the government's investigation of the defendant's billing for wound repairs performed by medical assistants, law enforcement agents sent questionnaires to patients of the defendant asking them, among other things, to provide information as to who was present during their wound repair procedures. After these questionnaires were sent out, many patients contacted the defendant's medical practice to inquire as to who had performed their wound closures.

57. In or about February 2013, within the Eastern District of Virginia and elsewhere, the defendant

## AMIR A. BAJOGHLI

did corruptly attempt to obstruct, influence, and impede an official proceeding, namely, (1) the investigation by federal law enforcement agencies, including the FBI and U.S. Department of Health and Human Services Office of the Inspector General, (2) the grand jury investigation pending in the Eastern District of Virginia, and (3) criminal prosecution through this indictment and court proceeding, by instructing his receptionist to tell inquiring patients that he had performed their wound closures, regardless of whether that was in fact true, when the defendant knew that the patients' inquiries related to the law enforcement questionnaires.

(In violation of Title 18, United States Code, Sections 1512(c)(2) and 2.)

## FORFEITURE NOTICE

58. Pursuant to Rule 32.2(a) Fed. R. Crim. P., the defendant AMIR A. BAJOGHLI is hereby notified that, if convicted of any of the offenses alleged in Counts 1 – 53 of the indictment, the defendant shall forfeit to the United States his interest in any property, real or personal, constituting or derived from proceeds obtained directly or indirectly as the result of the Count or Counts of conviction. If property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute property, including but not limited to the following:

    a.    A sum of money equal to at least $664,000 in United States currency, representing the amount of proceeds obtained as a result of the offenses;

    b.    Fidelity Investments account #X19-107115 in the name Amir Bajoghli; and,

    c.    Real property located at 7682 Ballestrade Court, McLean, Virginia.

(In accordance with Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853(p).)

A TRUE BILL Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

_____
FOREPERSON OF THE GRAND JURY

Dana J. Boente
United States Attorney

By: _____
Paul J. Nathanson
Assistant United States Attorney
Eastern District of Virginia
Counsel for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3981
Email: paul.nathanson@usdoj.gov

16