**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――――

No. 14-4798

―――――――――――

UNITED STATES OF AMERICA,

Plaintiff - Appellant.

v.

AMIR A. BAJOGHLI,

Defendant - Appellee.


―――――――――――

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Gerald Bruce Lee, District Judge.  (1:14-cr-00278-GBL-1)

―――――――――――

Argued:  March 25, 2015                Decided:  May 11, 2015

―――――――――――

Before NIEMEYER and FLOYD, Circuit Judges, and HAMILTON, Senior Circuit Judge.

―――――――――――

Reversed and remanded by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Floyd and Senior Judge Hamilton joined.

―――――――――――

**ARGUED:** Paul Nathanson, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellant.  Peter Hugh White, SCHULTE ROTH & ZABEL LLP, Washington, D.C., for Appellee.  **ON BRIEF:** Dana J. Boente, United States Attorney, Matthew Burke, Assistant United States Attorney, Katherine L. Wong, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellant.  Joe Robert Caldwell, Jr.,

BAKER BOTTS LLP, Washington, D.C.; Kirk Ogrosky, Murad Hussain,
ARNOLD & PORTER LLP, Washington, D.C., for Appellee.

---

NIEMEYER, Circuit Judge:

Dr. Amir Bajoghli, a board-certified dermatologist, was indicted for executing a "scheme or artifice to defraud" when billing public and private healthcare benefit programs during the period from January 2009 through August 2012, in violation of 18 U.S.C. § 1347, and for related offenses. The indictment set forth, in 53 of its 60 counts, particular "executions" of the fraudulent scheme.

On September 30, 2014, several weeks before the scheduled trial date of October 22, 2014, Bajoghli filed a motion to strike as unduly prejudicial certain financial details alleged in Paragraph 50 of the indictment; on October 13, he filed a motion in limine to exclude evidence of post-scheme conduct that the government intended to introduce to show his consciousness of guilt; and on October 20, he filed a motion in limine to exclude all evidence of the scheme that was not directly related to one of the 53 specifically charged executions. The district court granted all three motions, the latter two on the day before the trial was scheduled to begin. On the same day, the government filed this interlocutory appeal, pursuant to 18 U.S.C. § 3731, challenging the rulings.

Because we conclude that the district court's rulings unduly restricted the latitude reasonably necessary for the government to carry its burden of proof, we reverse and remand.

3

I

Bajoghli is the owner of the Skin and Laser Surgery Center, a medical practice that operates from three offices in Virginia and one in Washington, D.C., and that specializes in skin diseases and the performance of Mohs micrographic surgery. According to the indictment, Mohs surgery is a "highly lucrative," "specialized surgical technique for the removal of skin cancer from healthy skin" that is "generally performed on sensitive areas of the body, such as the head and neck, where preservation of healthy tissue and cosmetic appearance are particularly important."

On August 12, 2014, the grand jury returned a 60-count indictment against Bajoghli, charging: 53 counts of healthcare fraud, in violation of 18 U.S.C. § 1347; 6 counts of aggravated identity theft committed in connection with the scheme to defraud, in violation of 18 U.S.C. § 1028A; and 1 count of obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2). The indictment alleged that over a three-and-one-half year period -- from January 2009 through August 2012 -- Bajoghli "knowingly and willfully execute[d] . . . a scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses, . . . money owned by and under the custody and control of health care benefit programs, in connection with

4

the delivery of health care benefits, items, and services." More particularly, seventeen counts alleged executions of the scheme in which Bajoghli routinely diagnosed patients with skin cancer, even though they did not, in fact, have cancer, and then performed the medically unnecessary Mohs surgery on benign tissue. Fifteen counts alleged executions of the scheme in which Bajoghli directed "unlicensed and unqualified medical assistants" to perform wound closures on the Mohs surgery patients and then billed the healthcare benefit programs as if he personally had performed or supervised the closures, thereby claiming more money than he was entitled to under the reimbursement schedule. Ten counts alleged executions of the scheme in which Bajoghli billed for services that he claimed he had personally performed when, in fact, they had been performed by non-doctors, again allowing him to claim a higher reimbursement than he would have been allowed to claim had he disclosed that non-doctors had performed the services. And eleven counts alleged executions in which Bajoghli submitted bills "for preparing and analyzing [skin pathology] slides" when, in fact, he had personally performed neither service, but instead had hired outside contractors to perform the services at a cost far below the amount he claimed from the programs.

Bajoghli filed three pretrial motions to limit the government's evidence against him at trial:  the September 30

motion to strike allegations of certain financial details from Paragraph 50 of the indictment; the October 13 motion _in limine_ to exclude evidence of post-scheme conduct, which the government planned to introduce to show consciousness of guilt; and the October 20 motion _in limine_ to exclude any evidence that was not directly related to one of the 53 executions specifically charged in the indictment.

In the September 30 motion, Bajoghli sought to strike from Paragraph 50 the allegation that he "regularly billed the health care benefit programs $300 to $450 per slide." Paragraph 50 alleged in full:

> The defendant fraudulently submitted claims to patients' health care benefit programs for preparing the permanent section slides and analyzing those slides, when he actually performed neither service. The defendant regularly billed the health care benefit programs $300 to $450 per slide, when he had paid the Ohio company and the dermatopathologist a total of approximately $15 per slide for actually rendering the services.

(Emphasis added). Because healthcare benefit programs reimburse physicians at a predetermined rate, Bajoghli claimed that evidence of what he billed would be unfairly prejudicial because those amounts did not represent what he actually expected to receive from the programs. The district court granted Bajoghli's motion and, in doing so, also excluded, _sua sponte_, any evidence of "the fees or payments Defendant allegedly made to outside sources to perform" these services -- that is, the

6

$15 per slide paid to outside contractors. The court stated that the government could introduce evidence to prove that Bajoghli "would have been paid less (or not at all) had the claims not been materially false," but that it could not state the specific dollar amounts.

In the October 13 motion, Bajoghli sought to exclude evidence of actions that he had taken after the charged scheme had ended, which the government planned to introduce at trial to show his consciousness of guilt. The government intended to show that after Bajoghli was interviewed by law enforcement, (1) he immediately stopped sending pathology slides to outside contractors; (2) he stopped performing Mohs surgery without a supporting biopsy; and (3) he deleted scheduling data for past wound repairs that were performed by medical assistants. Bajoghli argued that this evidence was irrelevant; that it was evidence of subsequent remedial measures, which is barred by Federal Rule of Evidence 407; and that, if admitted at trial, it would be unfairly prejudicial, in violation of Federal Rule of Evidence 403. The district court did not rule on this motion until it ruled on the October 20 motion.

In the October 20 motion, Bajoghli sought to exclude "volumes of irrelevant, uncharged misconduct" evidence, as he characterized it, that related to his fraudulent conduct during the three-and-one-half year period of the scheme but that was

not directly tied to any of the 53 charged executions.  He argued that because this evidence was not directly relevant to any of the 53 charged counts, it was therefore improper "[p]ropensity evidence" offered only to show the defendant's bad character, in violation of Federal Rule of Evidence 404(b).  He also argued that by waiting until so close to the date of trial to give him notice of its intent to introduce this evidence, the government failed to comply with the notice requirement of Federal Rule of Evidence 404(b)(2).

On October 21, the day before the scheduled trial date, the district court issued an order granting both the October 13 and October 20 motions.  In doing so, the court ruled, without explanation, that "[a]ll testimony is . . . limited to the 53 charges in the indictment," thus excluding evidence of Bajoghli's uncharged conduct.  And in excluding evidence of the defendant's post-scheme conduct, it gave as reasons that the government had not provided adequate notice of its intent to introduce this "prior 'bad act' evidence," as required by Federal Rule of Evidence 404(b)(2), and, in any event, that the evidence would be excluded under Federal Rule of Evidence 403, as "the probative value of [the post-scheme] evidence is substantially outweighed by the danger of unfair prejudice."

The government filed this interlocutory appeal, seeking review of the district court's pretrial evidentiary rulings.

8

II

The government first challenges the district court's ruling limiting "[a]ll testimony . . . to the 53 charges of the indictment" and thus excluding evidence of Bajoghli's uncharged conduct in furtherance of the scheme during the three-and-one-half year period.  It notes that this ruling is especially debilitating because Bajoghli's criminal intent is hotly contested in this case, and it therefore contends that it needs to rebut the defense that the charged transactions were "isolated mistakes" by demonstrating that it did not merely "cherry pick" aberrant transactions.  As it argues, it must be able to prove the entire scheme, including Bajoghli's intentional and willful conduct in executing it.  Such a burden, it maintains, requires that it be allowed to introduce evidence that, although perhaps not directly related to any of the 53 executions charged, is nonetheless relevant to proving the scheme itself.  The government warns that if it were not able to offer evidence of uncharged executions in proving the scheme, it would have to charge hundreds, if not thousands, of counts in every large-scale healthcare-fraud case, such as this one.

Bajoghli maintains that the district court correctly concluded that the evidence at trial must relate to one of the specifically charged executions of the fraudulent scheme and that "evidence of an uncharged fraudulent scheme should not be

admitted." He asserts that the government's brief paints with too broad a brush, ignoring the 53 specific and discrete charges it brought under § 1347. As he argues, "the evidence at trial must relate to a specific allegation of fraud that the jury will have to consider." Because, as he contends, any evidence of uncharged conduct would be only "loosely relevant" to the charged executions, the evidence should be excluded under Rule 403 as unfairly prejudicial and under Rule 404(b), including Rule 404(b)(2)'s notice requirement, as "other acts" evidence.

The scope of relevant evidence at trial is, of course, dictated by the indictment. In this case, however, Bajoghli's position reveals a misunderstanding of the nature of the charges in the indictment and the scope of proof that is relevant.

Section 1347 punishes "[w]hoever knowingly and willfully executes . . . a scheme . . . to defraud any health care benefit program" when delivering healthcare services. 18 U.S.C. § 1347(a)(1) (emphasis added). A "scheme to defraud" is thus an element of the offense. See United States v. McLean, 715 F.3d 129, 137-38 (4th Cir. 2013) ("To sustain a conviction under 18 U.S.C. § 1347, the government [is] required to prove beyond a reasonable doubt that [the defendant] knowingly and willfully executed a scheme to defraud insurers by billing for medically unnecessary procedures" (emphasis added)). While fraud can be

committed simply by engaging in an isolated transaction, a scheme to defraud requires a plot, plan, or arrangement that is executed by a fraudulent transaction. See Black's Law Dictionary 1546 (10th ed. 2014) (defining "scheme" as "[a] systemic plan; a connected or orderly arrangement"; or "[a]n artful plot or plan, [usually] to deceive others").

In this case, the scheme alleged in the indictment is described as encompassing four types of conduct, beginning in January 2009 and continuing through August 2012.  And although the indictment charged only 53 "executions" of the scheme in 53 separate counts, it also alleged that each particular execution was "part of the scheme and artifice to defraud." Thus, the indictment charged that "for the purpose of executing the aforementioned scheme and artifice," described earlier to have lasted from January 2009 through August 2012, the defendant engaged in the particularly described fraudulent transactions. (Emphasis added).  Because a scheme is an element of a § 1347 offense and because the specifically alleged three-and-one-half year scheme is made part of each execution, evidence of the entire scheme is relevant to proving each particular execution.

It is important to recognize that just as all the overt acts of a conspiracy need not be charged in an indictment, see United States v. Janati, 374 F.3d 263, 270 (4th Cir. 2004) ("It is well established that when seeking to prove a conspiracy, the

government is permitted to present evidence of acts committed in furtherance of the conspiracy even though they are not all specifically described in the indictment"), all executions of a scheme likewise need not be charged, see United States v. Pless, 79 F.3d 1217, 1220 (D.C. Cir. 1996) ("That the government chose to charge as the execution of the scheme only the three deposits in National [Bank] does not reduce the boundaries of the scheme, which the statute requires the government to prove. . . . [I]t is not necessary for the government to charge every single act of execution of the scheme in order to prove the whole scheme"). Nonetheless, evidence of transactions and conduct not charged is relevant to proving the existence of and the boundaries of the conspiracy or scheme.  See Janati, 374 F.3d at 275 ("[T]he government has the right and the burden to prove in its case-in-chief a conspiracy broader than the individual overt acts alleged [and] therefore the district court must give the government a reasonable opportunity to carry this burden"); Pless, 79 F.3d at 1220 ("[T]he government is [not] artificially limited to presenting to the jury only that portion of the scheme that directly related to [the charged executions]").  A scheme and a conspiracy thus are, for these purposes, similar concepts.  See United States v. Lothian, 976 F.2d 1257, 1262 (9th Cir. 1992) ("Because an essential element of these offenses is a fraudulent scheme, mail and wire fraud are treated like

12

conspiracy in several respects"); United States v. Read, 658 F.2d 1225, 1239 (7th Cir. 1981) ("A scheme to defraud and conspiracy embrace analogous, but not identical, concepts"); United States v. O'Connor, 580 F.2d 38, 41-42 (2d Cir. 1978) (equating "a continuing scheme" with a conspiracy); SEC v. Nat'l Bankers Life Ins. Co., 324 F. Supp. 189, 195 (N.D. Tex. 1971) (describing "the possibility of reading 'scheme' as synonymous with a conspiracy" in a federal securities statute). We therefore conclude that when the government charges a defendant under § 1347 with a scheme to defraud and elects to charge only some of the executions of that scheme, its election does not limit its proof to only the charged executions. It may introduce other evidence of uncharged executions to prove the scheme.

To be sure, a district court still retains broad-ranging discretion to manage trials and limit proof that is, for instance, overly duplicative. But, as we noted in Janati, its discretion must be balanced by the need to give the government adequate latitude to prove its case, especially in a large and complex healthcare-fraud case where the defendant's criminal intent is placed at issue. See 374 F.3d at 273-74. We conclude that, in this case, the district court abused its discretion in failing to give the government sufficient latitude to carry its burden of proof.

13

In addition, it follows that because evidence of conduct not charged in a specific execution may be relevant to the nature and scope of a scheme charged under § 1347, such evidence is intrinsic to the "scheme" element, and Rule 404(b) therefore does not, as Bajoghli argues, regulate it as "other bad acts" evidence. See Unites States v. Grimmond, 137 F.3d 823, 832 (4th Cir. 1998) ("[W]hen 'other crimes, wrongs, or acts' evidence is relevant to establishing an element of the offense, Rule 404(b) is not even implicated").

In sum, we conclude that the district court abused its discretion in limiting the government's proof to that which is directly relevant to one or more of the 53 executions charged in the indictment, without taking into account the relevance of uncharged conduct to the alleged overarching scheme. The government has the burden of proving a scheme to defraud and Bajoghli's knowing and willful conduct in executing the scheme. And to that end, it must be allowed to offer evidence probative of these elements, even if that evidence is not directly related to one of the 53 executions.

### III

The government next challenges the district court's ruling to exclude evidence of the defendant's post-scheme conduct. It seeks to introduce evidence (1) that "after being interviewed by

14

law enforcement, [Bajoghli] immediately stopped sending pathology slides" to outside contractors; (2) that after his interview, "the defendant stopped performing Mohs surgery without a biopsy"; and (3) that the defendant "delet[ed] scheduling data for the past wound repairs that were performed by medical assistants." The district court considered this evidence to be "prior 'bad act' evidence" governed by Rule 404(b) and excluded it on the ground that the government had not provided Bajoghli with adequate notice, as required by Rule 404(b)(2).[*] Moreover, the court excluded this evidence under Rule 403, concluding that its probative value was "substantially outweighed by the danger of unfair prejudice . . . , confusing the jury . . . , and waste of judicial resources." The government argues that the district court erred in applying Rule 404(b) because the evidence is intrinsic to the charged crimes; that is, it "bear[s] directly on the defendant's intent as to the charged fraud (not some other crime) and [is]

---

[*] Even if Rule 404(b) were to apply, it is difficult to understand how the government had not provided adequate notice to Bajoghli. Bajoghli's motion to exclude evidence of his post-scheme conduct admitted as much, stating, "The government has indicated that they plan to introduce evidence of changes in procedures and practices in [his] offices after he became aware that he was under criminal investigation, presumably to demonstrate that the prior practices were illegal." Moreover, in his motion to exclude this evidence, Bajoghli did not raise a lack of notice as a ground for exclusion.

inextricably intertwined with how he committed the fraud and his efforts to conceal it once he learned [of the] investigation."

Bajoghli contends that Rule 404(b) does apply to this evidence because, as he argued with respect to the evidence of his uncharged conduct, it would not be "tied to any one of the 53 narrowly defined executions of healthcare fraud" and thus would not be "intrinsic" to the charged offenses. More particularly, he contends that "evidence of remedial measures," as a matter of law, "cannot be 'intrinsic' to any of [the charged] offenses" because the remedial measures all occurred after the period of time noted in the indictment as encompassing the alleged fraudulent scheme. In addition, he contends that its admission would be unfairly prejudicial under Rule 403, parroting the district court's conclusion.

Again, we agree with the government. As the government points out, it intends to offer evidence of Bajoghli's post-scheme conduct to prove his knowledge and intent to defraud, as is required by § 1347. For instance, that Bajoghli stopped sending pathology slides to outside contractors after he learned he was under investigation, but <u>before federal agents had even become aware of this practice</u> -- as the government represents -- would tend to prove Bajoghli's fraudulent intent and guilty knowledge with respect to this aspect of the scheme. Similarly, the government notes that Bajoghli "intends to challenge [the

16

charge of fraudulent Mohs surgeries] by asserting that he exercised reasonable medical judgment in performing Mohs surgeries and that any errors were the product of innocent . . . mistakes." Thus, it reasons, evidence that Bajoghli stopped his practice of performing Mohs surgeries without first reviewing biopsies once he learned of the investigation would tend to show that he knew the accepted standard of care for diagnosing skin cancer and had deliberately chosen to disregard it. And finally, as the government notes, evidence that Bajoghli deleted scheduling data from his computers -- data that revealed who had actually performed wound-repair procedures -- would tend to refute his claim that this aspect of the fraud resulted from honest billing mistakes. Cf. McLean, 715 F.3d at 139 (concluding that evidence that the defendant "attempted to shred patient files subpoenaed" by the government was probative that the defendant knew he "had something to hide"). The proffered evidence therefore would be probative to prove knowledge and intent, which are elements of the crimes charged in the indictment. And because Rule 404(b) does not apply to conduct that is intrinsic to the charged crime, the district court erred in applying the rule to this evidence. See United States v. Basham, 561 F.3d 302, 326 (4th Cir. 2009) ("The Rule 404(b) inquiry . . . applies only to evidence of other acts that are

'extrinsic to the one charged'" (quoting United States v. Chin, 83 F.3d 83, 87 (4th Cir. 1996))).

Bajoghli nonetheless argues that his post-scheme conduct cannot be intrinsic to the charged offenses because it took place after the end of the period of activity charged in the indictment. But it simply does not follow that conduct that takes place after the end of the period of activity charged in the indictment is -- as a matter of law -- subject to the requirements of Rule 404(b). In fact, our case law demonstrates that simply because a defendant's conduct takes place outside the time frame of the activities charged in the indictment does not, as Bajoghli argues, automatically render that conduct extrinsic to the charged offense and therefore subject to Rule 404(b). See United States v. Kennedy, 32 F.3d 876, 885 (4th Cir. 1994) ("The basic flaw in [the defendant's] argument is that . . . [it] erroneously assumes that all evidence falling outside the charged conspiracy period necessarily involves a separate, unrelated offense subject to the strictures of [Rule 404(b)]. It is well-established, however, that the mere fact that the evidence involved activities occurring before the charged time frame of the conspiracy does not automatically transform that evidence into 'other crimes' evidence"). Instead, conduct that takes place outside the time frame of the charged offense can avoid having to comply with the requirements

18

of Rule 404(b) where it is, inter alia, "relevant to establishing an element of the offense." Grimmond, 137 F.3d at 831-32. And, as we concluded above, Bajoghli's post-scheme conduct is relevant to proving his fraudulent intent and guilty knowledge.

The district court's additional ruling -- that Rule 403 requires exclusion of the evidence because its probative value is substantially outweighed by the danger of unfair prejudice and other concerns -- reflects a misunderstanding of what constitutes unfair prejudice under Rule 403. Once it is recognized that evidence is probative of an element of the crime charged, "the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly." United States v. Aramony, 88 F.3d 1369, 1378 (4th Cir. 1996); see also United States v. Siegel, 536 F.3d 306, 319-20 (4th Cir. 2008). And in this context, unfair prejudice "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Basham, 561 F.3d at 327 (emphasis added) (quoting Old Chief v. United States, 519 U.S. 172, 180 (1997)) (internal quotation marks omitted). Neither Bajoghli nor the district court has identified any ground that would support a finding of guilt different from proof that is specific to the offense charged.

19

Because the district court misapplied Rule 404(b) and Rule 403 in excluding evidence of Bajoghli's post-scheme conduct, it abused its discretion.

V

Finally, the government challenges the district court's ruling to exclude evidence that, despite receiving between $100 and $130 per slide from healthcare benefit programs based on his claim that he both prepared and analyzed his patients' pathology slides himself, Bajoghli paid outside contractors only $15 per slide to perform those tasks. The government contends that evidence of financial gain "is critical in a fraud case to establish a defendant's intent to defraud." It argues that the arrangement between Bajoghli and the outside contractors is "part and parcel of proving this aspect of the fraud" and that "an essential part of this arrangement was the amount that the defendant paid them." According to the government, "[t]he substantial disparity between the amount that the defendant received, and what he paid" can only "underscore[] [Bajoghli's] motive for this intentional deception."

Bajoghli contends that evidence of what he paid the outside contractors is irrelevant, and thus he urges us to affirm the district court's ruling to exclude it. According to Bajoghli, "this case is about billing and whether or not the billing was

20

false." Because "[a]ny amounts paid to outside contractors were not part of the alleged misrepresentations in bills submitted to insurers," those amounts, he argues, "were not material to the charged offenses of executing healthcare fraud schemes by submitting false claims."

We agree with the government. Because a violation of the healthcare fraud statute requires knowing and willful conduct, see 18 U.S.C. § 1347(a), the government must establish Bajoghli's intent to defraud. United States v. Godwin, 272 F.3d 659, 666 (4th Cir. 2001). And evidence of financial gain is particularly probative in a fraud case to establish the defendant's intent to defraud. See, e.g., United States v. Beverly, 284 F. App'x 36, 40 (4th Cir. 2008) (per curiam); accord United States v. Davis, 490 F.3d 541, 549 (6th Cir. 2007); United States v. Dearing, 504 F.3d 897, 901 (9th Cir. 2007) (endorsing the Sixth Circuit's declaration in Davis that evidence of profits can serve as indirect proof of one's intent to defraud); United States v. Wheeler, 889 F. Supp. 2d 64, 68 (D.D.C. 2012) ("In a § 1347 [healthcare-fraud] case, 'intent [to defraud] can be inferred . . . from profits'" (quoting Dearing, 504 F.3d at 901)).

Moreover, the district court's ruling allowing the government to introduce evidence that the defendant "would have been paid less (or not at all) had the claims not been

21

materially false" simply does not allow the government to present its case with sufficient detail and narrative.  Cf. Old Chief, 519 U.S. at 183 (recognizing "the offering party's need for evidentiary richness and narrative integrity in presenting a case").

We conclude, accordingly, that the district court abused its discretion in excluding this evidence.

REVERSED AND REMANDED