```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE
                   EASTERN DISTRICT OF VIRGINIA
 2                      Alexandria Division

 3   UNITED STATES OF AMERICA,      )
                                    )
 4                  Plaintiff,      )
                                    )  Crim. No. 1:14cr278
 5       vs.                        )
                                    )
 6   AMIR A. BAJOGHLI,              )  November 17, 2015
                                    )
 7                  Defendant.      )
     _____    )
 8

 9                          JURY TRIAL

10        ** EXCERPT:  TESTIMONY OF MICHAEL PALIAN**

11

12   BEFORE:      THE HONORABLE GERALD BRUCE LEE
                  UNITED STATES DISTRICT JUDGE
13

14   APPEARANCES:

15   FOR PLAINTIFF:  UNITED STATES ATTORNEY'S OFFICE
                     BY:  PAUL NATHANSON, AUSA
16                        KATHERINE WONG, AUSA
                          MATTHEW BURKE, AUSA
17
     FOR DEFENDANT:  SCHULTE ROTH & ZABEL
18                   BY:  PETER H. WHITE, ESQ.
                     ARNOLD & PORTER
19                   BY:  KIRK OGROSKY, ESQ.
                          MURAD HUSSAIN, ESQ.
20                        NICHOLAS DINGELDEIN, ESQ.

21                          ---

22   OFFICIAL COURT REPORTER:

23                   RENECIA A. SMITH-WILSON, RMR, CRR
                     U.S. District Court
24                   401 Courthouse Square, 5th Floor
                     Alexandria, VA 22314
25                   (703)501-1580
```

 1            (Thereupon, the following was heard in open

 2   court at 10:02 a.m.)

 3            THE CLERK:  1:14 criminal 278, United States

 4   versus Amir A. Bajoghli.

 5            MR. NATHANSON:  Good morning again, Your

 6   Honor.  For the United States, Paul Nathanson, Katherine

 7   Wong, Matthew Burke, Special Agent Mike Palian and Keeley

 8   Sandvig.

 9            MR. WHITE:  Good morning, Your Honor.  Peter

10   White for Dr. Bajoghli who is present.  With me at

11   counsel table right now is Kirk Ogrosky.  Nicholas

12   Dingeldein and Murad Hussain will be joining us shortly,

13   but we certainly don't need to wait for them.

14            THE COURT:  That's fine.

15            Good morning, Dr. Bajoghli.

16            Good morning, counsel.  Ready to bring the

17   jury out?

18            MR. NATHANSON:  Your Honor, there was just

19   one really quick issue.  You had asked -- there was an

20   objection yesterday to, I think, Government's

21   Exhibit 123-1 -- I'm sorry, 123 which was a description

22   of medical assistant Tanya Milan's duties.

23            THE COURT:  Yes.

24            MR. NATHANSON:  And there was question as to

25   whether there was actually testimony about Ms. Milan's

1    conducting wound repairs.

2           We have collectively reviewed our notes last

3    night and have identified testimony by medical

4    assistants, Roma Zekria and also Marina Yemdin to the

5    effect that Ms. Milan was one of the --

6           THE COURT:  Roma, what's the last name?

7           MR. NATHANSON:  Zekria, Z-E-K-R-I-A.  And she

8    testified -- I believe she testified to this, Your Honor,

9    on Thursday, October 29th.

10          THE COURT:  Okay.

11          MR. NATHANSON:  And then Marina Yemdin,

12   Y-E-M-D-I-N, I believe.  And, in our notes, she also

13   identified Ms. Milan as one of the people --

14          THE COURT:  Did she testify on the same day,

15   October 29th?

16          MR. NATHANSON:  Your Honor, I believe she

17   testified on Tuesday, November 10th.  She may have

18   started on Monday, November 9th, Your Honor, after -- I

19   don't know if she started after the defense expert or

20   not.

21          THE COURT:  Yeah, she started on the 9th, and

22   10th.

23          MR. NATHANSON:  I think it's the 10th, Your

24   Honor, that she testified to this.  And I can -- I

25   discussed this with Mr. White this morning.  I don't

1    think he has any recollection to the contrary, but I just

2    wanted to put on the record that this is before the jury

3    and there are percipient witnesses who have identified

4    Ms. Milan as one of the medical assistants who was doing

5    this.

6            MR. WHITE:  Your Honor, I don't disagree with

7    Mr. Nathanson's recollection.  Mine is the same after

8    looking at my notes.  She was identified as someone who

9    did wound closures.

10           I've two objections.  I have an objection to

11   this on two separate grounds.  One is she's not testified

12   as a witness here, so I think it's -- it's confusing and

13   irrelevant also because she has not been identified.

14           As a matter of fact, they've identified who

15   did the wound closures for all of these, and I believe it

16   was Ms. Yemdin.  None of the wound closures at issue

17   were -- here were done by Tanya Milan.  So that's my

18   objection to that piece, its relevance.

19           THE COURT:  All right.

20           MR. NATHANSON:  Your Honor, I'm not sure we

21   know precisely who did the wound repairs that are charged

22   in this case.  Our evidence, we believe, shows that it

23   was a medical assistant, and it was not Dr. Bajoghli.

24           But Ms. Yemdin's testimony was that she

25   didn't -- she thought she might have done them.  She

1    didn't know.  So we need to prove up that there were

2    other medical assistants doing them.  Certainly part of

3    the fraud scheme is that there were a series of medical

4    assistants who were doing unsupervised wound repairs.

5              The fact that Ms. Milan hasn't testified

6    doesn't matter because there are witnesses who personally

7    observed Ms. Milan do the repairs, and they've testified

8    about that.

9              THE COURT:  So why do you need the statement?

10             MR. NATHANSON:  Because they are false

11   statements by the defendant as to what these medical

12   assistants were doing.  These are very probative, Your

13   Honor.  These are --

14             THE COURT:  I saw what they were.  It was a

15   summary of someone's statement.  I don't know who

16   produced it.  I don't know how the FBI got it.  So that

17   wasn't -- no foundation was laid for that.

18             MR. NATHANSON:  I'm sorry.  I thought I had

19   it, and I can reiterate.  We have a stipulation with the

20   defense that these are documents that Dr. Bajoghli

21   provided to the Virginia Department of Health

22   Professionals.  So these are statements of the defendant

23   regarding matters that are at issue in this case.  And we

24   submit, Your Honor, that these are false statements

25   because he's telling --

```
 1              THE COURT:  I'm just focused on the issue
 2    they are statements of him that he made that are relevant
 3    to the case so they would be admissions, wouldn't they?
 4              MR. NATHANSON:  Yes, Your Honor, absolutely.
 5              THE COURT:  Then they will be admitted.  129
 6    will be received.
 7              MR. NATHANSON:  123 and --
 8              THE COURT:  123 and 129?
 9              MR. NATHANSON:  123 and 123-1.  I believe
10    they're actually admitted yesterday, but we appreciate
11    that for the Court's clarification.
12              THE COURT:  Just one second.
13              123-1 was admitted.  123 was not.  Now, 123
14    is being admitted.
15              MR. NATHANSON:  Thank you, Your Honor.
16    Appreciate that.
17              THE COURT:  Number 123-1 was admitted, right?
18              All right.  You can bring our jury out.
19    Thank you.
20              MR. NATHANSON:  Your Honor, should the
21    witness take the stand?
22              THE COURT:  Yes, that's fine.
23              You may be seated.
24              Good morning, ladies and gentlemen.
25              THE JURORS:  Good morning.
```

```
 1                THE COURT:  Good morning, Dr. Bajoghli.

 2                DR BAJOGHLI:  Good morning.

 3                THE COURT:  Good morning, Agent.

 4                THE WITNESS: Good morning, sir.

 5                THE COURT:  Ready to proceed?

 6                MR. NATHANSON:  Thank you, Your Honor.

 7                DIRECT EXAMINATION CONTINUED

 8   BY MR. NATHANSON:

 9       Q.  Good morning, Special Agent Palian.

10       A.  Good morning, Mr. Nathanson.

11       Q.  I want to return first, Special Agent Palian, to

12   some of the documents you were discussing as part of your

13   testimony yesterday.

14            Do you have Government's Exhibits 123 and 123-1 in

15   front of you?

16       A.  Yes, I do.

17       Q.  And are these documents that the defendant

18   provided to the Virginia Department of Health

19   Professionals?

20       A.  Yes, they are.

21       Q.  Let's put up first Government's Exhibit 123,

22   please, which is in evidence.

23            And Special Agent Palian, what medical assistant

24   is identified on Government's Exhibit 123?

25       A.  Tanya Milan is identified in that exhibit.
```

1     Q.   And what is the subject matter of the bottom half
2   of this document regarding medical assistant Tanya Milan?
3     A.   The subject matter is that the MA understands that
4   her role was purely assisting in wound repairs and then
5   goes into several things that the MA does and does not do
6   during wound repairs.
7     Q.   Okay.  So, if you could just walk through for the
8   jury, what does it state under the statement that the MA
9   understands her role is purely assisting with the
10  closures.
11    A.   Sure, it says here "the MA understands her role is
12  purely assisting with the closures and A, does not make
13  any medical decisions.
14        "B, does not render any professional judgment" --
15  I'm sorry, "does not render professional judgment.
16        "C, does not decide whether a defect is closed or
17  allowed to heal in by second intention.  This decision is
18  always made by the physician.
19        "D, does not decide on the choice of sutures and
20  always asks the physician for the exact specifications of
21  the sutures, although she has complete knowledge of the
22  sutures.
23        "E, does not make any decisions on the way the
24  defect is closed and always follows the physician's
25  instructions.

1          "F, any and all questions will be discussed with

2     the physician including any concerns a patient may have."

3          Q.   Okay.  Now, if -- do you have 123-1 in front of

4     you as well?

5          A.   I do.

6          Q.   And is this a similar document for another medical

7     assistant?

8          A.   Yes, it is.

9          Q.   And which medical assistant does this document

10     relate to?

11          A.   This document relates to Marina Yemdin.

12          Q.   And just focusing on the second half of the

13     document, I don't want to have you read it, Special Agent

14     Palian, but just does this basically have the same -- the

15     same information regarding Ms. Yemdin's role in

16     performing wound repairs?

17          A.   Yes, it has the same information in that she's

18     purely assisting with the closures.

19          Q.   I think you can go ahead and put that one down.  I

20     want to turn your attention now, Special Agent Palian, to

21     Government's Exhibit 116 which is already in evidence and

22     this is the document that you were testifying about when

23     we hit the 5 o'clock -- the 5 o'clock limit there

24     yesterday.

25          And I believe you testified that this is -- this

1   is claims data from the EDI Gateway, the electronic data

2   provider that the defendant's practice used; is that

3   correct?

4       A.   That's correct.

5       Q.   And I believe you testified that these were --

6   well, let me ask you.  So I think you already testified

7   about all of these columns up to through the submission

8   of date of service start.  And last thing I want to ask

9   you about was the procedure code on these.

10           What does it mean by procedure code as far as the

11  claim data is concerned?

12      A.   So procedure codes also referred to as CPT codes

13  and that's a five digit code for the procedure that was

14  performed on that patient on that day.

15      Q.   And does this identify the Mohs surgery codes for

16  these patients?

17      A.   Yes, these were all Mohs surgery codes.

18      Q.   Thank you.  You can go ahead and put that one

19  aside.

20           Now, did you also excerpt some claims data from

21  the defendant's Metasoft program?

22      A.   Yes, I did.

23      Q.   And, I'd like, with the assistance of the court

24  security officer, for you to take a look at Government's

25  Exhibits 114 and 117.

1          MR. NATHANSON:  And Your Honor, we have a

2  stipulation that these are from the defendant's Metasoft

3  program.  We would move them in at this time.

4          MR. WHITE:  No objection.

5          THE COURT:  All right.  114 and 117 will be

6  received.  Thank you.

7          MR. NATHANSON:  Thank you, Your Honor.

8          Ms. Sandvig, go ahead and pull up --

9     Q.  Before we do that, Special Agent Palian, do you

10  recognize these as excerpts that you pulled from the

11  defendant's Metasoft claims data?

12     A.  Yes, I do.

13     Q.  So, let's start with 114, please.

14          MR. NATHANSON:  And, Ms. Sandvig, see if you

15  can just pull up that first page, if you can blow up that

16  box a little bit.

17     Q.  Well, we'll walk you through.  So, which -- which

18  claims are included in Government's Exhibit 114, please?

19     A.  These appear to be the Mohs counts in the

20  indictment.

21     Q.  And, let's just walk through briefly if we can, I

22  don't want to go through every row, but just in terms of

23  the columns going left to right, what information is

24  included from the claims data on this exhibit?

25     A.  So, included in this exhibit are the patient's

1   last name and first name.  Date from is the date of

2   service that that patient was seen.  Attending provider

3   is the office that patient was seen and then the doctor

4   that patient was seen.  So, DR WB is Dr. Bajoghli in

5   Woodbridge.  DR TYS is Dr. Bajoghli in Tysons Corner.

6        The procedure code is the CPT code, and those were

7   all Mohs codes.  The number of units are the number of

8   times that that code was performed on that day.  Across

9   here are the amounts received by insurance.  The

10  guarantor amount is how much the patient paid.  Insurance

11  one is how much the primary insurance paid, and insurance

12  two is how much the secondary insurance paid.

13        User code is the staff member who updated that.

14  The allowed amount is what insurance -- the contracted

15  rate that insurance has agreed to pay for that procedure.

16  Then there's three of the diagnosis codes or four,

17  actually, four diagnosis codes.

18  Q.  And these were also known as ICD9 codes?

19  A.  That's correct.

20  Q.  Okay.

21        MR. NATHANSON:  Ms. Sandvig, go ahead and

22  turn to the second page of the exhibit, please.

23  Q.  And there's additional data that's excerpted here

24  related to each one of these counts.  What's the -- what

25  are the longer explanations that are included on the

1    second and third page?

2        A.   Sure.  The longer explanations that are

3    descriptions of the CPT codes and the ICD9 codes.

4        Q.   So, these are essentially the descriptions of the

5    codes that you referenced on the first page of the

6    exhibit just put out in words?

7        A.   That's correct.

8        Q.   Okay.  And again you didn't put these in, Special

9    Agent Palian.  This is just from the Metasoft data?

10       A.   This is straight from the Metasoft data, yes.

11       Q.   So, turn now if you would to Government's

12   Exhibit 117, please.  So, you testified that 114 was the

13   Mohs counts.  What's included on 117?

14       A.   On 117 includes the wound repairs counts and the

15   pathology counts.

16       Q.   And if you could just walk briefly through the

17   columns from left to side, just explain to the jury

18   what's excerpted here in terms of the claims data.

19       A.   Sure.  And a lot of these columns are very

20   similar.  We have again the last and the first name of

21   the patient, the date that patient was seen in the

22   office, the attending provider -- and these are all

23   doctor WB.  The procedure code is the CPT code.  So the

24   13000, 14000 and 15000 codes are all wound repairs and an

25   88000 codes are all pathology codes.

1    Q.   And do those codes that you identify now, do they

2    correspond to the code descriptions that are there on the

3    far right of the excerpt?

4    A.   Yes, they do.

5    Q.   And then in between is it information related to,

6    as you described on the prior exhibit information related

7    to the amount that was paid on the different -- by the

8    different insurance companies?

9    A.   Yes.

10   Q.   Okay.  You can go ahead and put those to the side.

11   Now, in addition to excerpting data, did you also,

12   Special Agent Palian, prepare some of your own summary

13   exhibits?

14   A.   Yes, I did.

15   Q.   At this time I ask the court security officer to

16   pass you a number of exhibits from the 300 series, 303,

17   304, 305, 306, and 307, please.

18        MR. WHITE:   Your Honor, the rulings

19   yesterday, so that we can make things go more smoothly

20   today, can my objections be preserved so I don't have to

21   interrupt today.

22        THE COURT:   Exactly, the record should

23   reflect that outside the presence of the jury, we took

24   out up certain exhibits and discussed them and rulings

25   were made and those rulings would apply, so the defense

1   doesn't have to make any additional objections for the

2   record.

3           Thank you

4           MR. NATHANSON:  Thank you, Your Honor.

5   BY MR. NATHANSON:

6   Q.   Do you have those in front of you, Special Agent

7   Palian?

8   A.   I have 305 -- I'm sorry, 303 through 307.

9   Q.   Let's go through these.  I'm not going to go

10  through them in the exact order, but let's just go

11  through them one by one.  Let me ask you some general

12  questions first.  Did you prepare all of these, these

13  summary exhibits?

14  A.   I did prepare these.

15  Q.   And just as a general matter, where did the

16  information come from on all the exhibits?

17  A.   The information came from several sources, some

18  from the Gateway EDI information, some from the

19  defendant's Metasoft, some from e-mails written by the

20  defendant.

21  Q.   And what steps have you taken to insure the

22  accuracy of all these materials?

23  A.   I've double checked and triple checked them all.

24          MR. NATHANSON:  So Your Honor, I believe 303

25  and 304 are already in.  At this time we moved in 305,

1   306 and 307.

2         THE COURT:  All right, they're received over

3   objections.   Thank you.

4         MR. NATHANSON:   Thank you.

5   BY MR. NATHANSON:

6    Q.   So let's start with 303, Special Agent Palian, and

7   Ms. Sandvig if you can go ahead and put up 303 on the

8   screen.

9         And this is a two page exhibit, is that right,

10  Special Agent Palian?

11   A.   Yes, there's two pages here.

12   Q.   And what did you summarize in Government's

13  Exhibit 303?

14   A.   In 303, we summarized the indictment counts in so

15  much as we talked about the patient, the date of service,

16  the date the claim was actually submitted, to what

17  insurance company it was submitted to and how much the

18  defendant was paid for each claim.

19   Q.   And, did this come from the claims data you've

20  already described, the Gateway EDI, Metasoft and so on

21  and so forth?

22   A.   Yes, it did.

23   Q.   So, on the first page, 1 through 17, are those the

24  Mohs counts?

25   A.   Those are the Mohs counts 1 through 17.

1      Q.   And the wound repair counts?

2      A.   The wound repairs counts are 18 through 32.

3      Q.   And now we're on the second page, and then the

4   final set there on the second page are the pathology

5   counts; is that right?

6      A.   That's 33 through 43.

7      Q.   Okay.  Now, I want to focus your attention on just

8   three of the Mohs counts for a moment.

9           And I'd like to bring up the first page.  I'd like

10  to keep up the first page of 303 and the first thing I'd

11  like to pull up next to it is Government's Exhibit 1-F

12  which is already in evidence.

13          Do you recognize 1-F, Special Agent Palian?

14     A.   Yes, I do.

15     Q.   And is this an outside pathology report for

16  Frederick Farber who is associated with Count 1 of the

17  indictment?

18     A.   Yes, it is.

19              MR. WHITE:  Your Honor, could I have a

20  moment?

21  BY MR. NATHANSON:

22     Q.   And, this is an outside pathology report from

23  Washington Pathology for Mr. Farber; is that right?

24     A.   Yes, it is.

25     Q.   And what's the reported date for the outside path

1    report that diagnosis Mr. Farber with verrucae vulgaris?

2        A.   This report was reported on June 4th, 2009.

3        Q.   And, what's the handwritten date where it says --

4    I'm not sure I can make out the -- what's the date?  Can

5    you identify that date?

6        A.   That date looks to be June 5th, 2005.

7        Q.   Okay.  And what was the date that Mr. Farber's

8    claim was submitted to Medicare in Count 1?

9        A.   That claim was submitted June 11th, 2009,

10       Q.   And how does the claim submission date relate in

11   time to the outside path report that came back diagnosing

12   Mr. Farber's ear lesion?

13       A.   That path report came back before the claim was

14   submitted.

15            MR. NATHANSON:  I want to next -- I want to

16   keep up 303, Ms. Sandvig, and I'd like to also pull up

17   next to it, Government's Exhibit 2-F to be the same

18   thing.

19       Q.   And do you recognize Government's Exhibit 2-F,

20   sir?

21       A.   Yes, I do.

22       Q.   And which patient is this one for?

23       A.   2-F is for Larry Brooks.

24       Q.   And what's the date that Mr. Brooks outside

25   pathology results were reported to Dr. Bajoghli's

1   practice?

2       A.   Those results were reported on July 10th, 2009.

3       Q.   And, it's right there at the top.  What was the

4   date that the claim was submitted for Mr. Brooks to the

5   insurance company?

6       A.   Looks like it was submitted -- let me check here,

7   June 14, 2009.

8       Q.   And again, how does the claim submission dates for

9   Mr. Brooks relate to the date that the path report was

10  reported to Dr. Bajoghli's office?

11      A.   That pathology report was received before the

12  claim went out.

13      Q.   And the last one I want to direct your attention

14  to is Government's Exhibit 12-E, please.

15           And do you recognize 12-E, Special Agent Palian?

16      A.   Yes, it's a pathology report for Jan Buccola.

17      Q.   And what's the date of the report for

18  Mrs. Buccola?

19      A.   The date of the report was December 8th, 2010.

20      Q.   And, according to your summary exhibit, what was

21  the date that Ms. Buccola's claim was submitted to

22  Medicare for her Mohs surgery?

23      A.   That claim was submitted December 9th, 2010.

24      Q.   And again, that was after the date of the path

25  report; is that right?

1    A.   It was submitted after the date of the path

2  report, that's right.

3    Q.   And, can you go ahead and put those exhibits to

4  the side.  And I want to focus your attention next on

5  Government's Exhibit 306, please.

6            MR. NATHANSON:  And Ms. Sandvig, if you can

7  blow up the actual text there, make it easier for

8  everybody.

9    Q.   What's summarized in your Exhibit 306, Special

10 Agent Palian?

11   A.   Summarized in 306 are all of the Mohs counts next

12 to it with the diagnosis that was on the frozen section

13 pathology report and their file and then how much the

14 defendant was paid for the Mohs surgery and the

15 subsequent repair that was necessary after that Mohs

16 surgery.

17   Q.   And that was the repair for that actual Mohs

18 procedure; is that right?

19   A.   For that actual wound, yes.

20   Q.   Was does it mean, for instance, when it's zeros

21 there?

22   A.   That means the wound was closed by second intent

23 healing and that there no wound repair conducted.

24   Q.   There was no charge?

25   A.   There was no charge for it.

1    Q.  Okay.  And was the total paid, the Mohs plus the

2    repair paid?

3    A.  Yes, it is.  It's the sum of those two columns.

4    Q.  This is for each of those Mohs procedures.

5        Now as part of your investigation, Special Agent

6    Palian, have you determined approximately what the

7    payment would have been for a procedure like cryo freeze?

8    A.  Yes, I have.

9    Q.  And, how did you determine what that would be?

10   A.  I went back and looked at publicly available

11   information that relates to what the payment rate was for

12   those time periods for that procedure.

13   Q.  And what did you determine in terms of Medicare's

14   contract payment for something like cryo freeze?

15   A.  It depends on what year the claim was filed, but

16   if a cryo freeze had been billed, it would have paid

17   between 65 and $80.

18   Q.  And you say it depends on the year.  Is that

19   because the dollar amounts go up each year a little bit?

20   A.  They vary some.  Actually they went down some

21   years.  Some years they went up.

22   Q.  You can go ahead and put that one to the side and

23   have you focus next on your Exhibit 304, please.

24       Could you explain to the jury, please, what's

25   summarized in Exhibit 304?

1    A.   Sure.  These again are all the Mohs counts.  And

2    if I can draw on the telestrator (phonetic) again, the

3    patient that had the Mohs surgery is in this column.

4    That's followed by the diagnosis that was on the frozen

5    section pathology report for that surgery in Dr.

6    Bajoghli's files.

7         In this column, we have the ICD9 code that was

8    billed to insurance for that procedure and then a

9    description of the ICD9 code that was billed.

10   Q.   Okay.  And these are descriptions -- these are

11   from the ICD9 book that's relied on by medical

12   professionals; is that right?

13   A.   Yes.

14   Q.   And all of these are diagnosis codes for different

15   types of cancer, right?

16   A.   Yes, they are.

17   Q.   Okay.  And, at least with respect to lines two,

18   and 12, there's a disconnect between the diagnosis code

19   that was submitted via insurance company and what was in

20   the frozen section path report; is that right?

21   A.   There is a disconnect.

22   Q.   In that the frozen section path report is a

23   noncancerous diagnosis, right?

24   A.   That's right.  The frozen section for those was

25   not cancer.

1      Q.   You can put that down, Special Agent Palian.   And
2   I want you to focus next on Government's Exhibit 305,
3   please.   And I'm going to pull that one up.
4          What is summarized, Special Agent Palian, in 305?
5      A.   Government's Exhibit 305 is a wound repair summary
6   chart.
7      Q.   So, let's walk through from left to right and I'd
8   like you to explain what's in each column and where the
9   data in each column came from.
10     A.   Sure.   The first column is the count that it
11  relates to in the indictment.   The second column is the
12  redacted patient name.   The third column is the -- I'm
13  sorry, it's not working now.   Oh, there we go.
14         The third column is the date of service which is
15  when that procedure was performed on that patient.   The
16  fourth column describes the wound repairs that was
17  performed on that patient.   So it's a description, not
18  the CPT code.
19         The fifth column is the office that that wound
20  repair was performed in and that information comes from
21  the day folders.
22     Q.   And when you say day folders, is that where the
23  super bills and the sign-in sheets were located?
24     A.   Super bills and sign-in sheets were located in
25  those folders, yes.

1    Q.   Okay.  Now, next to that, you've got "Dr. Bajoghli

2    per Metasoft and per e-mail", what's described there?

3    A.   That's Dr. Bajoghli's location based on the

4    Metasoft data and the e-mails that we recovered.

5    Q.   Okay.  So when you say per Metasoft, was that the

6    practice -- the practice's scheduling software?

7    A.   Yes, it was.

8    Q.   Okay.  So, for instance, when it says "out of

9    office on June 7, 2012", is that what's actually on the

10   schedule?

11   A.   That's what it said on the schedule.

12   Q.   And in the other instances, according to your

13   review and summary of the schedule, Dr. Bajoghli was in

14   Tysons; is that right?

15   A.   That's right.

16   Q.   The Tysons office.

17        What about per e-mails, what e-mails are you

18   referring to there?

19   A.   We're referring to the e-mails that went between

20   the billing staff and the doctor, detailing how many

21   patients were seen by which practitioners in which office

22   on which dates.

23   Q.   And, does the column to the immediate right of

24   that, does it actually reference the government's exhibit

25   numbers for those e-mails?

     1      A.   Yeah, it summaries the government exhibit number.
     2      Q.   So, those are the e-mails that were presented that
     3   showed -- that listed the providers and identified how
     4   many patients they had seen in a particular office on a
     5   particular day?
     6      A.   Yes, they were.
     7      Q.   Okay.  Now, let's go over to the provider on the
     8   claim.  Where does that information come from?
     9      A.   That information comes from the Gateway EDI.
    10      Q.   And, in all cases, who was the provider on the
    11   wound repair claim that was submitted to the insurance
    12   companies?
    13      A.   That was Dr. Bajoghli that was on the claim.
    14      Q.   And the last column is licensed practitioner on
    15   site.  What's identified here?
    16      A.   What's identified there is the practitioner that
    17   was in Woodbridge for all of these cases on those days.
    18      Q.   Okay.  And does this list -- and what did you base
    19   that summary on, what documents?
    20      A.   We based that off of super bills and off of the
    21   schedule.
    22      Q.   And, in all of those instances, did those records
    23   reflect that only Janet Rasmussen was present in the
    24   office?
    25      A.   That's correct.

1    Q.   Lastly, Special Agent Palian, I want to focus your

2    attention on Government's Exhibit 307.

3         If we could blow up the box there for 307.

4         Now, what's summarized in Government's

5    Exhibit 307, Special Agent Palian?

6    A.   Here we're summarizing the locations that claims

7    went out under the defendant's NPI number for that day.

8    Q.   Okay.  So, the days of service on the far left and

9    the related counts, are those wound repairs counts?

10   A.   Those are all wound repairs counts date.

11   Q.   Okay.  And what are the Xs in all three locations

12   reflect for each of those days?

13   A.   That reflects that Dr. Bajoghli's number was used

14   to bill insurance from those locations on those dates, if

15   there's an X there.

16   Q.   So on each of the days that the wound repairs were

17   performed, the defendant billed his NPI for each of his

18   office locations?

19   A.   Each of his office locations, yes.

20        MR. NATHANSON:  Court's indulgence.

21        We pass the witness.  Thank you.

22        MR. WHITE:  May I proceed, Your Honor?

23        THE COURT:  Yes.

24             CROSS-EXAMINATION

25   BY MR. WHITE:

1      A.   Good morning, Mr. White.

2      Q.   Good morning, Special Agent Palian.  How are you?

3      A.   I'm well, thank you.

4      Q.   You started your testimony by saying you had been

5  involved in this investigation since December of 2011.

6  Do I have that date right?

7      A.   Approximately.  I think it may have been the end

8  of November, 2011, the beginning of December.

9      Q.   So, just about four years at this point?

10     A.   Almost.

11     Q.   There was a case file opened prior to the time --

12  there was an FBI case file opened prior to the time you

13  became involved in it?

14     A.   Yes, there was.

15     Q.   And that case file was opened by another agent,

16  and the investigation started an investigating Dr.

17  Bajoghli, because the spouse of an FBI agent had

18  complained about not getting certain information from his

19  practice.  You know that?

20     A.   I don't remember coming from the spouse of an FBI

21  agent, but I know that the investigation was initiated on

22  a complaint.

23     Q.   It was a complaint from somebody related to actual

24  FBI agent, correct?

25     A.   I don't recall that.  I'm not sure.  If there's a

1    document that can refresh my memory, I'll take a look at

2    that but I don't recall that.

3        Q.   I may come back to that.  But there would be a FBI

4    form 302 or some other form that would be at the

5    beginning of your file that would reflect how it started?

6        A.   Yeah, it's an FT-71 complaint form, but yes.

7        Q.   Right.  So, you recall there was a complaint but

8    you don't recall it being related to an FBI agent?

9        A.   It may have been.  I just don't recall that.

10       Q.   Okay.  You were shown some Virginia Board of

11   Health documents, Government's Exhibit 122 and 123 if you

12   need to see them I'm happy to bring them up.

13       A.   I'd like to see them again if you don't mind.

14       Q.   Okay.  Do you have those in front of you?

15       A.   I don't have them in front of me.

16       Q.   Actually let me finish the first point now that I

17   have the --

18       A.   Sure.

19       Q.   -- document in front of me.  Do you have 122 in

20   front of you now?

21       A.   I have 122 in front of me, yes.

22            I'm going to show you what I will have marked for

23   identification purposes only as Defendant's Exhibits 161

24   and 162.

25            Handing you first Exhibit 161.

```
1    A.   Okay, I've got 161, sir.

2    Q.   And is that the document that opens the

3  investigative file?

4    A.   Yes, it is.

5    Q.   The one you were talking about previously?

6    A.   The FT-71.

7    Q.   And the person that opened the FBI file was whom?

8         MR. NATHANSON:   Your Honor, I thought this

9  was -- I'm objecting.   I thought this was being used to

10 refresh his recollection which is fine.   But putting the

11 documents in, he shouldn't be reading the documents.

12        THE COURT:   That's correct.   Objection

13 sustained.

14 BY MR. WHITE:

15   Q.   Okay.   Does that refresh your recollection what

16 complaint started the investigation?

17   A.   It does.

18   Q.   Okay.   And, it was from -- an individual that's

19 listed in that document; is that correct?

20   A.   Yes.

21   Q.   Okay.   If I could show you now what's marked for

22 identification only as 162, with your help, please.

23        And, that's an FBI form 302 report of interview

24 that was also in your investigative file --

25   A.   Yeah, that --
```

```
1    Q.   -- before you got involved?

2    A.   I'm sorry.  I didn't mean to interrupt.

3    Q.   That's okay.  That was in the file before you got

4  involved, right?

5    A.   Yes, it was.

6    Q.   And you're familiar with that document because you

7  would review the whole file?

8    A.   Yes.

9    Q.   And, does that refresh your recollection that the

10 initial complaint that started this entire investigation

11 was a complaint by the spouse of an FBI agent?

12   A.   Yes.

13   Q.   Okay.  Now, if we could turn to -- with your

14 assistance, if he could get Government's Exhibits 122 and

15 123.  Do you already have them?  Okay, terrific.

16        My question -- you testified that those documents

17 came from the Virginia Board of Health, correct?  I may

18 have that title wrong.  Where did it come from?

19   A.   The Department of Health Professionals.

20   Q.   The Department of Health --

21   A.   Health Professions.

22   Q.   And those documents came from a proceeding that

23 was begun by them to determine whether there should be

24 any action taken on Dr. Bajoghli's professional license,

25 correct?
```

1    A.   Correct.

2    Q.   And, that proceeding was started by you, correct?

3    A.   That's correct.

4    Q.   You referred information to them from your

5    investigation and asked them to begin an investigation

6    regarding his license, correct?

7    A.   I didn't ask them to begin an investigation.  I

8    just provided them with the information.

9    Q.   You provided them with the information that --

10   that started this investigation by them, correct?

11   A.   Correct.

12   Q.   And they have to date taken no action again Dr.

13   Bajoghli's license, correct?

14   A.   They're pending the outcome of the criminal

15   investigation is my understanding of the situation.

16   Q.   And they haven't suspended his license?

17   A.   They have not.

18   Q.   If you could look at 123-1, please.

19        MR. WHITE:  Can I get you to pull that up,

20   Ms. Sandvig, please.  If you could blow up the top half,

21   please.

22   Q.   I'd like to ask you, if you could, to look at the

23   top half of that document.

24   A.   Yes.

25   Q.   And could you please read what is in the top half

1    of that document, please, in the record.

2        A.   The entire top half?

3        Q.   You can start at "she has" --

4        A.   Okay.

5        Q.   -- regarding Marina Yemdin.

6        A.   "She's had over six years of experience working

7    for a busy Mohs surgeon in Brooklyn, New York and a

8    veterinary practice prior to her dermatology office

9    experience.  She has a bachelor degree in biology from

10   Brooklyn College.  She worked side by side and one on one

11   with me during repair procedures in the office in over

12   100 cases and I have -- I have personally observed her

13   placing sutures, both subcuticular and on the skin edges.

14        "She has performed flawlessly and has an

15   impeccable technique and skills with final results

16   indistinguishable from my own work.

17        "Marina is currently enrolled in RN program -- is

18   currently enrolled in RN program and will be receiving

19   her RN in May, 2013, and will continue on for her nurse

20   practitioner degree".

21        Q.   So, that was also on the document that you read

22   that you got from the Virginia Department of Health

23   Professionals; is that correct?

24        A.   Yes.

25        Q.   Thank you.  There's an exhibit that's been used a

1    number of times in this case and you can get it from the

2    court security officer, exhibit, I believe, it's 112.

3    That's the paper form.

4        A.   The CMS 1500.

5        Q.   The CMS 1500 form, you recall that?

6        A.   I think it is 112.

7        Q.   My question is really not about that document.

8    That's the document that has the very fine print on the

9    back --

10       A.   Yes.

11       Q.   -- that the individual yesterday had to get the

12   magnifying glass to read, that one?

13       A.   I think she got a magnifying glass, yes.

14       Q.   Okay.  So my question is, the claims that were

15   submitted in this case, all of those claims were actually

16   submitted electronically instead of by paper.  Am I right

17   about that or am I wrong?

18       A.   That's my understanding.

19       Q.   So that actual document wasn't actually used for

20   knife of the claims, that paper document wasn't used for

21   any of the claims at issue in this case?

22       A.   My understanding, though, is that all of the

23   information transmits electronically that was on the

24   paper form.

25       Q.   Right.  But that wasn't actually my question.

1    A.  Okay, pardon me.

2    Q.  My question was that paper form was not actually

3  used for any of the claims in the case?

4    A.  This piece of paper was not submitted.

5    Q.  The way they were submitted was through an

6  electronic document that has the same boxes to check and

7  the same information to fill in, correct?

8    A.  Yes, that's my understanding, right.

9    Q.  Right.  And, that obviously is an electronic

10  document.  It doesn't have a back of the page as this one

11  does, right?

12    A.  My understanding is that all that information --

13        THE COURT:  We want to know what you know,

14  not what you understand.  If you've seen it that's one

15  thing.  If you haven't seen it, then you can't testify to

16  it.

17        THE WITNESS:  Okay.  No, I haven't.  I

18  haven't seen it.

19  BY MR. WHITE:

20    Q.  So you haven't actually looked at the -- the

21  electronic form, that is, the way that all of the claims

22  actually submitted here were submitted; is that right?

23    A.  No, I looked at the electronic form.  It was done

24  through Metasoft.

25    Q.  So, you know that it was done through Metasoft but

1   you haven't actually looked at the form that's used when

2   that is being filled out by the biller; is that right?

3       A.   We purchased a copy of Metasoft and I actually

4   looked at that.

5       Q.   Okay, got it.  And that form, instead of being the

6   paper form, it has dropped down boxes and things like

7   that, I assume?

8       A.   It has dropped down boxes.

9       Q.   Okay.  Um, so, in connection with this case, you

10  purchased a copy of the Metasoft software; is that right?

11      A.   Yes, I did.

12      Q.   And, the -- had you ever used Metasoft before?

13      A.   No.

14      Q.   Okay.

15      A.   I'm not a biller.

16      Q.   So you had to learn how to navigate through that

17  system as you went through this case --

18      A.   Yes.

19      Q.   -- to extract the data you use to build the charts

20  that you've presented?

21      A.   No, that's not the way it happened.  We -- we

22  took -- it was my computer forensic people.  They took

23  the doctor's data, cracked into it and extracted out

24  spreadsheets and access data tables.

25      Q.   So you didn't actually do the work that went into

1   compiling these spreadsheets or the charts that you put

2   in evidence today; is that right?

3       A.   So, I didn't extract the data, but I -- I took the

4   date and I put it into the summary charts.  And I worked

5   with the data.

6       Q.   The actual extraction of the data from the image

7   of Dr. Bajoghli's computers you have from August 2009 was

8   done by somebody else at the FBI?

9       A.   Yes.

10      Q.   And, then you took the -- their work product and

11  extracted that down to the charts that you presented

12  today?

13      A.   Correct.

14      Q.   And, did you use Metasoft to do that?

15      A.   No, we didn't need to.

16      Q.   Once they had extracted, they had gone from the

17  Metasoft conversion to some other format that you could

18  use?

19      A.   Yeah, the -- the data we were provided had all the

20  columns that you saw here, so there was no need to put it

21  back into Metasoft.  It was all summarized in Excel.

22      Q.   Okay.  Now, you're aware from the extraction of

23  data from Dr. Bajoghli's practice, his computer systems

24  and so on that he has done thousands of Mohs procedures

25  over the time period, from 2008 through -- through 2012,

1   right?

2       A.  Yes, that's correct.

3       Q.  And, that he has reviewed thousands of frozen

4   section slides, billed for review thousands of frozen

5   section slides from his practice during that time period?

6       A.  I wouldn't say thousands, plural, but yes.  There

7   were --

8       Q.  About 1,800 or so?

9       A.  No, less than that, I think.

10      Q.  Aren't you aware that 1,800 slides were billed

11  from his practice during this time period?

12      A.  Um, what -- the data that I reviewed from

13  January 1st, 2009, to I believe August 9th, when we

14  seized -- when we took possession of those computers, I

15  think the number was closer to 13 or 1,400.  But, that's

16  the ballpark, Mr. White.

17      Q.  And that's -- but that's from 2009.  So you didn't

18  include 2008 data in that?

19      A.  We did not.

20      Q.  But, there were another -- large lump of frozen

21  sections that were done in 2008 as well?

22      A.  We didn't look at the 2008.

23          MR. NATHANSON:  I object to relevance grounds

24  prior to 2009.

25          MR. WHITE:  His practice, I think is relevant

1   and it's something he reviewed.

2          THE COURT:  All right.  Sustained the

3   objection.

4   BY MR. WHITE:

5    Q.   Now, you're aware as well that he did, between

6   January 2008 and April 2012, over 5,000 first stage mask

7   and hands Mohs procedures duration that time period;

8   isn't that correct?

9          MR. NATHANSON:  Your Honor, same objection,

10  relevance grounds prior to 2009.

11         THE COURT:  Which timeframe are you focused

12  on, Mr. White?

13         MR. WHITE:  I'm focused on the timeframe,

14  January 2008 through April 2012.  I can -- I can explain

15  to the Court maybe easier at sidebar why that period is

16  relevant.

17         THE COURT:  Okay.

18         MR. WHITE:  Thank you.

19         (Thereupon, the following side-bar conference

20  was had.)

21         MR. WHITE:  Your Honor, normally I would

22  limit my questions to the time period covered by the

23  indicted conduct, but the affidavit that he submitted in

24  support of search warrants actually references that time

25  period.  So, I know he has done the analysis for that

```
 1   time period of the number of procedures.  I don't know if
 2   he's done other analyses, but I know what numbers he's
 3   done during that time period, it covers the time period.
 4              THE COURT:  You said 2008 to 2012?
 5              MR. WHITE:  2008 through -- actually, his
 6   numbers were 2008 through April 2012.
 7              THE COURT:  Okay.
 8              MR. WHITE:  And the point is, I want to get
 9   into evidence, he knows the scope of the defendant's
10   practice.  So that's why I'm focused on that time period.
11              THE COURT:  Okay.
12              MR. NATHANSON:  Your Honor, I'm not sure the
13   dates in the search warrant are relevant, because
14   obviously, whatever is in the search warrant was for
15   purposes of obtaining a search warrant.
16              We're now focused on a specific time period
17   in the indictment.  We don't have any objection to the
18   scope of the practice during the charged time period.
19   Once we start getting to other time periods, this could
20   go on for quite a while and may have to bring in
21   evidence --
22              THE COURT:  Well --
23              MR. NATHANSON:  -- of additional time periods
24   as well.
25              THE COURT:  Forty-three counts, right --
```

```
 1                    MR. NATHANSON:  Yes.
 2                    THE COURT:  -- out of 1,400 patients.  I'm
 3     just trying to make sure I understand what was charged.
 4                    MR. NATHANSON:  Yep.
 5                    THE COURT:  So, I think it is relevant.
 6     Objection overruled.  I'm sorry.  Come back one second.
 7                    I will sit all day Thursday.  You were told I
 8     wouldn't sit all day Thursday, and today I have to leave
 9     at 12:30 for lunch with the judges at the judges'
10     meeting.  So we will sit all day Thursday.
11                    MR. WHITE:  Coming back at 2 today?
12                    THE COURT:  I think the meeting is only an
13     hour.
14                    MR. WHITE:  I was just trying.
15                    THE COURT:  12:30 to 1 Thursday.
16                    MR. NATHANSON:  So, lunch today --
17                    THE COURT:  12:30 to 1:30, and we sit all day
18     Thursday, normal schedule.
19                    MR. NATHANSON:  And tomorrow is all day?
20                    THE COURT:  Yeah, tomorrow is Wednesday.
21                    MR. NATHANSON:  Yeah.  We're fine.
22                    (THEREUPON, side-bar conference was
23     concluded.)
24                    THE COURT:  You may proceed.
25                    MR. WHITE:  Thank you.
```

1  BY MR. WHITE:

2  Q.  So, you did a calculation at one point of the

3  number of procedures that Dr. Bajoghli had billed for

4  between January 2008 and April 2012.  Do you remember

5  that?

6  A.  Yeah, I do.

7  Q.  And, you remember that he had done more than 5,000

8  first stage what's been called during this trial mask and

9  ears procedures of Mohs, correct?

10  A.  I think that's correct.  Without refreshing my

11  memory, I wouldn't want to say, but I believe that's

12  correct.

13  Q.  If you need to, I can give you a document that

14  will.  Just let me know.

15  A.  Okay.

16  Q.  You also found that he had done 1,400 or so what

17  you might call trunk, arms and legs Mohs procedures

18  during this time period?

19  A.  Again, it sounds about right.

20  Q.  Okay.  As -- and so that would be about 6,500

21  total Mohs procedures in that four-plus year period,

22  right?

23  A.  Those numbers add up.

24  Q.  So, during the time period relevant to this

25  indictment, he was doing about 1,500 Mohs procedures a

1  year, right?

2      A.  Yeah, I'd say that.

3      Q.  And, you're also aware that during that time

4  period, 2008 through April 2012, he billed 11,000 surgery

5  units; isn't that true?

6      A.  What are you defining as a surgery unit?

7      Q.  Well, I can -- you actually filed an affidavit in

8  this court at one point regarding how many -- in part,

9  among other things, how many surgery units Dr. Bajoghli

10  had done; isn't that right?

11     A.  I filed an affidavit.  I don't know if it said

12  surgery units.  I'd want to refresh my memory on that.

13     Q.  Okay.  I'm happy to get that for you.

14         What's our next one?  162 -- 163.

15         I'm going to show you what's marked as 163

16  defendant's exhibit.  This is not to be introduced, just

17  to refresh recollection.

18             MR. WHITE:  Let me make sure that I've tabbed

19  the right paragraph, Your Honor.  Give me a moment.

20         Thank you, sir.

21     A.  Would you like me to flip to the tab?

22     Q.  Yes, actually I have tabbed, I think, the

23  paragraph that talks about the number of Mohs procedures

24  and surgery units, Mohs surgery units.  Do you see that

25  one?  Did I get the right one?

1    A.   Paragraph 30?

2    Q.   Well, you take a look at it.  It's your affidavit.

3    A.   Here we are, yep.

4    Q.   So, in that affidavit you filed -- and again, this

5    was a while ago, so you're not remembering the exact

6    number, it's not surprising.  But that affidavit says

7    that in that time period, January 2008 through

8    April 2012, he did 569 of the first stage Mohs procedures

9    on the hands and the face, right?

10   A.   Did you just say 569?

11   Q.   I probably did, I meant 5,069?

12   A.   That's correct.

13   Q.   And that's what your research at that time showed

14   you from the records that you had?

15   A.   Yes.

16   Q.   And, he also had done 1,400 or so trunk

17   procedures, right?

18   A.   Yes, that's right.

19   Q.   So, you get the total of 6,500 Mohs procedures in

20   just over four years?

21   A.   Yes, 64, 69.

22   Q.   64, 69?

23   A.   At least.

24   Q.   And then, it also -- that affidavit also shows

25   that you compiled the number of total surgery units that

1    he had done during that time period, right?

2        A.   Yes.

3        Q.   And, that would include second stages of Mohs and

4    other surgical procedures?

5        A.   Yes, there we are, thank you, yes.

6        Q.   So, there were over 11,000 total surgery units

7    during that time period that he billed?

8        A.   Yes.

9        Q.   So, 2,500 or so a year surgery units that he was

10   billing at the time, right?

11       A.   Yeah, 2,500.

12       Q.   And, of the -- and of those, there are 17

13   surgeries that are at issue in this case, that are

14   charged in this case; is that correct?

15       A.   No.

16       Q.   There are 17 Mohs -- there are more than 17 Mohs

17   surgeries charged in this case?

18       A.   If we're talking units, it's larger than that,

19   because some of those patients had multiple stages, which

20   if the first stage wasn't needed, the second stage

21   definitely wasn't needed.

22       Q.   Fair enough, but under 20, under 25, at least?

23       A.   Yeah, under 25.

24       Q.   Under 25 total procedures, right?

25       A.   Yes.

1   Q.   And out of the -- at that time, 6,500 Mohs

2   procedures that he had done in four-plus years, there

3   were only 17 Mohs procedures, first stage Mohs procedures

4   that are charged here; is that right?

5   A.   I would amend that comment by saying that these

6   numbers are from October 2006 to April of 2012.  A

7   relevant time period is January 1st, 2009, I believe,

8   or -- to 2009, is the relevant time period.  So there's

9   two and a half years of surgery units included in that

10  number --

11  Q.   Well --

12  A.   -- wouldn't be --

13  Q.   To be clear, it's not up to you to determine what

14  the relevant time period is for purposes of this case, is

15  it?

16  A.   No, it's not.

17  Q.   So, I'm just talking about the time period that

18  you were looking at at that time, right?

19  A.   Yes, but, and my only point with that we're

20  talking about overlapping time periods --

21  Q.   Sure.

22  A.   -- that aren't necessarily concurrent, so I --

23  Q.   And they would be -- and frankly, I think you

24  would admit that August 2008 through April 2012, doesn't

25  include all the ones that are relevant because April

1    through August he was still doing more procedures?

2        A.   That's correct.

3        Q.   So probably another 500 or so Mohs procedures

4    during that time period?

5        A.   Based on that rate, yes.

6        Q.   Okay.  And out of all of those procedures, 6,500,

7    7,000 procedures, 17 are the ones charged here, correct?

8        A.   Again, it's larger than that number.  I think we

9    agreed on at least 25, but, yes.

10       Q.   No, we agreed on 25 as to the number of surgery

11   units.  That's 25 out of 11,000 surgery units?

12       A.   Yes, I'm sorry.

13       Q.   Twenty-five out of 11,000 surgery units or

14   thereabouts are charged here.  And 17 out of 6,500 Mohs

15   procedures are charged here, correct?

16       A.   Seventeen out of 6,500 Mohs procedures, yes.

17       Q.   Okay.  And to be fair, the number is actually

18   higher than 6,500, because the data that you compiled

19   cuts off at April of 2012 and doesn't go through August

20   as the procedures do, correct?

21       A.   Yes, but if we're going to do that, then I guess

22   I'd say that there's actually 89 that we're looking at

23   based on the chart that we think were unnecessary Mohs

24   surgery.  Seventeen have been charged, but 89 have been

25   presented.

1    Q.   Okay.  So, use that number if you prefer.  So, 89

2    out of 7,000 Mohs procedures are the ones that the

3    government thinks are relevant here, right?

4    A.   Um, can we talk about that 7,000 number or you

5    want to leave that for later?

6    Q.   No, I think that 7,000 number was your number.  It

7    was 6,500 between January 2008 and April 2012, right?

8    A.   Yes, that's correct.

9    Q.   And probably another 500 or thereabouts between

10   April and August, 2012?

11   A.   Our universe, though, consisted of --

12   Q.   You can answer that question.

13   A.   I'm sorry, go ahead.

14   Q.   There were 500 more from April 2012 to

15   August 2012?

16   A.   There were 500, that's correct.

17   Q.   That's 7,000, right?

18   A.   Yes, absolutely.

19   Q.   Okay.  Now, you mentioned that you have reviewed a

20   lot of -- actually, let me ask you another question.

21   A.   Sure.

22   Q.   I'm going to show you what's been marked but not

23   introduced as Defendant's Exhibit is 104-B with the

24   assistance of the court security officer.

25        Thank you.

1          Do you see that chart, Special Agent Palian?

2     A.   I do.

3     Q.   You've seen that chart before, correct?

4     A.   Yes, I have.

5     Q.   And that was a chart that we put together from

6     Metasoft data for certain codes for 2009 through 2012

7     from Dr. Bajoghli's practice?

8     A.   It is Metasoft data, yes.

9     Q.   Okay.  Are the numbers that -- were you asked to

10    look at the numbers on this chart?

11    A.   I don't know if I was asked, but I did.

12    Q.   You did.  So you looked at the numbers on this

13    chart?

14    A.   Yes.

15    Q.   Are they right?

16    A.   No.

17    Q.   What's wrong with them?

18    A.   So, first, let me just address that in a couple of

19    ways.  First there's numbers I couldn't confirm because I

20    believe the 2012 total includes August to December of

21    2012 which I wasn't able to confirm since we didn't have

22    that data.

23    Q.   Okay.

24    A.   But, second, the permanent section biopsies were

25    not all performed by Dr. Bajoghli.  Approximately

1  30 percent of these were, I believe.  So, I don't know

2  if --

3      Q.  That number, is that an accurate number for the

4  practice, though, for that?

5      A.  That's an accurate number for the practice, yes.

6      Q.  Okay.  So that's an accurate number for the

7  practice and you couldn't --

8      A.  Based on what I can tell from the data that I

9  have, yes, it's an accurate number.

10      Q.  And it's fair you couldn't necessarily tell

11  whether -- whether it was Dr. Bajoghli or somebody else

12  in the practice who had done that permanent section

13  analysis?

14      A.  No, I can't determine that.

15      Q.  You can't determine that.  Not all of these were

16  Dr. Bajoghli?

17      A.  Not all of these were Dr. Bajoghli.

18      Q.  Fair enough.  All of the frozen section were Dr.

19  Bajoghli's, though?

20      A.  Yes.

21      Q.  And are those frozen section numbers, right?

22      A.  Again, as much as I can tell, they're very close

23  if not correct.

24      Q.  Okay.  So, according to the numbers that you

25  analyzed from 2009 through 2012, there were over 1,800

1    frozen sections done by Dr. Bajoghli's practice during

2    that time period, correct?

3        A.   Not based on the numbers that I have.

4        Q.   So the far right column -- and, let me just make

5    sure I've got this right.

6        A.   And only because the 2012 number --

7             MR. NATHANSON:   I'm sorry, I'm going to

8    object.  This isn't in evidence.  It's a summary chart

9    that the defense created.  If they want to testify, it

10   should be in evidence.  It should come in through a

11   sponsoring witness.

12            MR. WHITE:   I'm trying to get him to sponsor

13   it right now.  He checked the numbers.  I'm trying to

14   find out which ones he agrees with.

15            THE COURT:   All right.  It looks like he's

16   trying to lay a foundation.  Objection overruled.

17   BY MR. WHITE:

18       Q.   All right.  So, let's just start with 2009, you

19   did have full data for 2009, right?

20       A.   Yes, I did.

21       Q.   And the 2009 number for Mohs surgery was 890.  Was

22   that accurate?

23       A.   Very close.

24       Q.   Very close, okay.

25       A.   I wouldn't call it accurate, but I'd call it close

1    enough.

2        Q.   How close is close enough?

3        A.   I --

4        Q.   A couple or something like that?

5        A.   I can't rate on your chart.

6        Q.   I'm just wondering what you mean by close enough.

7        A.   You know, I just don't remember the exact number.

8    I can't -- I -- I wouldn't have submitted this as mine,

9    but, I mean, if you want to say it's good, that's fine.

10       Q.   That's fine, good enough.

11            THE COURT:  If you want to say it's good,

12   it's fine.  Is that what you just said?

13            THE WITNESS:  I don't have a problem with

14   this necessarily.

15            THE COURT:  Okay, next question.

16   BY MR. WHITE:

17       Q.   The next column over in 2009 is both types of

18   biopsies.  It says 1,761.  Were you able to confirm that

19   number?

20       A.   For the practice, yes.

21       Q.   For the practice?

22       A.   Again, close.  I'm not -- I don't think these are

23   the exact numbers.

24       Q.   Fair enough.  So, and both types of biopsies is

25   frozen section and permanent section, right?

1    A.  Both types of biopsies is frozen section and
2    permanent section, yes.
3    Q.  Let's maybe just focus on the frozen section
4    biopsies.  Maybe we can avoid part of this problem.  338
5    frozen section biopsies for Dr. Bajoghli in 2009.  Is
6    that number accurate?
7    A.  338 frozen section biopsies for Dr. Bajoghli in
8    2009, was that your question?
9    Q.  Yes.
10   A.  Yes, I think I stated I think that's close, but I
11   don't think that's the exact number.
12   Q.  Okay.
13       MR. WHITE:  So the -- Your Honor, if I could
14   ask for  Court's indulgence to set up the easel, please?
15       THE COURT:  All right.
16       MR. WHITE:  Thank you.
17       May I approach?
18       THE COURT:  Yes, uh-huh.
19       THE WITNESS:  Mr. White, would you be able to
20   adjust this so I can see it, too  ?
21       MR. WHITE:  Of course.
22       THE WITNESS:  Thank you.
23       MR. WHITE:  This is the best I can do is
24   green highlighter, but that should cover it.
25   Q.  So, for 2009, and we're just going to do Mohs and

1    frozen sections.  Fair enough?  You following what I'm

2    doing here --

3        A.   Yes.

4        Q.   So, 2009 total Mohs surgery and these would all be

5    by Dr. Bajoghli, correct?

6        A.   Yes, in 2009, we don't have any evidence that he

7    did -- he performed -- that anyone else performed Mohs

8    surgery.

9        Q.   As a matter of fact, during the entire time

10   period, you don't have any evidence that anyone else

11   performed Mohs surgery other than Dr. Bajoghli and his

12   practice, do you?

13       A.   No, that's not true.

14            THE COURT:  Mr. White, hold on.  We got black

15   markers here.

16            MR. WHITE:  Thank you.  Let me start over.

17       A.   I'm sorry, the last answer to my question was no,

18   that's not true.

19       Q.   Okay.  So, for 2009, there were 890 Mohs

20   procedures billed by Dr. Bajoghli's practice or

21   thereabouts, correct?

22       A.   Thereabouts.

23       Q.   And there were 338 frozen section biopsies,

24   correct?

25       A.   Again, that's close, I think.

1    Q.   Close, okay.  So -- and you're aware that of these

2  frozen section biopsies not all of those ended up in

3  Mohs, correct?

4    A.   That's correct.

5    Q.   And, the other Mohs procedures would be filled in

6  by permanent section biopsy analyses that were done by

7  the practice, right, or were transmitted to the practice?

8    A.   Yes.

9    Q.   Referrals to the practice with an existing biopsy

10  result --

11   A.   Yes.

12   Q.   -- for example?  Okay.

13        2010, 2010, I have 1,034 Mohs surgeries by Dr.

14  Bajoghli's practice.  Is that right or close?

15   A.   I think it's close.

16   Q.   Okay.  And, I have 454 frozen section biopsies,

17  correct?

18   A.   Again, close.

19   Q.   Okay.  So, again, not all of these frozen section

20  biopsies ended up in Mohs procedures, right?

21   A.   Yes.

22   Q.   As a matter of fact, generally about half of them

23  don't end up in Mohs procedures from your analysis?

24   A.   I don't know that number.

25   Q.   Okay.  But a significant number of them do not end

1    up in Mohs procedures or have you never done that

2    analysis?

3        A.   Not sure.

4        Q.   Okay.  But, obviously, there are a number of Mohs

5    procedures that have been done based on permanent

6    sections biopsies other than just these frozen sections,

7    correct?

8        A.   I'm sorry.  Could you ask that question one more

9    time.

10       Q.   Sure.  It's -- 454 is a lot less than 1,034?

11       A.   454 is less than a thousand.

12       Q.   So the point is there are permanent section

13   biopsies that are being used for probably -- for most of

14   the Mohs that are being done in 2010, correct?

15       A.   I don't know if it's Mohs, but there is a

16   significant portion we can tell that.

17       Q.   It's got to be at least 600?

18       A.   Got to be at least 600.

19       Q.   And that would be most, right?

20       A.   It would be greater than half, yes.

21       Q.   And it's actually -- you know it to be a lot

22   larger than 600 because a number of these frozen section

23   biopsies done by Dr. Bajoghli did not end up in Mohs?

24       A.   That's correct.

25       Q.   2011, we have 1,021 Mohs surgeries, again,

1   substantially accurate?

2       A.   Close.

3       Q.   Okay.  And, frozen sections biopsies by Dr.

4   Bajoghli 573?

5       A.   Close.

6       Q.   Again, close, okay.  All right.  So, again, the

7   same not all of these frozen section biopsies in 2011

8   ended up in Mohs procedures, right?

9       A.   Correct.

10      Q.   And there were a number, again the majority of

11  these Mohs procedures were as a result of permanent

12  sections biopsies, correct?

13      A.   Yes.

14      Q.   Okay.  In 2012, and this may be where your data is

15  different than mine.  In 2012, you only have data through

16  August; is that right?

17      A.   Early August.

18      Q.   Early August.  And our data, I think you were

19  saying must go through the end of the year because our

20  numbers are different there?

21      A.   That's right.

22      Q.   Do you recall what your number was for through

23  August?

24      A.   No, I don't.

25      Q.   All right.  So, I had 1,332 for the year.  So is

1   it fair to say that two thirds of those are from the

2   pre-August time period?

3       A.   I wouldn't be able to say.

4       Q.   So --

5       A.   I wouldn't feel comfortable.

6       Q.   You wouldn't feel comfortable saying.  So you

7   looked at this before, but you don't remember what the

8   number is here, right?  And we've got 1,332 but you

9   couldn't confirm that because your data cuts off in

10  August?

11      A.   That's correct.

12      Q.   So, there's a number in here that is some portion

13  of -- I'll put slash 1332 to indicate that some portion

14  of 1332 was the pre-August time period that you looked

15  at, right?

16      A.   Okay.

17      Q.   And the practice remained fairly consistent in

18  terms of the Mohs practice ramping up over this time

19  period, right?

20      A.   Yeah.  I'd agree with that.

21      Q.   And if it were two thirds of it, that would be 900

22  or so.  Is my math decent on that?

23      A.   I mean -- two thirds is -- yeah, 900 of 1300.

24      Q.   Fair enough, and I'll put 900 question mark.

25      A.   Can you put ish, that would make me feel better.

1    Q.   I'd be happy to put 900ish.

2    A.   Thank you.

3    Q.   As a matter of fact, I'll cross out the other one.

4    I want to use your testimony.  So, 900ish and then I had

5    one -- 448 frozen section biopsies for 2012.  Is that

6    number right, based on what you saw through August?

7    A.   Again, I can't say what --

8    Q.   Okay.  So, if it --

9    A.   I don't know if Dr. Bajoghli's practice is very

10   seasonal.

11   Q.   Fair enough.  And you don't necessarily know what

12   he was doing between August and the end of the year?

13   A.   Correct.

14   Q.   So, if it was two thirds of that number, we're

15   probably looking at 300ish here.  Is that fair to say?

16   Would that be your word for it?

17   A.   I don't know.  You can put ish.

18   Q.   Okay, that's fine.  Fair enough.

19        Now, doing the math on this and I'm going to have

20   to round a little bit.  I can't do it on the fly, but

21   we're looking at about 4,000 Mohs procedures from the

22   2009 to the 2012 time period that you said is relevant

23   here, right?

24   A.   Yeah, okay.

25   Q.   Okay.  That's through, again that's through August

1   2012, right?  And frozen section --

2       A.  Can we put that down for the 2012 part that it

3   goes through August?  Can we write that there?

4       Q.  Sure, yeah.  Does that take care of it?

5       A.  Sure.

6       Q.  Okay.  So this is full year, 2009, full year 2010,

7   full year 2011, two thirds of 2012?

8       A.  Correct.

9       Q.  And then on this side, frozen section slides there

10  are -- do some quick math here, about 1,700.

11      A.  Yeah.

12      Q.  Okay.  All right.  So, during the time period that

13  you've identified as relevant here, we're looking at

14  4,000 Mohs procedures done by Dr. Bajoghli and 1,700

15  frozen section -- frozen sections reviewed by Dr.

16  Bajoghli, correct?

17      A.  According to that chart.

18      Q.  Right.  And, you were involved in the process that

19  involves getting frozen section slides to Dr. Lang who

20  testified in this case?

21      A.  That's right.

22      Q.  And Pearson Lang was the Mohs surgeon from, I

23  believe, Charleston, South Carolina?

24      A.  Yes.

25      Q.  And you brought him 1,287 frozen section slides to

1    review, initially, correct?

2         A.   That number sounds really close, yes.

3         Q.   You didn't bring him all 1,700 that Dr. Bajoghli

4    had reviewed between 2009 and August of 2012, did you?

5         A.   No, we didn't.

6         Q.   Why not?

7         A.   We brought everything that we had access to with

8    the exception of one box from Stafford in 2012.

9         Q.   Okay, so --

10        A.   So, there was maybe -- I'd hate to guess, but 40

11   or 50 frozen sections in there that we didn't bring him.

12        Q.   So some of the 1,700 you didn't have access to?

13        A.   We didn't have access to another portion of the

14   1,700.  It appeared because of the way the slide was made

15   that they were all locked together.  So there were 20 or

16   30 or 50 slides that were kind of fused together.  So we

17   didn't have access to the slides in those big bulk.

18        Q.   The way they had been stored or whatever kind of

19   caused them to kind of fuse together?

20        A.   Uh-huh.

21        Q.   Couldn't do individual -- so you sent him a

22   portion of these, the portion that you had access to and

23   thought was usable?

24        A.   We sent him everything that we thought we had

25   access to.  I mean, with the exception of that one box

1    from Stafford, we sent him everything we had access to.

2       Q.   Fair enough.  But the relevant universe of slides

3    that Dr. Bajoghli had reviewed, you would agree is this

4    1,700 from January 2009 through August 2012?

5       A.   The only thing that I would -- I would possibly

6    disagree with this number and I haven't checked this is

7    the denied claims.  If there was a denied frozen section,

8    it may show up as in your number here.

9       Q.   Fair enough.  So there could be some that were

10   denied where he had done a frozen section, but the bill

11   was denied, so that --

12      A.   So it was submitted twice and it's double counted

13   here.

14      Q.   So, there could be a little bit of double

15   counting?

16      A.   There's some of that.

17      Q.   Not a significant amount of double counting in

18   these numbers from what you've seen, right?

19      A.   I'm not sure.  I couldn't say.

20      Q.   Okay, fair enough.

21           But, you would agree with me that the relevant

22   universe of frozen section slides is some form of this

23   1,700 frozen section slides that Dr. Bajoghli reviewed

24   between 2009 and August 2012.  Is that fair?

25      A.   Again, I'd call the relevant universe closer to

1    1,200, because that's what we analyzed.  I think your

2    1,287 number is right.  That's what I'd call a relevant

3    universe.

4        Q.   That's what you choose to send to Dr. Lang?

5        A.   That's what we had access to.

6        Q.   That's what you had access to.  Other than the box

7    from Stafford which you chose not to send?

8        A.   Correct.

9        Q.   Which you did have access to.

10       A.   We did have access to that.

11       Q.   Fair enough.  And the relevant universe of Mohs

12   procedures that was done was 4,000 or thereabout during

13   this time period, right?

14       A.   Thereabout.

15       Q.   And, out of the 4,000 Mohs procedures, 17 were

16   charged here, and 88 or 89 are alleged to have been

17   unnecessary, right?

18       A.   Correct.

19       Q.   So, you're looking at about just over two percent

20   of the Mohs procedures that he did during this time

21   period, that 89 is a little bit over two percent of those

22   procedures, right?

23       A.   That's what that math works out to be, yes.

24       Q.   So, two percent of his Mohs procedures you're

25   saying were unnecessary based on the 89 that you had both

1    of your experts analyze, correct?

2        A.  Well, I wouldn't -- I wouldn't characterize it as

3    two percent.

4        Q.  Okay.  89 out of 4,000 are the ones that have been

5    presented here in court.

6        A.  I disagree with your denominator.  That's why I'm

7    saying I wouldn't call it two percent.

8        Q.  Because some of those were Mohs procedures that

9    were done pursuant to permanent section slides?

10       A.  Correct.

11       Q.  So you think the only thing relevant is the number

12   of frozen section slides?

13       A.  That's correct.

14       Q.  Again, not your call as to what's relevant.  My

15   question is, two percent of the Mohs procedures that he

16   did are -- represents the 89 that are here in court,

17   right?

18       A.  Again, I can't agree with that two percent if I

19   don't agree with the denominator.  I can agree with your

20   math.

21       Q.  How about my math, 89 out of 4,000, that's over

22   two percent?

23       A.  I can agree with your math.

24       Q.  80 out of 4,000 would be exactly two percent?

25       A.  Yes.

1    Q.   So it's 2.2 percent to be precise?

2    A.   I don't have a calculator, but it sounds by right.

3    Q.   Okay.  And you would -- your point is that the

4    frozen section is the right number to look at, right?

5    A.   I think the frozen section is the right number to

6    look at because those are the only ones that Dr. Bajoghli

7    looked at where he was the only person to look at them.

8    Q.   Okay.  So, out of the 17,000, you would agree with

9    me that 17 charged here out of the 1,700, I apologize, is

10   one percent, right?  Seventeen out of 1,700 is one

11   percent?

12   A.   Seventeen out of 1,700 is one percent.

13   Q.   Seventeen counts, 1,700, that he reviewed, one

14   percent of them have been charged here, right?

15   A.   One percent have been charged, correct.

16   Q.   And that number would be a little higher if you

17   include the 89 something like four percent?

18   A.   I mean, I guess.

19   Q.   Eighty-five?

20   A.   I don't know.

21   Q.   I think five percent would be 85, so --

22   A.   Okay.

23   Q.   So roughly five percent if you include the 89 of

24   the 1,700 or what's charged here as unnecessary Mohs

25   procedure.

1     A.   One out of every 20 patients, yes.

2     Q.   Okay.  And that's -- I said charged here.  I

3   should have said one out of -- one out of every 20 frozen

4   sections that he reviewed are ones that are included in

5   the chart.  Fair enough?

6     A.   I guess I shouldn't have said patients because

7   patients had multiple frozen sections, so that number may

8   be larger.

9     Q.   As a matter of fact, multiple patients would come

10  in with multiple lesions that they would look at at the

11  same time?

12    A.   Absolutely.

13    Q.   That happened very frequently.  All right.

14         MR. WHITE:  Court's indulgence one moment.

15         THE WITNESS:  Would you like this back,

16  Mr. White?

17  BY MR. WHITE:

18    Q.   Sure if it's in your way, I'd be happy to take it.

19  Thank you.

20         I'd like to talk some about the charts that you

21  have prepared.

22    A.   Okay.

23    Q.   And, before we get to that, the 89 that have been

24  included that we have been talking about, those are the

25  ones about which Dr. Lang and Dr. Patterson agreed that

1    there was not cancer present from their review of the

2    slides, right?

3       A.   Dr. Lang and Dr. Patterson informed us those were

4    clearcut cases and those were the ones they agreed on.

5    They didn't know they agreed on them.

6       Q.   You saw Dr. Rosic testified, too?

7       A.   I did see Dr. Rosic testify.

8       Q.   She disagreed with the vast majority of their

9    diagnosis, correct?

10            MR. NATHANSON:   Objection, Your Honor, asking

11   him to comment on other witness's testimony.

12            THE COURT:   Sustained.

13   BY MR. WHITE:

14      Q.   Dr. Rosic's analysis didn't have anything to do

15   with your putting together your 89 slides, right?

16      A.   Yes, Dr. Rosic's testimony we didn't factor into

17   anything.

18      Q.   Got it.

19      A.   And we weren't aware of it.

20      Q.   By the way, I think you said that they said all of

21   those were clear, all of those 89.  Don't you recall Dr.

22   Lang testifying that one of the charged counts here was

23   actually cancer from the stand?  Don't you remember him

24   saying that?

25            MR. NATHANSON:   Your Honor, I'm going to

1  object again, and it's the witness -- it's the jury's

2  recollection of the witness that controls, not this

3  witness .

4          MR. WHITE:  He volunteered a comment about

5  what they said.

6          THE COURT:  All right.  I sustain the

7  objection.

8          MR. WHITE:  Okay.

9  BY MR. WHITE:

10    Q.  Let's start with, Special Agent Palian, which was

11  the exhibit that you looking at when you talked about the

12  cryo freezes.  Can you remind me what the number of that

13  was?

14    A.  Stand by.

15    Q.  I think it's 306.  Do I have that right?

16    A.  306 is correct.

17    Q.  Could you pull up 306, please.

18    A.  Excuse me.  I have 306.

19    Q.  Can you blow up -- actually the whole text chart.

20  Okay.

21          So, this is 306 and this is what you were looking

22  at while you testified about what Dr. Bajoghli would have

23  gotten if he had done a cryo freeze on these, correct?

24    A.  Correct.

25    Q.  And I think he said what he would have gotten if

1    he had done a cryo freeze was something like 70 to 80 or

2    $90 depending on the time?

3        A.   Depending on the time period.

4        Q.   You're not testifying that cryo freeze was the

5    appropriate thing to do for any of these lesions, are

6    you?

7        A.   That's what Dr. Lang testified to.

8        Q.   I want to know what you're testifying to?

9        A.   I'm not a doctor.  I can't testify.

10       Q.   You're not a physician?

11       A.   No, I'm not a physician.

12       Q.   So you're not testifying --

13       A.   I shouldn't say I am not a physician.  Let me

14   clarify.

15       Q.   You're not an MD?

16       A.   No, I'm not an MD.

17       Q.   And you didn't do a dermatology residency?

18       A.   No, I did not.

19       Q.   Did not do a pathology residency?

20       A.   No.

21       Q.   So, you're not qualified to read slides?

22       A.   No, I'm not.

23       Q.   And you're not qualified to testify as to what the

24   appropriate treatment is for any particular patient is,

25   are you?

1    A.   I'm not qualified to do that.

2    Q.   So you're not saying that the appropriate

3  treatment for any of these patients was a cryo freeze,

4  are you?

5    A.   No.

6    Q.   As a matter of fact, there are a number of

7  different treats that can be appropriate, even for a

8  benign lesion, correct?

9    A.   There are -- my understanding again, I'm not a

10 dermatologist, but there's a number -- my understanding

11 is there's a number of different methods that these

12 things can be treated with.

13   Q.   There can be cryo freeze, simple excisions, other

14 methods that are done, correct?

15   A.   My understanding is those exist, yes.

16   Q.   And if there's a simple excision, there's a wound

17 closure for that too, right?

18   A.   Not always.

19   Q.   Not always.  It can be second intention healing

20 for that, too, correct?

21   A.   Can be.

22   Q.   But there can be a wound closure charge for that

23 too, right?

24   A.   There can be.

25   Q.   Okay.  So, using the example that you talked about

1    Frederick Farber, the diagnosis I think you said by Dr.

2    Lang was that that was a wart, or at least, you probably

3    recall that.  I may have that wrong.  Was that Lang or

4    Patterson said it was a wart?

5         A.   Lang.

6         Q.   If that was removed by simple excision, there

7    would be a wound closure charge potentially for that,

8    too, correct?

9         A.   Potentially but not necessarily.

10        Q.   Not necessarily, okay.  Now, there's one piece of

11   this I want to specifically focus you on.  You've got

12   repaired paid column here and there are four instances

13   where Dr. Bajoghli didn't bill for any repair.  Do you

14   see that?

15        A.   Four instances, that's correct.

16        Q.   Four of the 17, correct?

17        A.   Yes.

18        Q.   And, those as I think you testified are instances

19   where he allowed this surface wound to heal by second

20   intention healing, correct?

21        A.   The patient files lead me to believe that.

22        Q.   So the patient files indicate that as to Larry

23   Brooks there was no charge for a wound closure because

24   the wound was allowed to heal on itself, correct?

25        A.   Yes.

1    Q.   Much like if somebody had gotten a bad scrape on

2    their knee and just let it heal on its own, correct?

3    A.   Correct.

4    Q.   So there is no charge for a wound closure when

5    that happens, right?

6    A.   There is no charge for a wound closure when that

7    happens.

8    Q.   And in four of the 17 instances here where Dr.

9    Bajoghli diagnosed cancer and did Mohs surgery, he did

10   not charge for any wound closure, correct?

11   A.   Correct.

12   Q.   And that's pretty typical from the documents

13   you've seen throughout his practice, there are a number

14   of patients who did Mohs surgery and did not have wound

15   closure charges because of second intention healing,

16   correct?

17   A.   There is a number of them.  I wouldn't be

18   comfortable estimating that number, but there is a number

19   of them.

20   Q.   Fair.  These aren't the only four instances out of

21   the 4,000 Mohs procedures where second intention healing

22   led to no wound repair charge, are they?

23   A.   Correct, they're not.

24   Q.   There are lots of them, right?

25   A.   I don't know if there's lots of them, but.

1    Q.   It's not a very well defined term, is it?

2    A.   No.

3    Q.   Okay.  Significant number, maybe that's better?

4    A.   Again, I --

5    Q.   All right.  Now, you gave a diagnosis for 15 of

6    these 17 diagnosis per FS path report.  Do you see that?

7    A.   Yes, that's correct.

8    Q.   And two of the 17 -- 15 of the 17 are cancer as

9    you understand it, and two of the 17 are benign lesions,

10   correct?

11   A.   Correct.

12   Q.   Let's talk about Larry Brooks for a moment.  And

13   Larry Brooks, you're aware that throughout the patient

14   file for Larry Brooks, Dr. Bajoghli's contemporaneous

15   diagnosis for Larry Brooks' lesion was squamous cell

16   carcinoma, correct?

17            MR. NATHANSON:  Objection, Your Honor, calls

18   for speculation.  He's asking for what was in Dr.

19   Bajoghli's mind at the time, contemporaneous diagnosis.

20            MR. WHITE:  I asked what was in his file.

21            THE COURT:  Objection overruled.

22   BY MR. WHITE:

23   Q.   You need me to repeat the question?

24   A.   Please.

25   Q.   In Dr. Bajoghli's file for Larry Brooks, which

1    you're very familiar with, on several occasions, and I'm

2    happy to walk you through them, the contemporaneous

3    notations in Dr. Bajoghli's file show that he diagnosed

4    that lesion as squamous cell carcinoma.  Isn't that

5    correct?

6        A.   There are places in the file where it's diagnosed

7    as --

8        Q.   Lots of places in the file.  Do you want to walk

9    through them?

10       A.   Up to you.

11       Q.   There's more than one, right?

12       A.   There's more than one.

13       Q.   The Mohs map says it's a squamous cell carcinoma,

14   correct?

15       A.   I believe it does.

16       Q.   And, the patient form that the MA fills out while

17   doing the service, that says it's squamous cell

18   carcinoma, too?

19       A.   You're talking about the patient encounter form?

20       Q.   Yes.

21       A.   Yes. I believe it does.

22       Q.   And the letter that he sent to another doctor that

23   says it's squamous cell carcinoma, correct?

24       A.   I believe so.

25       Q.   And even his operative notes that says it's a

1    squamous cell carcinoma, correct?

2        A.   I'm sorry, his what notes?

3        Q.   His operative notes.

4        A.   Operative notes, I believe it does.

5        Q.   Right.  And as well, the permanent section

6    analysis -- I'm sorry, the frozen section path report

7    here talks about ruling out squamous cell carcinoma for

8    Mr. Brooks, correct?

9        A.   It does speak to ruling out squamous cell

10   carcinoma, yes.

11       Q.   So, if I've counted it correctly, there are at

12   least six instances in the file where the contemporaneous

13   documents indicate that Dr. Bajoghli's diagnosis was

14   squamous cell carcinoma, correct?

15       A.   I didn't keep count, but if you say that is, I

16   believe you.

17       Q.   Okay, at least five.

18       A.   Again, I didn't keep count, but I think you said

19   five things.

20       Q.   Fair enough.  But on your chart, you put the

21   diagnosis was a benign lesion, an SK?

22       A.   Correct, that's what's was on the frozen section.

23       Q.   And you're aware that the frozen section report

24   for Larry Brooks was actually not prepared at the same

25   time as the procedure was done.  You're aware of that,

1    right?

2        A.   I don't know that.

3        Q.   Didn't you --

4        A.   I can't say when that file was created.  I can say

5    when it was last modified.

6        Q.   When was it last modified?  I'll give you help,

7    July 27th.

8        A.   That sounds right.

9        Q.   Service was July 6th.

10       A.   Correct.

11       Q.   So the service was on July 6th.  On July 10th, the

12   pathology report from Dr. Ocampo comes back that says

13   it's seborrheic keratosis, correct?

14       A.   I think that was the date.

15       Q.   The document that's been introduced in court as

16   his frozen section path report 2B, that says it's

17   seborrheic keratosis, correct?

18       A.   Yes, the frozen section said that.

19       Q.   And that document was not created until after Dr.

20   Ocampo's external pathology report came back and

21   disagreed with Dr. Bajoghli's diagnosis of squamous cell

22   carcinoma, correct?

23       A.   Again you're using the word "created".  The

24   metadata doesn't say when it was created.  It says when

25   it was modified.

1    Q.   Fair enough.  The version that was introduced in
2    court was last modified on July 27th.
3    A.   I don't think that's correct.  The version that
4    was introduced in court was a paper document.  There's no
5    metadata that goes with paper documents.
6    Q.   But you've looked at the version that's connected
7    to the metadata that was last modified on July 27th,
8    correct?
9    A.   I'm sorry.  Could you ask that question again.
10   Q.   You've looked at the version that existed in their
11   electronic files that was last modified on July 27th?
12   A.   Yes, I have.
13   Q.   It is identical to the one the government
14   introduced in court, isn't it?
15   A.   Yes, it is.
16   Q.   So there was no change on July 27th -- so the
17   version that existed on July 27th on the server, is the
18   same as the paper version that was introduced in court,
19   correct?
20   A.   It appears to be the same.  However, I will say
21   that the metadata would show that it changed if somebody
22   had put a space in there, right.  If somebody adds --
23   hits the space bar once, it's going to show it was
24   modified on that date.  They would appear to be the same
25   document, the paper and the electronic.  I wouldn't know

1    the difference.

2       Q.   Did you see a space difference between the one

3    that was in court and the one that was in the -- that was

4    stored on the system?

5       A.   If it was at the end of a sentence, you wouldn't

6    see it.

7       Q.   Okay.  So you're just -- you're hypothesizing that

8    somebody put a space into a report that was already in a

9    file --

10      A.   I'm not hypothesizing anything.  I'm telling you

11   why you can't necessarily draw that conclusion.  I'm not

12   saying that that's what happened.  I'm saying why your

13   conclusion isn't necessarily true.

14      Q.   That's a ludicrous conclusion, though, isn't it,

15   that somebody put in a space you can't tell?

16      A.   If you open up a document --

17            THE COURT:  Excuse me.  Excuse me.  The way

18   this works is one question, one answer.

19            We're going to break now.

20            Ladies and gentlemen, please listen to me

21   carefully.  I have a slight change in the schedule.  So,

22   today, we're going to break now for 15 minutes.  I'm

23   going to break for lunch today at 12:30, from 12:30 to

24   1:30 because I have a judges' meeting.  All the judges

25   are meeting at 12:30 today.

```
 1              We will sit all day on Thursday as the normal
 2   schedule, 10 to 5 on Thursday.  So to be clear, we're
 3   going to break now 15 minutes.  We're going to come and
 4   we'll break for 12:30 for lunch, from 12:30 to 1:30
 5   because I have a judges' meeting.  We'll sit all day on
 6   Thursday.  Thank you.
 7              A JUROR:  What about Wednesday?
 8              THE COURT:  Wednesday, too, absolutely all
 9   day Wednesday, too.  Thank you for saying that.
10              All right.
11              (Court recessed at 11:31 a.m. and reconvened
12              at 11:48 a.m.)
13              THE COURT:  You can bring the jury out,
14   Mr. Toliver.  Thank you.
15              You may be seated.
16              All right, counsel, you may proceed.
17              MR. WHITE:  Thank you, Your Honor.
18              CROSS-EXAMINATION CONTINUED
19   BY MR. WHITE:
20      Q.  Special Agent Palian, when we left off, we were
21   talking about Government's Exhibit 306.
22      A.  306, yes, sir.
23      Q.  And the one I was specifically focused on was the
24   Larry B which was the Larry Brooks line on two?
25      A.  Yes, we were talking about.
```

1    Q.   And the number of times -- I think we were up to

2    the point where you were aware that the metadata for the

3    document which is facially identical to the one that was

4    entered in court shows it was last modified on July 27th

5    after Dr. Ocampo's external pathology report came out

6    listing his seborrheic keratosis diagnosis.

7         Did I phrase it correctly?

8    A.   You did phrase it correctly.

9    Q.   So that's what it shows?

10   A.   It does show that.

11   Q.   And your point at the end was if somebody had gone

12   into the document -- if somebody had typed in seborrheic

13   keratosis, despite everything else in the medical file as

14   Dr. Bajoghli's diagnosis on July 6th, if they went in and

15   just put a space in on July 27th, then that would

16   indicate the last modified date was July 27th, right?

17   A.   That or if somebody had taken a word out and then

18   put it back in and saved it, the documents would still

19   again look the same, but it would show as modified.

20   Q.   You know of absolutely no evidence that that

21   actually happened?

22   A.   No, I don't have any evidence of that.

23   Q.   As a matter of fact, the normal way to look at

24   this, you as an investigator would say, that was done

25   on -- the report was done after Dr. Ocampo's analysis

1   came back, given the forensic data, correct?

2        A.   No, I wouldn't necessarily look at it that way.

3        Q.   So you would say as an investigator that it's

4   possible somebody put a space in and that's what happened

5   on that --

6        A.   I would say inconclusive.  I can't tell.

7        Q.   You would say it's inconclusive.

8             But throughout Dr. Bajoghli's medical file, it is

9   not inconclusive that his diagnosis, other than this one

10  document created after Dr. Ocampo's different diagnosis

11  came back, Dr. Bajoghli's diagnosis was clearly squamous

12  cell carcinoma from every document in that file, correct?

13       A.   Every other document states squamous cell

14  carcinoma, that's correct.

15       Q.   But you put SK on this report, right?

16       A.   Because that's what was on the frozen section,

17  that's correct.

18       Q.   A prior version of this produced to us had that as

19  Dr. Bajoghli's actual diagnosis, didn't it?

20            MR. NATHANSON:  Objection, Your Honor,

21  relevance.

22            THE COURT:  Sustained.

23  BY MR. WHITE:

24       Q.   Now, let's look at Janet Buccola.  That's the

25  other instance on this, Janet B, Count 12.  Do you see

1    that one?

2        A.   Yes, I see that.

3        Q.   That's the other instance on this chart where a

4    noncancer diagnosis is listed on your chart, correct?

5        A.   Correct.

6        Q.   Exact same fact pattern here where throughout

7    Janet Buccola's file, Dr. Bajoghli's Mohs map has a

8    cancer diagnosis, correct?

9        A.   Dr. Bajoghli's Mohs map has a cancer diagnosis.

10       Q.   And Dr. Bajoghli's operative notes has a cancer

11   diagnosis, correct?

12       A.   I believe that's true.  I haven't reviewed the

13   report recently, but I think that's true.

14       Q.   And Dr. Bajoghli's letter to the referring

15   physician has a cancer diagnosis, correct?

16       A.   I believe it does.

17       Q.   And Dr. Bajoghli's patient encounter form has a

18   cancer diagnosis, correct?

19       A.   I think so.  I'm not positive.

20       Q.   And, in this case as well, there was an external

21   pathology that came back after the Mohs was done that had

22   a different reading on the slide from Dr. Bajoghli,

23   correct?

24       A.   It did have a different reading.

25       Q.   And that reading was SK, right?

1    A.   Yes.

2    Q.   And in this case as well the metadata for the

3  document that has been introduced as an SK, shows that it

4  was created after the external pathology report came

5  back; isn't that true?

6    A.   I don't know that.  I haven't seen that metadata.

7    Q.   So you haven't looked at the metadata for the

8  other frozen section path reports stored on the system?

9    A.   No, I have not.

10   Q.   You weren't curious to see whether the last change

11  date for Janet Buccola was, like with Larry Brooks, the

12  last modified date was after the external pathology

13  report came in?  You weren't curious about that?

14   A.   No, because the metadata is inconclusive a lot of

15  the times.

16   Q.   Because they could have put a space in at the end

17  and you wouldn't be able to know.

18   A.   It could have made any one of a number of

19  modifications to that that wouldn't show up on the

20  document that's in the file.

21   Q.   Let's talk about the number of modifications.  One

22  is putting a space in at the end of a line.  You wouldn't

23  notice that?

24   A.   I wouldn't notice that.

25   Q.   Another is deleting a word and typing it right

1   back in and you wouldn't know that, right?

2       A.   Correct, any modification that keeps the two

3   documents looking the same, you wouldn't notice that, but

4   the metadata would show it was changed.

5       Q.   Okay.  What other modifications might do that?

6       A.   I'm not a computer expert, but -- I'm not sure.

7       Q.   You don't know of any reason to think that

8   somebody deleted a word after the fact and typed it back

9   in, do you?

10      A.   No, I don't have any reason to think that.  I'm

11  just saying it's inconclusive.

12      Q.   You don't have any reason to think that anybody

13  added a space on to a document after the external

14  pathology report came back, do you?

15      A.   Nope.

16      Q.   The normal explanation is that's actually when the

17  document was created, isn't it?

18      A.   I don't know when this document was created.  I

19  can't tell that.

20      Q.   But you know it was modified after the external

21  pathology came back with the seborrheic keratosis

22  diagnosis, correct?

23      A.   For Larry Brooks we know that.

24      Q.   And for Janet Buccola, you never checked?

25      A.   We never looked.  There's no reason to.

1   Q.   And as a matter of fact, did you look at the

2   metadata for all of these and see that for almost all of

3   them, they were actually last modified in the system well

4   after the procedure, did you know that?

5   A.   I didn't have that information because I didn't

6   look at that.

7   Q.   So you didn't look to see when these were created

8   other than the Brooks report?

9   A.   We relied on the paper file.  We didn't rely on

10  the electronic.

11  Q.   But the FBI actually looked into the Brooks -- the

12  Brooks frozen section report, correct?

13  A.   We did.

14  Q.   And, the metadata on that one indicated it was

15  last modified on July 27th, 21 days after the procedure

16  had been done by Dr. Bajoghli, correct?

17  A.   Yes, 21 days.

18  Q.   And the way it was modified to is visually

19  identical to what's been presented in court, correct?

20  A.   Correct.

21  Q.   All right.

22       MR. WHITE:  Now, could you bring up 304,

23  please.  And if you could -- I don't know.  This needs to

24  be much more readable for this purpose, but maybe if you

25  could blow up the first three lines, please.  I'm not

1   sure that made it a whole lot more readable, but let's

2   take a shot with it.

3       Q.   Line one lists a diagnostic code 173.3, correct?

4       A.   Yes, it does.

5       Q.   And the description next to it, that's just the

6   description that goes with that diagnostic code, correct?

7       A.   Yes.

8       Q.   And you'll notice that line three has the same

9   173.3 code, correct?

10      A.   Yes.

11      Q.   So it has the exact same description next to it,

12  correct?

13      A.   It does.

14      Q.   So, at that time, whether it was a squamous cell

15  carcinoma or a basal cell carcinoma --

16      A.   You're correct.

17      Q.   -- of the skin or other part of the face, it got

18  the same code, correct?

19      A.   Yes.

20      Q.   And, the code is what dictates what gets billed

21  and what gets paid, correct?

22      A.   Correct.

23      Q.   So, at this time, whether it was a squamous cell

24  carcinoma or a basal cell carcinoma, it didn't matter to

25  the insurance carriers, because they had the same code

1    for both of them, right?

2        A.   The ICD9 code was the same for both at that time,

3    yes.

4        Q.   So whether it was squamous cell or basal cell,

5    gets the same code, gets billed and paid the same way?

6        A.   Yes, you put the same ICD9 code down, that's

7    right.

8        Q.   And the amounts that are paid for the Mohs

9    surgeries and the wound closures and everything else,

10   those are all set by, take them maybe one at a time,

11   Medicare sets the amount it will pay for a Mohs procedure

12   at a particular time in a particular place or a wound

13   closure in a particular time and a particular place,

14   correct?

15       A.   Each insurance carriers sets their own

16   reimbursement rates.

17       Q.   So Medicare would have one and maybe Blue Cross

18   Blue Shield would have a different rate and Anthem a

19   different rate and Tricare may even have a different

20   rate?

21       A.   Yes.

22       Q.   Okay.  The amounts that were paid here in the

23   exhibits that you showed, those were all the standard

24   rates that those insurers, if we can call Medicare an

25   insurer as well for this purpose, that those insurers

1    would normally pay for the procedures that would done; is

2    that right?

3        A.   Yes.

4        Q.   Okay.

5            Now, you mentioned that you had been involved in

6    this investigation since December or November 2011; is

7    that right?

8        A.   Approximately, in there, yes, late November, early

9    December.

10       Q.   You were involved as well in obtaining the

11   information that Special Agent Weeter used in the

12   interrogation of Dr. Bajoghli in August of 2012, correct?

13       A.   Obtaining what information?

14       Q.   Well, Special Agent Weeter went into that -- he

15   testified that he went into that interview with

16   documentation about a patient named David Purdie.

17       A.   That's correct?

18       Q.   And you were involvement in getting that

19   documentation to Special Agent Weeter and Special Agent

20   Gowens prior to that interview, correct?

21       A.   Yes, I was.

22       Q.   And that information was largely a document that

23   was obtained from Colleen Hyde; isn't that correct?

24       A.   I believe it was.

25       Q.   And Colleen Hyde is an individual who worked at

1   Dr. Bajoghli's practice?

2       A.   She did.

3       Q.   Correct.  And she -- you had signed her up as a

4   confidential informant in 2010, correct?

5       A.   I didn't sign her up as a confidential informant

6   but she was signed up as a confidential informant in

7   2010.

8       Q.   She was signed up by the FBI in 2010 as a

9   confidential informant?

10      A.   Correct.  I wasn't working on the case back then.

11      Q.   Right.  That's right.

12           So she continues to work there from 2010 through

13  at least August 2012 and is providing information

14  confidentially to the FBI without letting people at the

15  practice know, correct?

16      A.   Correct.

17      Q.   And, she would occasionally take documents from

18  the practice and bring them to the FBI, right?

19      A.   Yes.

20      Q.   And one of the documents that she took from the

21  practice which was given to the FBI, was a handwritten

22  frozen section report for patient David Purdie, correct?

23      A.   I don't remember if it was handwritten or not, but

24  I know that was provided.  I just don't know if it was

25  handwritten.

1    Q.   Fair enough.  There was a frozen section report
2    for patient David Purdie, correct?
3    A.   There was a frozen section report in there.
4    Q.   And what she had told you and the reason Dr.
5    Bajoghli was asked about David Purdie was that this was
6    an instance where Dr. Bajoghli had done unnecessary Mohs
7    surgery because it was a seborrheic keratosis and not
8    cancer, right?
9    A.   Correct.
10   Q.   And that's what the confidential informant told
11   you?
12   A.   That's what I was informed of, yes.
13   Q.   So, that's why Special Agent Weeter and Special
14   Agent Gowens asked Dr. Bajoghli about David Purdie
15   because this information had been obtained previously,
16   right?
17   A.   Yes, it had been obtained previously.
18   Q.   That was wrong, was it?
19   A.   What was wrong?
20   Q.   The diagnosis was wrong?
21   A.   Which diagnosis?
22   Q.   The slide that Ms. Hyde gave you the information
23   for, you're aware that Dr. Lang later reviewed that
24   slide, correct?
25   A.   Dr. Lang later reviewed that slide, that's right.

1    Q.   And Dr. Bajoghli had diagnosed that slide as

2    squamous cell carcinoma, I believe, correct?

3    A.   I don't remember which it was, but it was a

4    cancerous diagnosis.

5    Q.   It was cancerous.  Squamous cell or basal cell?

6    A.   I think it was basal cell actually.

7    Q.   So the diagnosis was basal cell.

8         Dr. Lang agreed with Dr. Bajoghli, correct?

9    A.   Yes, they did.

10   Q.   So, Dr. Lang agreed with Dr. Bajoghli that this

11   diagnosis that supposedly had been obtained from Colleen

12   Hyde that was supposedly -- let me start that over.

13        Dr. Lang agreed with Dr. Bajoghli that the lesion

14   he treated on David Purdie was cancer, right?

15   A.   Dr. Lang and Dr. Bajoghli looked at the same slide

16   and both agreed that it was basal cell carcinoma, yes.

17   Q.   Cancer?

18   A.   Cancer.

19   Q.   And the form that you had been given by your

20   informant that indicated it was seborrheic keratosis,

21   that was for a completely different lesion on David

22   Purdie's body, wasn't it?

23   A.   No, it wasn't.  It was for the same body area.

24   Q.   For the same body area, but a different spot on

25   the body area?

1    A.   I don't know that.  It appeared to be the same

2    spot.

3    Q.   In any event, you've looked at Mr. Purdie's file,

4    correct?

5    A.   Yes.

6    Q.   And you're aware that that file documents Dr.

7    Bajoghli's diagnosis of that lesion as cancer, correct?

8    A.   Correct.

9    Q.   And, you're aware that Dr. Lang agreed with Dr.

10   Bajoghli's diagnosis, correct?

11   A.   Correct.

12   Q.   And you're aware as well, aren't you, that David

13   Purdie could not have been an instance where Dr. Bajoghli

14   took the frozen section and the Mohs layer at the same

15   time.  You're aware of that, right?

16   A.   I'm not sure how I would be aware of that.

17   Q.   Well, the Mohs log for -- for David Purdie

18   indicates that there are -- there is a frozen section for

19   David Purdie, and then a couple other slides are analyzed

20   and then a Mohs layer for David Purdie, correct?  I could

21   show it to you if you want.

22   A.   Can I see the Mohs log?

23   Q.   Sure.

24        MR. WHITE:  Can you pull up 244, please.

25        MR. NATHANSON:  Your Honor, I'm going to

1    object to this on relevance grounds.  This isn't a

2    charged count.

3              MR. WHITE:  He brought up the fact that he

4    was involved in this entire investigation, so the entire

5    investigation is relevant.  And also there has been

6    testimony about this interview where Dr. Bajoghli's

7    statements supposedly changed after being confronted

8    about David Purdie.

9              THE COURT:  Objection overruled.

10             MR. WHITE:  Thank you.

11   BY MR. WHITE:

12       Q.   Page 54, please.

13             Now, generally, before we get to the specifics on

14   this, Special Agent Palian, you recognize this to be one

15   of the Mohs logs that the techs would keep and they would

16   enter in the people and the slide numbers that they

17   were -- that they were preparing as they went?

18       A.   Yes, it's the Mohs log.

19       Q.   Okay.

20             MR. WHITE:  And, if you could blow up the

21   bottom six lines, please.  And if you could just blow up

22   the left half.  That may make it bigger and more

23   readable.  Thank you.

24       Q.   And you're aware that this log, generally the

25   practice people have said was to log in slides as they

1    came in in sequence, the sequence that they came into the

2    lab?

3        A.   Yeah, that's correct.

4        Q.   And you see that -- that David Purdie came in on

5    September 3rd.  That was the date of treatment, 2010,

6    correct?

7        A.   Yes.

8        Q.   And, he came in and there were two frozen sections

9    done, FS10-051, and FS10-052.  Do you see that?

10       A.   I see them both.

11       Q.   And the one that -- the one that's relevant here

12   that had the cancer diagnosis, that's FS10-052.  Do I

13   have that right?

14       A.   Ah, yes.

15       Q.   Okay.  So you can see that FS10-052 comes in and

16   then there are three other entries below that.  Now, FS

17   here means frozen section, right?

18       A.   It does.

19       Q.   And your understanding is that's the biopsy that

20   is done to determine the cancer diagnosis, correct?

21       A.   That's my understanding.

22       Q.   So, in this circumstance, it looks like there were

23   two biopsies done of Mr. Purdie; one on the right side

24   and one on the left side to make it easier.  Is that

25   fair?

1      A.   Yes.

2      Q.   And then it looks like there were two other

3    patients whose B slides came in.  And B slide means that

4    a Mohs layer, correct?

5      A.   It does.

6      Q.   So, David Purdie's two frozen sections came in and

7    two other patients' Mohs layers came into the lab.

8    That's what that means, right?

9      A.   Yes.

10     Q.   And then after those two other patients' Mohs

11   layers were prepared, then David Purdie's Mohs layer was

12   prepared for the left lateral forehead, correct?

13     A.   Yes. It appears that way from the record.

14     Q.   So, this was not a situation where Dr. Bajoghli

15   did the biopsy and the Mohs layer at the same time, is

16   it?

17     A.   It does not appear that it is.

18     Q.   And, in this -- this is the sequence of treatment

19   that Special Agent Weeter and Special Agent Gowens were

20   asking about when they interviewed Dr. Bajoghli in

21   August 2012, correct?

22     A.   August of 2012, that's right.

23     Q.   Right.  Now, you can take that down.

24          You had a code name for Colleen Hyde when she was

25   a confidential informant working for you, didn't you?

1      A.   I didn't provide the code name, but yes, she did
2  have a code name.
3      Q.   Who provided it?
4      A.   The previous agent who worked on the case before I
5  came in?
6      Q.   What was her code name?
7      A.   Home Slice.
8      Q.   Home Slice?  So your reports refer to her as CHS
9  Home Slice, right?
10     A.   Sometimes, sometimes just CHS.
11     Q.   And CHS means confidential human source?
12     A.   Correct.
13     Q.   But whenever we see that CHS Home Slice refers to
14  Colleen Hyde?
15     A.   Yes.
16     Q.   And Colleen Hyde worked for Dr. Bajoghli, right?
17     A.   She did.
18     Q.   And she is the one who gave you the frozen section
19  analysis and told you that this was an example of Dr.
20  Bajoghli doing unnecessary Mohs on a benign liaison,
21  correct?
22     A.   Colleen provided me with two reports that
23  conflicted and said this was an example of unnecessary
24  Mohs surgery, that's right.
25     Q.   And this is the same person who was given -- or

1    who -- basically stole prescriptions from Dr. Bajoghli's

2    practice and filled them for painkillers including

3    OxyContin, correct?

4        A.   Yes.  I don't know if it was specifically

5    OxyContin.  I don't think it was.  But, yes, it was

6    Percocet and Vicodin, I believe.

7        Q.   Series of painkillers, correct?

8        A.   They were series of painkillers that were

9    Oxycodone based.

10       Q.   Oxycodone base, which is the base for OxyCotin,

11   correct?  So, it could have been OxyCotin; it could have

12   been a generic?  It could have been Vicodin?

13       A.   Well, yes.

14       Q.   And, you relied on information that Ms. Hyde had

15   given you in connection with that affidavit we were

16   looking at previously that you filed in court, correct?

17       A.   I relied on that information.

18       Q.   And you stated that she was reliable in that

19   affidavit, right?

20       A.   Yes.

21       Q.   Okay.  There is an additional aspect to Ms. Hyde's

22   cooperation with all, and that was that she was actually

23   paid by the FBI at one point, wasn't she?

24       A.   She was paid.

25       Q.   When was she paid?

1      A.   You can give me my report.  It would refresh my

2   memory, but it was sometime in 2012.

3      Q.   2012.  That's fair enough.

4           So she was actually paid by the FBI to give

5   information that could lead to a prosecution of Dr.

6   Bajoghli, correct?

7      A.   She was paid by the FBI and she provided us

8   information.  I won't say that it -- it could lead to a

9   prosecution because at that time we didn't know that.

10     Q.   Well --

11     A.   We were just gathering information.

12     Q.   The purpose of the investigation is to figure

13  whether to bring a prosecution, correct?

14     A.   Whether to bring a prosecution, yes.

15     Q.   And you weren't asking her for information that

16  would prove Dr. Bajoghli's innocence at that time?

17     A.   No, that's not true.  We asked her for any and all

18  information.

19     Q.   And she stole this file from his practice and gave

20  it to you and said, this was an instance where he had

21  done Mohs surgery on an SK, right?

22     A.   I disagree with the word "stole", but yes, she

23  provided me the information.

24     Q.   Borrowed?

25     A.   Call it whatever you want, she provided it to us,

1    but it's not stole.

2        Q.  Was it hers?

3        A.  It was not her information, but she's entitled to

4    give it to us.

5        Q.  She's entitled to give it to you?

6        A.  Yes.

7        Q.  It's not hers, right?

8        A.  It's not hers.

9        Q.  It's his, right?

10       A.  It's his.

11       Q.  He didn't authorize her to did it?

12       A.  He did not authorize her to take it.

13       Q.  To you that's not stealing?

14       A.  No, because she was authorized to do it.

15       Q.  By you?

16       A.  By myself and the Department of Justice.

17       Q.  Now, you've gotten in trouble in the past for

18   improperly giving confidential informants money, haven't

19   you?

20       A.  Yes.

21       Q.  And, it was also in a healthcare case, right?

22       A.  No.

23       Q.  Not a healthcare case?

24       A.  It was not healthcare case.

25       Q.  You were disciplined by the FBI for improperly

1  giving a confidential informant money, correct?

2     A.  Yes.

3     Q.  And, given a certain number of days off?

4     A.  Yes, I was.

5     Q.  Correct.  Is that mistake on your part?

6     A.  I'm sorry.

7     Q.  Was that a mistake on your part?

8     A.  It was a mistake in policy, yes.  I didn't follow

9  the policy correctly.

10     Q.  So you didn't follow the policy correctly.  Was

11  that fraud on your part?

12     A.  No, absolutely not.

13     Q.  So, that was just a mistake?

14     A.  It was a mistake.

15     Q.  Okay.  Were you unaware of some of the details of

16  the policy and that's why you made the mistake?

17     A.  I was unaware of the details of policy.

18     Q.  That policy maybe was complicated and you didn't

19  know all the rules when you gave that money to another

20  confidential informant, not Ms. Hyde, correct?

21     A.  Right.

22     Q.  So you got the rules wrong and you were

23  disciplined for it, right?

24     A.  I got the rules wrong, and I was disciplined.

25     Q.  But that was just a mistake?

1    A.   It was a mistake.

2    Q.   Relying on Ms. Hyde isn't the only mistake you've

3  made in this case.  You also told the prosecutors in this

4  case that you suspected that Dr. Bajoghli at one point

5  was moving money offshore, didn't you?

6    A.   Yeah, at one point, we brought a concern to the

7  defense, which turned out to be incorrect, that's right.

8    Q.   So your concern was that he was moving money

9  offshore.  As a matter of fact, you told the defense and

10 you told the prosecution that you believe that's what was

11 going on, correct?

12   A.   That's right.

13   Q.   As a matter of fact, that was a mistake, too,

14 wasn't it?

15   A.   That was a mistake.

16   Q.   Because actually what was going on was Dr.

17 Bajoghli was moving money from one -- moving money from

18 one US Bank to another US Bank to buy an office building

19 in McLean, Virginia, correct?

20   A.   That's my understanding after the fact, yes.

21   Q.   McLean, Virginia, is not offshore, is it?

22   A.   It is not.

23   Q.   Again, another mistake, not a crime on your part?

24   A.   Not a crime.

25           MR. WHITE:  Could you bring up Government's

1   Exhibit 117, please.  Now, this is another one that's

2   hard to read.  Government's Exhibit 117, if you could

3   blow up maybe the last part where the sequence on the

4   right changes to the pathology count, the bottom third,

5   if I have it right.

6      Q.   Okay.  So the bottom third of this document,

7   Special Agent Palian, lists by line the pathology counts

8   that are part of this indictment.  Is that right?

9      A.   Correct.

10      Q.   And those list the amount that was received by Dr.

11   Bajoghli's practice for those various pathology billings,

12   right?

13      A.   Yes.

14      Q.   And, it may or may not go on to the next page, I

15   don't remember.  But that's at least most of the

16   pathology counts here, correct?

17      A.   I think it's all of them.

18      Q.   Okay, thank you.  And, in those instances, those

19   are instances where Dr. Bajoghli's practice billed for

20   both what's called the technical component and the

21   professional component of slide reading, correct?

22      A.   Correct.

23      Q.   So, in the typical slide reading as you're aware

24   from your review, under this particular code, you can

25   bill for either the technical component or the

 1   professional component or both; is that right?

 2       A.   Right.

 3       Q.   And, you put a modifier on it to determine whether

 4   it's the technical component or the professional

 5   component instead of both, right?

 6       A.   If you don't put a modifier, it's considered

 7   global, but, yes, if you put one of the modifiers on.

 8       Q.   So this would be the global amount that was would

 9   received for most if not all of these?

10       A.   Yes.

11       Q.   Because there was no modifier put on it, correct?

12       A.   Correct.

13       Q.   And just to be make sure we're clear about this,

14   the technical component is actually just the taking the

15   tissue and mounting it on to a slide, right?

16       A.   There's other things that go into it, yes, that's

17   the --

18       Q.   But, it's generally what's going on?

19       A.   Generally what's going on.

20       Q.   And the professional component is the actual

21   looking at it under a microscope?

22       A.   Correct, and rendering a diagnosis.

23       Q.   Right, like what Dr. Lang, Dr. Rosic, Dr.

24   Patterson did?

25       A.   Correct.

1    Q.   And if you do both of those, under this one code,

2    you can bill for both, right?

3    A.   If you do both of them, you can bill for both,

4    correct.

5    Q.   The vast majority of Dr. Bajoghli's pathology

6    billings are only for the professional component; isn't

7    that right?

8    A.   No, that's not true.

9    Q.   Over the course of this time?

10   A.   That's not true.

11   Q.   That's not true.  But, you are aware that there

12   are a number of times that the billings were actually

13   done for just the professional component using that

14   modifier?

15   A.   My understanding is that Dr. Bajoghli was paid

16   approximately $631,000 for --

17             MR. WHITE:  Your Honor, please -- this is

18   completely nonresponsive.  This is an effort to pollute

19   this record with irrelevant evidence.

20             Motion to strike.

21             THE COURT:  The question that was asked did

22   not call for a monetary amount, so the objection is

23   sustained.

24             Ladies and gentlemen of the jury, don't get

25   caught up in the numbers.  That's not really what the

1    issue is.  The issue is whether or not these claims were

2    false.

3              THE WITNESS:  Pardon me, I'm sorry.

4    BY MR. WHITE:

5       Q.  So, there are instances where there -- my question

6    is, there were instances where the billing was done for

7    the professional component only by his practice?

8       A.  There were instances of that.

9       Q.  And those instances, you would get paid less than

10   the amounts here?

11      A.  Correct.

12      Q.  The ones here -- and as a matter of fact, there

13   were a number of instances, including some if not all the

14   ones here, where after the fact, there were corrected

15   claims submitted, right?

16              MR. NATHANSON:  Objection, Your Honor.

17              THE COURT:  Sustained.

18   BY MR. WHITE:

19      Q.  You're aware that there was a procedure to correct

20   claims after they're submitted?

21              MR. NATHANSON:  Objection, Your Honor,

22   relevance grounds.

23              MR. WHITE:  He's testified to how he got this

24   money.

25              THE COURT:  The objection is sustained.

1          MR. WHITE:  Okay.  Court's indulgence one

2    moment.

3    BY MR. WHITE:

4      Q.  If we could go back to Janet Buccola which I was

5    asking you about before and if I could get you to put up

6    I think it's 12-C.

7      A.  May I have 12-C?

8      Q.  Sure.

9          MR. WHITE:  If you could blow up the top half

10   of that, please.

11     A.  Yes, sir.

12     Q.  And if you recall, this was one of the ones that

13   we were talking about.  I think you said you did not look

14   to see when this frozen section report was typed up in

15   the metadata.

16     A.  We did not look at the metadata.

17     Q.  You did not look at the metadata for that --

18     A.  We did not --

19     Q.  -- frozen section report, correct?

20     A.  I'm sorry.  I talked over you, pardon me.  Would

21   you ask that question.

22     Q.  Let start that over for the court reporter.

23          You did not look at the metadata for the frozen

24   section report that led you to put SK in the column on

25   your chart for Janet Buccola, correct?

1    A.  We did not look at the metadata.  That's correct.

2    Q.  So you don't know when that document was last

3  modified, correct?

4    A.  I don't know when that document was last modified.

5    Q.  But this is the procedure that's charged as to

6  Janet Buccola, correct?

7    A.  I believe it's the mandible.

8    Q.  So it's the left mandible, basal cell carcinoma

9  which actually is what you recall it being?

10   A.  Yes.

11   Q.  Correct.  And you see that tech listed to the

12  right there, CH?

13   A.  Yes.

14   Q.  That's Colleen Hyde, correct?

15   A.  I believe it is.

16   Q.  The cooperator that you were paying and getting

17  information from regarding Dr. Bajoghli's practice,

18  right?

19   A.  CH is Ms. Hyde.

20   Q.  Okay.

21   A.  Ms. Hyde.

22   Q.  Ms. Hyde's sister, Jennifer Hyde still works for

23  Dr. Bajoghli; isn't that correct?

24   A.  To the best of my knowledge, that's true.

25   Q.  Okay.  Okay.  Thank you.  That's all I have with

1    the file.

2         Now, as to your Metasoft review --

3              MR. WHITE:  Court's indulgence one moment.  I

4    apologize.

5              Would you bring up Government's Exhibit 305,

6    please.

7    Q.   And, what I particularly want to focus your

8    attention on, Special Agent Palian, is the Bajoghli

9    section.

10   A.   Yes, sir.

11   Q.   And, the column that says per schedule, that's the

12   column that you got from review of data stored in

13   Metasoft; is that correct?

14   A.   I think the column says per Metasoft.  It doesn't

15   say per schedule.

16   Q.   I'm looking at the wrong version, I apologize.

17   Per Metasoft, thank you.  That's the column that you

18   obtained by looking through the Metasoft scheduling data,

19   correct?

20   A.   Yes.

21   Q.   And you had bought a version of Metasoft

22   scheduling -- the Metasoft program, correct?

23   A.   Yes, we purchased a version of Metasoft.

24   Q.   Is that what you used to look at it or did you not

25   need it for that purpose?

1     A.   We didn't need it for that purpose.  It was just
2     in the Excel spreadsheet.
3     Q.   Gotcha.  Okay, so and I think you said that you
4     had triple checked all of the information on here to make
5     sure it was right?  Is that correct?
6     A.   That's correct.
7     Q.   I'm going to show you what I'm having marked as
8     Defense Exhibit 164.  Copy to the government.
9          I apologize, there are two.
10          If you would hand that to the witness, please.
11          I'm showing you Defense Exhibit 164.  Do you
12    recognize that to be the spreadsheet?  I apologize it's
13    several pages taped together, but that is a spreadsheet
14    that comes from the Metasoft program.  You recognize
15    that?
16    A.   It looks like Metasoft.
17    Q.   Sure, and that's for the date, August 7th, 2012,
18    correct?
19    A.   Where would I find that on here?
20    Q.   I believe it's at the top.
21    A.   Yes.
22    Q.   Okay.  And, on August 7th, 2012 -- could I ask you
23    to blow up the bottom two lines of the chart that is
24    Government's Exhibit 305.
25          So, on August 7, 2012, what you recognize to be a

1   Metasoft schedule spreadsheet from Dr. Bajoghli's

2   practice, does in fact show that he was in Tysons in the

3   morning, correct?  It's the column all the way to the

4   left.

5       A.  Yes.

6       Q.  And the bottom of that in the afternoon, when the

7   actual wound closures were done on August 7th, actually

8   indicates that he was where?

9       A.  I don't think that indicates that he was at

10  Woodbridge.

11      Q.  The bottom left --

12      A.  But, I don't think that's what that means.

13      Q.  So, the document says that he was in Woodbridge

14  while those closures were done, right?

15      A.  I don't know that it says that.

16      Q.  Doesn't your understanding -- I thought your

17  understanding was that you would look at where the

18  location was by Dr. Bajoghli to fill in this chart,

19  correct?

20      A.  Yes, it says right here, Dr. Bajoghli Tysons.

21      Q.  So Dr. Bajoghli is in Tysons and it's got patients

22  listed on the Tysons location in the morning, correct,

23  for Dr. Bajoghli.

24      A.  It does.

25      Q.  Indicating that he was in Tysons in the morning,

1    which is why you put Tysons here, correct?

2        A.   Yeah.

3        Q.   It also has patients listed in Woodbridge in the

4    afternoon when these closures were done, correct?

5        A.   Um, it has patients under his -- his thing here,

6    yeah.

7        Q.   Under his name, and that's what you used when

8    there were patients listed under his name, that's how you

9    would use this to figure out where he was, correct?

10       A.   Again, we used where it said he was, yes.

11       Q.   And this document says he was actually in

12   Woodbridge, while those closures were being done, doesn't

13   it?

14       A.   I don't know if I see that.

15       Q.   I thought you said that you used the location of

16   the appointments in the scheduler to determine how to

17   fill in per schedule where he was?

18       A.   We did.

19       Q.   Right.  And this document indicates --

20            MR. NATHANSON:  Your Honor --

21            MR. WHITE:  -- that he saw patients in

22   Woodbridge.

23            THE COURT:  Hold on.

24            MR. NATHANSON:  I'm going to object on

25   foundation grounds.  We don't know the providence of this

1    and -- maybe we should approach, Your Honor.

2              THE COURT:  All right.

3              (Thereupon, the following side-bar conference

4    was had.)

5              MR. NATHANSON:  So, Your Honor, my objection

6    is as follows.  This is incredibly confusing and

7    misleading to the jury because this is a document -- I'm

8    seeing this for the first time today.  Presumably, this

9    was produced from the defendant's schedule that's been in

10   his exclusive custody and control since the search

11   warrant.  And our material is obviously based on what we

12   seized during the search warrant.

13             We're now going to have to elicit on redirect

14   that our material is based on stuff that was obtained

15   during the search warrant, and we had agreed with

16   Mr. White not to mention the search warrant.

17             This obviously reflects a change that was

18   made to the schedule after the material was obtained, and

19   I just want to be clear that, you know, this is opening

20   the door to our redirecting Special Agent Palian to

21   discuss the circumstances that he received the data.

22             The defense has never -- despite being

23   offered has never sought to obtain a copy of our imaging

24   of the schedule, and that this is -- this is based

25   entirely on something that's been in the defendant 's

1    control.  And we have evidence that certainly we can put

2    on in rebuttal case that he altered the schedule after

3    the search warrant was conducted.

4              MR. WHITE:  In serial fashion, none of this

5    requires them to say that there was a search warrant

6    executed.  But that's not the biggest part of this, but

7    it can very easily be done to say that nobody's going to

8    object.  They know that they got all of his data in

9    August 2012.

10             If they have a witness who can come on and

11   say what they got is different than that, they can use

12   it.  This is what's on there.

13             The agreement was that we would use the

14   native information we had.  They would use what they had.

15   That's what this is.  This came off that.  That was

16   there.  They never looked.

17             MR. NATHANSON:  I want a stipulation in front

18   of the jury that this comes from a computer program

19   that's been in the defendant's control for the last three

20   years.

21             THE COURT:  Well, first of all, he hasn't

22   offered it in evidence.  He just had the witness identity

23   it and go through it.  He hasn't offered it in evidence

24   at all, right?

25             MR. NATHANSON:  Yes, Your Honor, and we

1    object to the admission.  But he's also reading from it,

2    which is improper.  If it can't be submitted he can ask

3    him questions, but he's presenting it as fact to the jury

4    that the schedule that supposedly the government had in

5    its possession is different from summarized -- Special

6    Agent Palian's summary exhibit.

7            THE COURT:  He certainly is doing that, but

8    he has not offered this document into evidence yet.  And

9    so I understand you to be saying that you need now to

10   bring up the search warrant.  I don't think you need to

11   bring up the search warrant at all.

12           I think you can bring up the fact you were

13   given a set of documents from Dr. Bajoghli's office.

14   That's what he prepared it from.  This document you don't

15   know what it was prepared from.  From the standpoint of

16   fairness, and if he has a witness that can offer or show

17   where this came from, that would be different, but he

18   hasn't offered it in evidence.

19           MR. NATHANSON:  And certainly, Your Honor, I

20   expect to elicit from Special Agent Palian that an image

21   of what was -- I won't say seized, but what was obtained

22   by the government in August was never requested by the

23   defense.  So this is necessarily based on the computer

24   program that's been in the defendant's control all this

25   time.

1           THE COURT:  I don't have any problem with

2     that.

3           MR. WHITE:  I don't know whether that was

4     requested by defense or not matters.  I can't see why it

5     does.

6           MR. NATHANSON:  We made it available in

7     discovery.  We offered you.

8           MR. WHITE:  That's fine.  We agreed we would

9     use this.  If they've got evidence, they actually look

10    and they have evidence this is different, I think we'll

11    hear about it.

12          THE COURT:  Well, the thing is, you're

13    sponsoring an exhibit.  You have to lay the foundation

14    for it.  You have to show reliability.  You haven't shown

15    that.  All you've done is question the witness, produced

16    something to him and it's not in evidence.

17          MR. WHITE:  I do understand.  And I'm not --

18          THE COURT:  So to be clear in terms of your

19    objection, A, I don't think you can bring up the word

20    search warrant.  I think you can bring up that the agent

21    prepared his data based on an image of business records

22    produced by Dr. Bajoghli.  "Produced by Dr. Bajoghli"

23    doesn't sound like search warrant.

24          And, you go with him, that he is very careful

25    in going over what he did.  And that's what he has and

1    that's different from this.  That's as far as you can go.

2              MR. WHITE:  And just for the record, we make

3    a specific *Brady* request for their actual data regarding

4    that afternoon and whether it's the same or different

5    from the one we have.

6              THE COURT:  We're in trial.

7              MR. WHITE:  I understand.

8              THE COURT:  If you looked at discovery from

9    now, it's not going to happen tonight.

10             MR. WHITE:  I think it will, because they're

11   going to prove it's different.

12             MR. NATHANSON:  Your Honor, if -- it's going

13   to take several days.  If they want to provide us a hard

14   drive we can give them a copy of the image.  It took the

15   FBI several days to do that.  We made that available to

16   the defense a year after, and we're in trial right now.

17   We can do our best to produce it.

18             THE COURT:  We're not starting over.  We're

19   in trial now.

20             You understand what my ruling was?

21             MR. NATHANSON:  I understand and certainly

22   will -- I will attempt to hone it to the word in that

23   regard.  I'll do the best.

24             THE COURT:  Okay, we will stop at 12:30 any

25   way.

1              (Thereupon, side-bar was concluded.)

2              THE COURT:  Ladies and gentlemen, in fairness

3    of the party, because I have to leave at 12:30 and this

4    matter is detailed than the other matters we looked at, I

5    think what I should do now is break now for lunch until

6    1:30.

7              My plan is to be back at 1:30, but I've not

8    been to this judge's meeting so I'm not sure how long

9    it's going to take.  But I'll let you be informed if I am

10   longer than 1:30.

11             Please don't discuss the case.  Don't permit

12   the case to be discussed in your presence.  Leave your

13   notes in the jury deliberation room.  Thank you.

14             (Court recessed at 12:29 p.m. and reconvened

15             at 1:30 p.m.)

16             THE COURT:  Ready to bring the jury out?

17             MR. WHITE:  Yes.

18             THE COURT:  You can bring the jury out,

19   Mr. Toliver.  Thank you.

20             You may be seated.  All right, counsel, you

21   may proceed.

22             MR. WHITE:  Thank you, Your Honor.

23   BY MR. WHITE:

24   Q.  When we left off, Special Agent Palian, we were

25   talking about Defense Exhibit 164.  Do you still have

1  that in front of you?

2     A.  Yes, I have that.

3     Q.  That's the spreadsheet.

4          MR. WHITE:  Your Honor, I didn't have a copy

5  previously.  I gave a copy to your clerk so that you

6  could have one as well.

7          THE COURT:  Thank you very much.

8          MR. WHITE:  Thank you.

9  BY MR. WHITE:

10    Q.  Now, to be fair, you recognize this to be a

11 Metasoft run from the defendant's program that he kept in

12 his practice, right?

13    A.  It appears to be.

14    Q.  But this was not run off of the database that you

15 got on August 9th, 2012, correct?

16    A.  Correct.

17    Q.  It's run off the one that was kept at the practice

18 and you haven't had access to it since August 9, 2012.

19    A.  I'm sorry, I didn't mean to interrupt.  I have not

20 had access to it since August 9th, 2012.

21    Q.  And so whether somebody put this in after

22 August 9, 2012, you wouldn't know about that because

23 that's not the version you have, correct?

24    A.  I wouldn't know if there were alterations made

25 after August 9th, 2012.

1    Q.   And the data here purports to be for August 7th,

2    2012, correct?

3    A.   Correct.

4    Q.   And, it's -- the day that you got access to the

5    complete image of the computer of Dr. Bajoghli's practice

6    was two days later, August 9th?

7    A.   Correct.

8    Q.   And so you wouldn't know whether or not the

9    version you got had been completely filled out for

10   August 7th, 2012, by the time that you got access to it

11   on August 9th, correct?

12   A.   I don't know what was put in after August 9th,

13   2012.

14   Q.   And you don't know whether the August 7th calendar

15   had been completely filled out as of the date that you

16   got it?

17   A.   Somebody could have put in something after

18   August 9th, yes.

19   Q.   This document shows that he was in Tysons that

20   morning which is what your calendar entry says, right?

21   A.   Yes.

22   Q.   And, you also see that this document shows in the

23   far left column an abbreviation, WB and a bunch of

24   patient names under that for Dr. Bajoghli, correct?

25   A.   WB and then two patient names after that, yes.

1    Q.   Actually if you look at the far left, it's got WB
2    under Dr. Bajoghli, do you see that, the green and blue?
3    A.   Oh, yes, yes, yes.
4    Q.   So it looks like there's -- maybe ten patients in
5    the first column, another four in the second column and
6    then two in the third column?
7    A.   I see what you're talking about, yes.
8    Q.   All under Dr. B at WB?
9    A.   I was looking at the patients that were under
10   Tysons, you're right.
11   Q.   Okay.  Underneath -- just to be clear, underneath
12   the Tysons part, it's got a couple of patient names and
13   there's a line that says Dr. B at WB sometime in the
14   afternoon and two names, correct?
15   A.   Yes.
16   Q.   And then there's a separate column that has a
17   bunch more patient names with WB at the top, correct?
18   A.   Yes.
19   Q.   And, WB, you know to be the nomenclature they
20   would use for the Woodbridge office, right?
21   A.   Correct.
22   Q.   So this one appears to show that he was in
23   Woodbridge seeing these patients that afternoon, correct?
24   A.   You mean this data appears to show that?
25   Q.   Okay.  Now, you said that you tripled checked your

1   data before you made your chart, correct?

2       A.   Yes.

3       Q.   Did you quadruple check over lunch?

4       A.   Yes.

5       Q.   And what did you find?

6       A.   I found that it did say Dr. B at WB in there.

7       Q.   So, this is actually in your data, too, right?

8       A.   It's in my data.

9       Q.   So your data indicates that Dr. Bajoghli was

10  actually in the office at Woodbridge at this time,

11  correct?

12      A.   It says that.

13      Q.   And, when you triple checked it, you didn't find

14  that, did you?

15      A.   No.

16      Q.   And you know that issue is really important to

17  this case, don't you?

18      A.   Yes.

19      Q.   As a matter of fact, nobody from the government

20  even told me that you checked it and found out that he is

21  in fact innocent of those charges because he was there;

22  isn't that true?

23      A.   I'm not able to render a judgment on innocence or

24  not innocent.

25      Q.   You know that it matters whether he was there,

1    right?

2        A.   I don't know what insurance companies these people

3    are for, so I don't know how those charges stack up.

4    It's not for me to judge that.

5        Q.   But you got it wrong when you triple checked it,

6    didn't you?

7        A.   What I summarized in my chart was where he was

8    based on the top there.  That's where he was generally

9    all day, and we were told that he didn't change places so

10   that's why I summarized with what was on the top where he

11   says he was all day.

12       Q.   You were told he didn't change places.  Who were

13   you told that by?

14       A.   We were told by his staff.

15       Q.   By his staff.  And you trusted his staff, people

16   like Colleen Hyde?

17       A.   I trusted his staff, yes.

18       Q.   Turns out they were wrong here.  He actually was

19   in two places on that day, wasn't he?

20       A.   I don't know that.

21       Q.   According to this data that's what it says,

22   doesn't it?

23       A.   According to this data, it suggests that he might

24   have been in Woodbridge, but I don't know that.  I

25   wouldn't have personal knowledge of that.

1    Q.  But you have no problem telling the jury that

2  people had told you he didn't change locations, right?

3    A.  That's correct.  That's what I was told.

4    Q.  And you don't know if they're right either, do

5  you?

6    A.  I was only told that.

7         MR. WHITE:  Your Honor, at this point we move

8  the admission of Defense Exhibit 164.  Seek to publish.

9         MR. NATHANSON:  No objection, Your Honor.

10         THE COURT:  164 will be received.

11         MR. WHITE:  May I use the Elmo, please?

12         THE COURT:  Yes.

13  BY MR. WHITE:

14    Q.  Okay.  You see in the upper left corner of this

15  document that says August 7, 2012, correct?

16    A.  Yes.

17    Q.  And you see during the across the top column, it

18  says that Dr. Bajoghli in Tysons today?

19    A.  Correct.

20    Q.  Do you see that?  And you see across this column,

21  a list of other patients that he saw in Tysons in the

22  morning, correct?

23    A.  Yes.

24    Q.  Okay.  And, the fact that this says in Tysons

25  today is what you used to create the exhibit that said he

1   was in Tysons when the wound closures were done in

2   Woodbridge, correct?

3        A.   Yes.

4        Q.   What you didn't look at previously was the bottom

5   of this page, did you?  You didn't look at that when you

6   put that chart together, did you?

7        A.   I don't recall it being -- looking like this.

8   That's the only --

9        Q.   But your version of it says that on it, doesn't

10  it?

11       A.   My version says on it Dr. B, Woodbridge.  I don't

12  recall the rest of it.

13       Q.   Your version has these two in red here?

14       A.   I didn't look at that.

15       Q.   Does your version have that?

16       A.   I don't know.

17       Q.   What did you -- you said you looked at something

18  over the break.

19       A.   Yes.

20       Q.   What did you look at?

21       A.   I looked at the Excel spreadsheet that had some of

22  this data, specifically for Dr. B at Woodbridge.

23       Q.   And the Excel spreadsheet had Dr. B at Woodbridge

24  that afternoon, right?

25       A.   That's what it said.

1     Q.   So when you created the summary chart, if you

2  could bring up Government's Exhibit -- which is the

3  summary chart that lists him incorrectly as being in

4  Tysons.

5           THE COURT:  305.

6           MR. WHITE:  305.  If you could bring up 305,

7  please, if we could switch.  If you could blow up the

8  bottom two, please.

9     Q.   So Government's Exhibit 305 which you said you

10 triple checked before you came to court and put it in,

11 lists two counts Marvin B and Joseph M as repair counts

12 here, doesn't it?

13    A.   It does.

14    Q.   And those two counts are actually charged in this

15 case, right?

16    A.   They are.

17    Q.   And, under Dr. Bajoghli location, you've got

18 Tysons, correct?

19    A.   Correct.

20    Q.   That's not true, is it?

21    A.   Again, according to the top of this chart it says

22 Dr. Bajoghli in Tysons.  That's what I relied on because

23 that was where he was ostensibly all day.

24    Q.   You said you relied on the Metasoft data to make

25 this chart; isn't that true?

1    A.   Yes.

2    Q.   The Metasoft data indicates he was in Woodbridge

3    that afternoon, doesn't it?

4    A.   The Metasoft data does say that it says, Dr. B at

5    Woodbridge.

6    Q.   That's the version you have had since 2012 that

7    shows that he was in Woodbridge that afternoon, correct?

8    A.   It says Dr. B at Woodbridge.

9    Q.   And so your own data shows that he was in

10   Woodbridge that afternoon, correct?

11   A.   Again, the chart says Dr. B at Woodbridge.

12   Q.   The chart -- the data you got on August 9, 2012,

13   lists him being in Woodbridge --

14   A.   That data says that --

15   Q.   -- that day, so that's wrong where it says that he

16   was in Tysons, correct?

17   A.   No, because he's clearly in Tysons that day.

18   Q.   That morning.

19   A.   All I see is Dr. B in Tysons today.  That's what

20   we based the chart on.

21   Q.   So you didn't bother to look and see if he

22   actually saw patients that afternoon in Woodbridge while

23   the wound closures were being done?

24   A.   I don't recall whether I checked that or not.  I

25   think I did.

1   Q.   When you triple checked this before you brought it

2   into the court and now represented to the Court and this

3   jury that the Metasoft data shows that he was not the

4   Woodbridge when they were done, you didn't bother to look

5   at the part of the chart that shows he was there, did

6   you?

7   A.   Which part, I'm sorry, I didn't hear.

8   Q.   The part of the chart at the lower left that you

9   had for three years now --

10  A.   I can't see from this where he -- it says Dr. B in

11  Woodbridge here.  I don't know where these patients were

12  seen.  It says Dr. B Tysons here underneath all that.

13  Q.   Okay.  So, were you right or wrong when you said

14  that he was in Tysons at the time?

15  A.   I was right.  He was in Tysons that day.

16  Q.   Okay.  But that very data you relied on to make

17  that determination shows he was in Woodbridge that

18  afternoon, doesn't it?

19  A.   The data says here Dr. B at Woodbridge.  I can't

20  tell what column this relates to, your far left column.

21  I can't tell where those patients were seen.

22  Q.   Okay.  Let's see if we can find out from the other

23  data you collect over time.

24       By the way, it says the provider on site was Janet

25  Rasmussen right?

1    A.   Where is that?

2    Q.   All the way to the right, licensed provider on

3  site.

4    A.   That's correct.

5    Q.   If Dr. Bajoghli was there, that would be wrong

6  too, wouldn't it?

7    A.   Yes, if Dr. Bajoghli was there, then we should

8  have put licensed provider on site, Janet Rasmussen, Dr.

9  Bajoghli.

10   Q.   And as you understand from the evidence in this

11 case, it makes a difference whether or not he was there?

12   A.   Yes.

13   Q.   That's why you triple checked?

14   A.   Yes.

15   Q.   Okay.  Let's go back again to the Elmo.

16        Okay.  So, on this Elmo, it lists a number of

17 patients that Dr. Bajoghli supposedly saw in Woodbridge

18 that afternoon, correct?

19   A.   Yes.

20   Q.   And, if we could go all the way to the right of

21 that chart, please.

22        It's a little bit harder to see here, but you can

23 probably read it on yours.  The far right column lists

24 Marvin Bryant, and Joseph Mitchell, right?

25   A.   Ann Kowatch,  Marvin Bryant and Joseph Mitchell,

1   yes.

2       Q.   And Marvin Bryant and Joseph Mitchell are wound

3   closures that were indicted and charged here, correct?

4       A.   Yes.

5       Q.   And they were charged here in part because Dr.

6   Bajoghli, according to your testimony, wasn't in

7   Woodbridge at that time; isn't that right?

8       A.   Correct.

9       Q.   And tell the jury what the time is that Marvin

10  Bryant and Joseph Mitchell's appointments were, according

11  to this calendar.

12      A.   It looks like 3:45 for Bryant and maybe 4 o'clock

13  for Mitchell.

14      Q.   3:45, 4 o'clock, somewhere there in the afternoon?

15      A.   In the afternoon.

16      Q.   If we could go back to the right column, in the

17  right column, you see at the right column at the top has

18  Dr. Bajoghli's name at the top, correct?  I'm sorry, the

19  left column has Dr. Bajoghli's name at the top,  correct?

20      A.   Yes.

21      Q.   And it says WB.  That means Woodbridge, right?

22      A.   Where does it say that?

23      Q.   WB, if you could look at the monitor, do you see

24  that?

25      A.   Yes.

1    Q.   And also the column just to the right of that it

2  says Dr. Bajoghli at WB, right?

3    A.   Yes.

4    Q.   And that would indicate, according to your

5  understanding of this schedule, that Dr. Bajoghli was in

6  Woodbridge from 1:15 or 1:45 on through the time period

7  of the appointments for the two people that the

8  government indicted counts for wound closure, correct?

9    A.   Correct.

10   Q.   And that document indicates that he was indeed in

11  the Woodbridge office when those closures were done,

12  doesn't it?

13   A.   The documents says that.

14   Q.   Well, let's see if we can find some corroboration

15  from other which -- other places in your file.

16        Do you see an entry for Richard Stritch,

17  S-T-R-I-T-C-H?

18   A.   Yes.

19   Q.   Richard Stritch, 3:30, you see that, right?

20   A.   Yes.

21   Q.   And that would indicate, as you understand this

22  document, that Dr. Bajoghli saw Richard Stritch in

23  Woodbridge at 3:30 that afternoon, correct?

24   A.   Yes.

25   Q.   Around the same time as the two wound closure

1   counts charged in this case, right?

2        A.   Correct.

3        Q.   Now, for -- for Richard Stritch, if we could

4   switch to the Government's Exhibit 95 at page 72, already

5   admitted in evidence, I believe.  Am I correct?  This is

6   already in evidence?

7             Government's Exhibit 95 is one of the documents

8   that you obtained from Dr. Bajoghli's practice, correct?

9        A.   Yes.

10       Q.   And, this is a business record of Dr. Bajoghli's

11  correct?

12       A.   Yes.

13            MR. WHITE:  And, if you could blow up the top

14  part of that, please.

15       Q.   So, this document shows Richard Stritch.  Does it

16  have a date of service on it?

17       A.   It does.

18       Q.   What's the date?

19       A.   August 7th, 2012.

20       Q.   Same date as the wound closures when Dr. Bajoghli

21  supposedly was not in Woodbridge, correct?

22       A.   Correct.

23       Q.   Does it have a location for where Dr. Bajoghli saw

24  Mr. Stritch?

25       A.   It says Woodbridge.

 1    Q.   So it's Woodbridge.  Does it have a time?

 2    A.   3:30.

 3    Q.   And that B at the top, your understanding is that

 4   means Dr. Bajoghli is the person who saw him, right?

 5    A.   It's my understanding.

 6    Q.   Okay.  If we could go to the bottom half of that

 7   document, please.

 8         And you recognize that the bottom right that's a

 9   signature for this super bill for Mr. Stritch's service

10   in Woodbridge on that afternoon, correct?

11    A.   Correct.

12    Q.   And 210 would be the amount that was billed,

13   right?

14    A.   I believe so.

15    Q.   And that looks like Dr. Bajoghli's initials there

16   similar to the other ones you've seen, correct?

17    A.   Similarly.

18    Q.   And that would mean that Dr. Bajoghli personally

19   saw Mr. Stritch at that time, right?

20    A.   That's my understanding.

21    Q.   Have you seen explanation of benefits forms in

22   connection with your work in this case?

23    A.   I have.

24    Q.   Handing to the government what's been marked as

25   Defense Exhibit 165, if I could give a copy to the

1    witness and the Court, please.

2         Defense Exhibit 165, does that appear to be an

3    explanation of benefits for Dr. Bajoghli's practice for

4    Mr. Stritch?

5    A.  Yes, it does.

6    Q.  And, does it show the billed amount of $210, the

7    same as the super bill that's been introduced in

8    evidence?

9    A.  Yes, it does.

10   Q.  And does it show the date of service?

11   A.  It does.

12   Q.  And that's August 7th, 2012, same date we've been

13   talking about?

14   A.  It is.

15   Q.  When Mr. Stritch was seen by Dr. Bajoghli in

16   Woodbridge, correct?

17   A.  Yes.

18        MR. WHITE:  We move 165, Your Honor, and ask

19   to publish.

20        MR. NATHANSON:  No objection, Your Honor.

21        THE COURT:  165 will be received.  You may

22   publish.

23   BY MR. WHITE:

24   Q.  Starting at the upper left, that's where it lists

25   Dr. Bajoghli's practice, correct?

1      A.   It is.

2      Q.   And patient's name is the same patient, Richard

3   Stritch?

4      A.   Correct.

5      Q.   And, for the middle of this page, it lists the

6   date of service and the billed amount, right?

7      A.   Yes.

8      Q.   And that billed amount is the same as the super

9   bill, correct?

10      A.   It is.

11      Q.   So this is related to Dr. Bajoghli seeing

12   Mr. Stritch in Woodbridge, right?

13      A.   It has Dr. Bajoghli's NPI number on it, yes.

14      Q.   You noticed the NPI number and you know that's Dr.

15   Bajoghli's?

16      A.   Yes.

17      Q.   Let's take a look -- if we could switch to

18   Government's Exhibit 95 at page 60, please.  Actually --

19   I want to show you one other patient on Defense

20   Exhibit 164.  You see a patient name Lilly Brown?

21      A.   Which patient?

22      Q.   Lilly Brown, the first one.

23      A.   Lilly Brown, yes.

24      Q.   You see that one?

25      A.   Yes.

1    Q.   So, that would say that Dr. Bajoghli saw Lilly

2    Brown in Woodbridge that afternoon 1:45, correct?

3    A.   Correct.

4    Q.   Now, if we could switch to Government's

5    Exhibit 95, already in evidence at page 60.  If you could

6    blow up the top part, please.

7         This is already in evidence.  We can get through

8    this quickly, I think.  This is a super bill for Lilly

9    Brown for when Dr. Bajoghli saw her in Woodbridge on

10   August 7, 2012, the afternoon where you have testified he

11   was in Tysons, correct?

12   A.   Correct.

13   Q.   And it shows that he actually did see Lilly Brown

14   and billed for service that day, correct?

15   A.   It appears that way.

16   Q.   And if we could go to the bottom of the page,

17   please.  And do you see a similar squiggle there.  That

18   would be where Dr. Bajoghli signed it?

19   A.   Correct.

20   Q.   If you could show you Defense Exhibit 166, please,

21   with the assistance of the court security officer.  This

22   is an explanation of benefits, is it not, for Lilly

23   Brown?

24   A.   Yes.

25   Q.   And this is for the same service you just saw the

1    super bill for?

2       A.   It is.

3       Q.   And this is the explanation of benefits that were

4    paid for Ms. Brown for the visit with Dr. Bajoghli in

5    Woodbridge on the afternoon of August 7, 2012, correct?

6       A.   It is.

7            MR. WHITE:  We move 166, Your Honor.

8            MR. NATHANSON:  No objection, Your Honor.

9            THE COURT:  166 will be received.

10   BY MR. WHITE:

11      Q.   And, very briefly, again, this document is similar

12   to the other one, has Dr. Bajoghli's provider number on

13   it, and shows that he billed for the service with

14   Ms. Brown on that date, correct?

15      A.   It does.

16      Q.   All right.  So, not to make a big a point of this,

17   if you could pull up Government's Exhibit -- which is the

18   one that has the location supposedly on it?  The 305?

19      A.   Which location?

20      Q.   That has the -- the one that lists that he was in

21   Tysons instead of Woodbridge when he was actually in

22   Woodbridge, that one.  305.

23           Could we bring that up, please.

24           So, Government's Exhibit 305, the last two lines

25   are the two people we've been talking about, Marvin

1    Bryant and Joseph A. Mitchell, Junior, correct?

2        A.   Correct.

3        Q.   And those are two indicted counts here, right?

4        A.   They are.

5        Q.   And, those are two indicted counts where the

6    theory is that Dr. Bajoghli was not there in the office

7    when the wound closures was down, right?

8        A.   Correct.

9        Q.   You made a mistake here, didn't you?

10       A.   I'd want to go back and check my data before I

11   said that, but the data -- the schedule does say Dr.

12   Bajoghli was in Woodbridge.

13       Q.   And the exhibits that the government introduced

14   show that he was in Woodbridge, right?

15       A.   Right.

16       Q.   You weren't trying to submit a fraud on the Court,

17   were you?

18       A.   Of course I wasn't.

19       Q.   You made a mistake?

20       A.   It was a mistake.

21       Q.   And after you triple checked it to make sure you

22   got it right, you still made a mistake?

23       A.   I made a mistake.

24       Q.   And that's not fraud, is it?

25       A.   If this is all correct, it's a mistake and it's

1    not fraud.

2        Q.  And your own data that you checked corroborates

3    everything that I just said, correct?

4        A.  Not everything, but the parts that I did check

5    corroborates what you say.

6        Q.  The parts that you check corroborate and the

7    exhibits that the government introduced and we just

8    introduced, they all corroborate it, right?

9        A.  They do so far.

10       Q.  So you have no reason to think that you were right

11   at this point when you put Tysons there, you were wrong

12   about that, correct?

13       A.  I -- before I say I was wrong about that, I'd like

14   to check all the data, but yes, I --

15       Q.  All right.  So the data the government introduced,

16   and the data that you checked over lunch indicates this

17   is wrong.  Fair to say that?

18       A.  Not wrong.  I mean he was in Tysons that day, so

19   I'm not really ready to say wrong.

20       Q.  Was he in Tysons when the wound closures were

21   done?

22       A.  No, not in Tysons.  Per the Metasoft schedule at

23   the top there, it said he was in Tysons that day.

24       Q.  But the Metasoft data we just went through that

25   you admitted was the same as your data shows he was in

1    Woodbridge that afternoon when these were done, doesn't

2    it?

3        A.   Again I'm not trying to belabor the point,

4    Mr. White, but again it says Dr. B at Woodbridge.  I

5    could confirm that.

6        Q.   Right.  And the documents that the government

7    introduced shows that he was in Woodbridge, right?

8    Government's Exhibit 95, those two pages I showed you,

9    they show he was in Woodbridge, don't they?

10       A.   Yes, they said that he was in Woodbridge.

11       Q.   And those were documents you've had for three

12   years as well, right?

13       A.   Correct.

14       Q.   And even though you've all this data for that

15   long, you still made a mistake, correct?

16       A.   If I check the data and it looks that way, yes,

17   I'll admit that I made a mistake.

18       Q.   Even though you triple checked it, you made a

19   mistake, didn't you?

20       A.   If it looks that way, I'll say I made a mistake.

21       Q.   And that's not fraud, it is?

22       A.   No, a mistake is not fraud.

23            MR. WHITE:  No further questions, Your Honor.

24                    REDIRECT EXAMINATION

25   BY MR. NATHANSON:

1    Q.   Special Agent Palian, I want to ask you a few

2    questions.  I want to first start briefly on 164 which is

3    the schedule that defense counsel showed you.

4    A.   Yes.

5    Q.   See if I can -- so -- so, this is the part that

6    Mr. White showed you that had to do with -- the top of

7    this is Dr. Bajoghli, right, on the left side?

8    A.   Correct.

9    Q.   Okay.  And wound repairs that are charged in this

10   case are part of Dr. Bajoghli's schedule; is that right?

11   A.   They're not part of Dr. Bajoghli's schedule.

12   Q.   And actually here on the other end of the

13   schedule -- I don't know if that's in focus or not.  They

14   appear on the far right; is that right?

15   A.   That's right.

16   Q.   And, they appear under header that says,

17   Woodbridge/nurse; is that right?

18   A.   Woodbridge/nurse, that's right.

19   Q.   Okay.  I just want to go through a couple other

20   topics that you discussed with Mr. White just briefly.

21        And I think I'll start, Special Agent Palian, with

22   the stuff on the easel that he started your

23   cross-examination with.

24        And you were asked a lot of questions about

25   different numbers.  Do you recall that?

1    A.  Yes, I do.

2    Q.  Okay.  And, were these numbers that you provided

3  or that Mr. White provided?

4    A.  I didn't provide those numbers.  Mr. White did.

5    Q.  And have you had an opportunity to verify whether

6  any of these numbers are correct?

7    A.  No.

8    Q.  And, I think at one point, you disagreed with the

9  denominator Mr. White was using on at least some of the

10 statistics?

11   A.  That's right.

12   Q.  And could you explain to the jury why did you not

13 agree with the percentage that he was calculating?

14   A.  Sure, so where we were talking about 4,000 Mohs

15 surgeries, yes, the defendant conducted 4,000 Mohs

16 surgery, but many of those came in after a frozen section

17 pathology which was conducted by an outside laboratory --

18   Q.  I'm sorry, you said a frozen section?

19   A.  Pardon me, a permanent section, where a laboratory

20 independently said this person had cancer.  What we were

21 interested in is the frozen sections where Dr. Bajoghli

22 was the only person to look at that.  So that's why I

23 disagreed with that denominator.

24   Q.  And during your cross-examination were you

25 provided with any statistic of how many instances Dr.

1    Bajoghli did a frozen section and it proceeded to Mohs

2    surgery?

3       A.   I don't believe I was.

4       Q.   And have you calculated such statistics as part of

5    this case?

6       A.   No.

7       Q.   Have statistics been part of your investigation

8    that resulted in the charges in this case?

9       A.   No, they haven't.

10      Q.   I want to focus next briefly on Government's

11   Exhibit 306, please.  Do you recall this one, Special

12   Agent Palian?

13      A.   Yes, I do.

14      Q.   And you were asked some questions by defense

15   counsel about the zeros and the repair and paid column.

16      A.   Yes.

17      Q.   Now, as part of this investigation, have you

18   become familiar with the CPT codes that get charged for

19   Mohs surgery?

20      A.   Yes.

21      Q.   And what's included in those CPT codes?

22      A.   What's included in that code is a simple closure.

23      Q.   So, in the instances where it says zero under the

24   repair paid, does that -- does the Mohs charge already

25   have included in it a payment for simple closure?

1    A.   Yes, it does.

2    Q.   And, based on your review of these code and the

3    claims in the case is there reduction in the amount paid

4    if the defendant decided not to do any closure at all?

5    A.   No, there's no reduction.

6    Q.   So, these are instances, the zeros, where no

7    complex closure was paid; is that are right?

8              MR. WHITE:   Objection to the leading and also

9    misstates his prior testimony which leads to second

10   intention healing.

11             MR. NATHANSON:   I'm happy to rephrase, Your

12   Honor.

13             THE COURT:   Rephrase.   Sustain the objection.

14   BY MR. NATHANSON:

15   Q.   And based on your review of the claims data, what

16   if any complex closures were charged where the zero

17   appears on the repair paid column?

18   A.   No complex closures were charged those days.

19   Q.   You can go ahead and take that down.   Thank you.

20        I want to move next to the questions you were

21   asked about a -- a cooperator in this case name Colleen

22   Hyde.

23   A.   Yes.

24   Q.   You recall those questions.   And, I believe you

25   testified on cross-examination that early on in the

1    investigation, you relied on Ms. Hyde to provided

2    documents; is that right?

3        A.    Correct.

4        Q.    Now, at that time -- and you were also asked

5    questions about Ms. Hyde's obtaining pills improperly.

6    Do you recall those questions?

7        A.    Yes, I do.

8        Q.    Okay.  And, early on in the investigation when you

9    were relying on what she was providing you, what if

10   anything did you know about this unlawful pill use?

11       A.    We didn't -- we didn't know about that unlawful

12   pill use at that time.

13       Q.    And approximately when did the FBI become aware of

14   that?

15       A.    I think it was October of 2014, but I'm not

16   positive.

17       Q.    You were asked questions about the fact that

18   Ms. Hyde was paid; is that correct?

19       A.    Yes, that's right.

20       Q.    And, are informants sometimes paid by the FBI?

21       A.    They are.

22       Q.    Is that consistent with FBI policy?

23       A.    Absolutely.

24       Q.    How much was Ms. Hyde paid in this case?

25       A.    I think it was $500.

1   Q.   How many times was she paid?

2   A.   Only once.

3   Q.   I want to turn next to the questions you were

4   asked about a patient named Mr. Purdie.  Do you remember

5   those questions?

6   A.   David Purdie, yes.

7   Q.   And, was Mr. Purdie's file something that the FBI

8   was focused on early on in the investigation?

9   A.   We were focused on it early on, yes.

10   Q.   And did there come a time when the FBI stopped

11   focusing on the Purdie case?

12   A.   Yes.

13   Q.   And is Mr. Purdie's Mohs surgery included in the

14   indictment in this case?

15   A.   It is not.

16   Q.   Is his Mohs procedure included in the list of 89

17   Mohs counts that have been admitted?

18   A.   It's not.

19   Q.   And you were also shown in connection with the

20   questions about Mr. Purdie's case, you were also shown a

21   page from the Mohs log.  Do you remember that?

22   A.   Yes.

23   Q.   Now at the time that you were focused on

24   Mr. Purdie's case, did the FBI have in its position at

25   that point the Mohs log?

1    A.   No, we did not.

2    Q.   I want to next turn your attention, Special Agent

3 Palian, to the question of the frozen section pathology

4 report for Larry Brooks.  Do you recall being asked some

5 questions about that?

6    A.   Yes.

7    Q.   Specifically about metadata?

8    A.   Yes.

9    Q.   And I believe you testified that as part of your

10 investigation, you did not obtain -- you did not

11 investigate metadata for various documents that are in

12 the patient files?

13   A.   We did not.

14   Q.   Now, in what form did the FBI obtain the documents

15 from the patient files, or the patient files themselves?

16   A.   The patient files themselves were in paper form.

17   Q.   Okay.  And, did there come a time after trial had

18 already started that you obtained metadata for a document

19 from the Larry Brooks patient file, at least the

20 electronic version?

21   A.   Yes, that's correct.

22   Q.   And, at that time with the assistance of the court

23 security officer, I'd like to pass you what we've marked

24 as Government's Exhibit 700.

25        MR. WHITE:  Your Honor, I don't care if

1    there's some foundational questions asked about this, but

2    I do have an objection to that if we get to that point.

3                THE COURT:  All right.

4                MR. NATHANSON:  I do seek to admit it, Your

5    Honor.  I don't know if we should go to sidebar or I

6    should try to lay a foundation first.

7                THE COURT:  Well, it's usually helpful to lay

8    a foundation first.

9                MR. NATHANSON:  Happy to, Your Honor.

10   BY MR. NATHANSON:

11      Q.  Do you recognize what we've marked for

12   identification as Government's Exhibit 700, Special Agent

13   Palian?

14      A.  I do.

15      Q.  And what do you recognize it as?

16      A.  This appears to be the metadata reports for Larry

17   Brooks' file produced by the FBI.

18      Q.  And is this something that you were involved in in

19   obtaining just as a matter of couple weeks ago?

20      A.  I was involved in obtaining it.

21      Q.  And is that the metadata for the document that

22   resembles what I believe is marked as Government's

23   Exhibit 2F?

24      A.  Yes.

25                MR. NATHANSON:  Your Honor, at this time we

1    move the admission of Government's Exhibit 700.

2                MR. WHITE:  My objection is foundation.  I

3    don't think he actually recovered that or can -- maybe he

4    can talk intelligently about it.  It's gobbly-gook to me.

5    I think it was done by a separate team at the FBI.  I

6    don't have a problem with asking him what he knows about

7    what it shows, even though --

8                THE COURT:  I think he just gave the

9    foundation.  He didn't say anything that he did it

10   personally.

11               He didn't say about him doing it personally,

12   did he, Mr. Nathanson?

13               MR. NATHANSON:  No, Your Honor.

14               THE COURT:  The objection's sustained.

15               MR. NATHANSON:  May we approach, Your Honor?

16               THE COURT:  I gave you a chance to lay your

17   foundation.  Do you have a foundation?  I gave you a

18   chance.

19               Come to sidebar.  Come to sidebar.

20               (Thereupon, the following side-bar conference

21   was had.)

22               MR. NATHANSON:  Your Honor, on

23   cross-examination, Mr. White asked Special Agent Palian

24   if he had obtained the metadata for this particular

25   document and he asked him questions about what that

1    metadata showed.

2         This is the document he relied on in answer

3    to Mr. White's questions.  And this is the document that

4    Mr. White had been willing to stipulate to several weeks

5    ago as to the correctness of the data.

6         I don't know how we can -- he can answer

7    questions about a topic that Mr. White has already raised

8    with him without referring to the actual document that

9    informed him what that metadata is.

10        MR. WHITE:  A couple of problems with that.

11   First off, the reason there was no stipulation is the

12   government wouldn't agree to it, but that's neither here

13   nor there for where we are right now.

14        This document has a lot of technical -- what

15   appears to be computer coding and path documentation on

16   it.  If they want to call someone to explain that, then

17   they could call the person who can speak to what that

18   means.  If he is a person who has the training to speak

19   to what that means, I suppose that's fine.

20        I'm not doubting the -- that the document --

21   that the document made sense to whoever got it.  But,

22   there's been no foundation that he has the ability to

23   interpret it.  And what it's going to present to the jury

24   is something extremely complicated that I don't believe

25   he has the technical expertise to explain.  And he's not

1    the person who did it.

2              If they want to admit that, they can call the

3    person who did it and he can explain what it means.

4              THE COURT:  Didn't you question him about the

5    metadata on the July 27th document?

6              MR. WHITE:  I did.

7              THE COURT:  And he answered those questions?

8              MR. WHITE:  He did.

9              THE COURT:  Did he have that document in

10   front of him when he did?

11             MR. WHITE:  He didn't.

12             THE COURT:  He did not.

13             MR. WHITE:  That's what -- I don't believe he

14   relied on the document.  I believe he relied on what the

15   document means, because that document doesn't say

16   anything that's intelligible to me.

17             THE COURT:  I don't remember any objection.

18   Did you object to his testimony about that?

19             MR. NATHANSON:  No, Your Honor.  Special

20   Agent Palian did obtain the document.  He relied on it.

21   Here's the issue.  There's -- this is a report of the

22   metadata regarding the documents.  Some of the document,

23   the metadata is helpful to them.  Some of them does not

24   support the argument they're trying to make.

25             And Mr. White is trying to get in the stuff

1    that helps him without the rest of it.  And the jury

2    needs to see the entire report of the metadata from the

3    documents to see it's not reliable.

4              THE COURT:  If you have the right witness,

5    you can do that.  You can also present -- I don't know

6    about the expertise of these jurors.  There might be

7    somebody on the jury who has IT experience who can read

8    that code.  I can't read it.

9              Can I see what it looks like?

10             MR. NATHANSON:  Yes, Your Honor.  May I get

11   it from the --

12             THE COURT:  Sure, uh-huh.

13             MR. NATHANSON:  So just to get to the crux of

14   it, Your Honor, so this is the exhibit.  So what they

15   want to do, what they've elicited from Special Agent

16   Palian is that the modified data, 72709I.

17             THE COURT:  He received that?  It could have

18   been a space, kind of at that --

19             MR. NATHANSON:  Who knows.  But the issue is,

20   this data is inherently unreliable because the created

21   and the access dates are actually after the modified

22   date.  And -- this is the metadata for the document we

23   all agree it's of the same document.

24             This is a unique identifier for the document,

25   actually provided to us by the defense.  And this is the

1    document that was produced by the FBI cart team, the

2    computer forensic team in response to their specific

3    *Brady* request that we obtained.  And we got it a couple

4    weeks ago in the middle of trial.

5            We turned it over and Mr. White asked

6    questions about this.  I have a right to ask about those

7    dates as well.  Because he answered on cross-examination,

8    Your Honor, that he didn't think the data was reliable.

9            And this -- this is why, I mean, in some

10   respects, Your Honor, this isn't being admitted for the

11   truth.  It's being admitted to explain Special Agent

12   Palian's answer which is why he didn't think the metadata

13   was reliable.

14           THE COURT:  You can ask him why he thinks

15   it's not reliable.  You can ask him if he tested the

16   information, if it revealed other dates.  But you can't

17   offer that in evidence because you can't lay a

18   foundation.

19           And again, I don't know what the jury knows.

20   We might have somebody on the jury, an IT professional

21   who can read this.  And -- and I think it's a sideshow

22   anyway, but go ahead.

23           MR. WHITE:  Your Honor --

24           THE COURT:  So, you can't admit it.  You can

25   ask questions about it.

1          MR. WHITE:  If I may, the problem with having

2   him answer the questions is the reason there are

3   origination dates after the date it was clearly created

4   is they had a server crash.  Everything had to transfer

5   to a new server.  That's the problem with having him

6   testify about this, because he's not going to know the

7   answers.  He's got to bring the right witness.

8          THE COURT:  I'm prepared to accept what you

9   say as an officer of the court, unless you have a witness

10  that says that means nothing to him.

11         MR. WHITE:  He can't have him say it because

12  he doesn't know either.  It would have to be someone

13  that --

14         THE COURT:  My judgment is you can ask him

15  questions about what he knows.

16         MR. NATHANSON:  I will ask him to explain why

17  he told Mr. White he thought the metadata was

18  inconclusive.

19         THE COURT:  That's fine.  Thank you.

20         (THEREUPON, side-bar conference was

21  concluded.)

22         THE COURT:  Ready to proceed, counsel?

23         MR. NATHANSON:  Yes, just waiting for the

24  court reporter.

25  BY MR. NATHANSON:

1    Q.  Special Agent Palian, we were -- I was asking you

2  questions about the metadata for a document that

3  resembles the Larry Brooks' frozen section report.  Do

4  you recall that?

5    A.  Yes.

6    Q.  And Mr. White asked you some questions about it as

7  well.  And, I believe your answer was something to the

8  effect that you thought the metadata was inconclusive?

9    A.  That's correct.

10    Q.  Why did you tell Mr. White that your conclusion

11  was inconclusive?

12    A.  One of the things that you can't determine from

13  the metadata is when the original document was created.

14  It's just not a part of that -- that metadata.

15       So if, for example, a document was created and

16  then copied, you would see different conflicting dates

17  with that because of how it was copied.  You would see a

18  creation date after a modified date possibly.

19    Q.  Okay.

20    A.  There's oddities with it that you can't really be

21  conclusive with it.

22    Q.  And was that your conclusion based on your review

23  of data related to this file?

24          MR. WHITE:  Objection, to his conclusion.

25          MR. NATHANSON:  Well --

1          THE COURT:  Sustained.

2   BY MR. NATHANSON:

3      Q.  And was that why your answer was that it was

4   inconclusive as to the Larry Brooks document.

5      A.  Yes.

6      Q.  And, were you able to determine -- excuse me.

7   Based on your investigation, were you able to determine

8   what the last print date was of the document?

9          MR. WHITE:  Objection, Your Honor.  It goes

10  beyond his -- his technical expertise.  He isn't the

11  person who retrieved this data, and I don't think he's

12  qualified to interpret it.

13         MR. NATHANSON:  I'm just asking what he

14  knows, Your Honor, what -- whether he was able to learn

15  it or not.

16         THE COURT:  Overruled.

17  BY MR. NATHANSON:

18     Q.  So, Special Agent Palian, based on your

19  investigation of metadata, were you able to determine

20  what the last print date was --

21     A.  No, I wasn't.

22         MR. NATHANSON:  No further questions, Your

23  Honor.

24         THE COURT:  May the witness be excused?

25         MR. WHITE:  I think he's going to stay but

1    for our purposes --

2              THE COURT:  I mean in terms of being called

3    again.

4              MR. WHITE:  We may call him again.

5              MR. NATHANSON:  He may be recalled.

6              THE COURT:  He may be recalled.  Okay, thank

7    you.

8              (Thereupon, the witness withdrew from the

9    stand.)

10             (Excerpt concluded at 2:13 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2

 3              I, Renecia Wilson, an official court

 4    reporter for the United State District Court of Virginia,

 5    Alexandria Division, do hereby certify that I reported by

 6    machine shorthand, in my official capacity, the

 7    proceedings had upon the excerpt testimony in the case of

 8    United States of America vs. Amir Bajoghli.

 9              I further certify that I was authorized and

10    did report by stenotype the proceedings and evidence in

11    said excerpt testimony, and that the foregoing pages,

12    numbered 1 to 155, inclusive, constitute the official

13    transcript of said proceedings as taken from my shorthand

14    notes.

15              IN WITNESS WHEREOF, I have hereto subscribed

16    my name this  30th day of  December, 2016.

17

18                              /s/
                           _____
19                           Renecia Wilson, RMR, CRR
                             Official Court Reporter

20

21

22

23

24

25
```